# EXHIBIT 1

*C.K., et al. v. McDonald, et al.,* No. 2:22-cv-01791-NJC-JMW

SETTLEMENT AGREEMENT

**TABLE OF CONTENTS**

I. GOALS AND OBJECTIVES ............................................................................ 1

II. RECITALS .................................................................................................... 2

III. OBLIGATION TO PROVIDE THE RELEVANT SERVICES ..................... 3

IV. THE IMPLEMENTATION PLAN ................................................................ 4

    A. Implementation Plan Requirements ................................................... 4

    1. The Process for Developing the Implementation Plan ................... 4

    2. Detailed Standards and Requirements for Each of the Relevant Services…5

    3. Eligibility Criteria .......................................................................... 8

    4. Reimbursement Rates ................................................................... 10

    5. Initial Quality Improvement Plan ................................................ 10

    6. Public or Stakeholder Access to Data ......................................... 10

    7. Service Delivery in the Least Restrictive Setting ........................ 11

    8. Input into the Development of the Implementation Plan .............. 11

    9. Network Adequacy Requirements ............................................... 12

    10. Educating Families and Other Stakeholders .............................. 12

    11. Disputes Regarding the Implementation Plan ............................ 12

    B. The Timeline for Development of the Implementation Plan ........... 13

V. THE QUALITY IMPROVEMENT PLAN ..................................................... 13

    A. QIP Performance Indicators .......................................................... 14

B. QIP Interim Utilization Targets ........................................................... 18

C. QIP Quality Improvement Procedures ............................................... 18

VI. THE AUDIT ............................................................................................. 22

VII. ROLLOUT AND DELIVERY OF THE RELEVANT SERVICES ............. 24

A. Obligation to Put the Implementation Plan into Effect ................................. 24

B. Other Reporting Requirements .......................................................... 24

C. Regular Review of Reimbursement Rates ............................................. 25

D. Corrective Action ........................................................................ 25

VIII. POWERS AND DUTIES OF THE INDEPENDENT REVIEWER ........... 25

IX. TERMINATION OF THE SETTLEMENT AGREEMENT ......................... 27

X. DISPUTE RESOLUTION AND ENFORCEMENT MECHANISMS ........... 29

A. Mediation of All Disputes by the Independent Reviewer ............................. 29

B. Court Enforcement and Appeal ......................................................... 31

XI. COURT APPROVAL ................................................................................. 32

XII. MISCELLANEOUS ................................................................................. 33

XIII. DEFINITIONS ....................................................................................... 37

APPENDIX A: The Relevant Services .............................................................. 41

APPENDIX B: Timeline for Development of the Implementation Plan…………48

## SETTLEMENT AGREEMENT

This Settlement Agreement concerns the civil action captioned *C.K., et al. v. McDonald, et al.*, Case No. 2:22-cv-01791-NJC-JMW, and is dated August 7, 2025, but it will not be effective until the date of final approval by the Court. This Settlement Agreement is by and between Defendants James V. McDonald, in his official capacity as Commissioner of the New York State Department of Health, and Ann Marie T. Sullivan, in her official capacity as Commissioner of the New York State Office of Mental Health, and Plaintiffs C.K. through his next friend P.K.; C.W. through her next friend P.W.; C.X. through her next friend P.X.; C.Y. through his next friend P.Y., for themselves and those similarly situated. This Settlement Agreement is conditioned on approval by the United States District Court for the Eastern District of New York, as required by Rule 23 of the Federal Rules of Civil Procedure.

## I.    GOALS AND OBJECTIVES

1. The goal of this Settlement Agreement is to enable Defendants to develop and improve upon their delivery of medically necessary, intensive home and community-based mental health services to Medicaid-eligible children with mental health conditions in New York State, to correct or ameliorate their conditions, in substantial compliance with Title XIX of the Social Security Act, and specifically the Early Periodic Screening, Diagnosis, and Treatment ("EPSDT") provisions of the Medicaid Act, 42 U.S.C. §§ 1396d(r)(5), 1396a(a)(10)(A), 1396a(a)(43) and 1396d(a)(4)(B); Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, 28 C.F.R. § 35.130; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

2. The specific objective of this Settlement Agreement is the development and successful implementation of a multi-year plan to provide timely access to intensive home and community-based mental health services statewide to children in the Classes, defined in ¶ 7 below, consistent with the Parties' shared goals and objectives described herein, in a sustained manner over time. This Settlement Agreement is intended to result in all members of the Classes' being provided medically necessary services on a timely basis.

3. These goals and objectives are intended to provide structure and guidance for the planning, implementation, future development, and sustainability of the service delivery system. The goals and objectives are not exit criteria, which are set forth in Section IX of this Settlement Agreement.

4. This Settlement Agreement shall remain in effect until the Termination Date.

1

## II.    RECITALS

5. Plaintiffs brought this lawsuit, entitled *C.K. v. Bassett* (the "*C.K.* Litigation"), now known as *C.K. v. McDonald*, filed March 31, 2022, Case No. 2:22-cv-01791, seeking certification of two classes and declaratory and injunctive relief against Mary T. Bassett**,** in her official capacity as Commissioner of the New York State Department of Health ("DOH"), and Ann Marie T. Sullivan, in her official capacity as Commissioner of the New York State Office of Mental Health ("OMH"). James V. McDonald is the current DOH Commissioner. The lawsuit was initially assigned to United States District Judge Brian M. Cogan, and subsequently assigned to the Hon. Nusrat J. Choudhury, United States District Judge, as Case No. 2:22-cv-01791-NJC-JMW.

6. Plaintiffs filed their First Amended Complaint on October 31, 2022 (Dkt. No. 34). The First Amended Complaint is the operative pleading in this action.

7. On February 22, 2024, the Court certified the two plaintiff classes (Dkt. No. 73), to which the Parties had stipulated for purposes of all causes of action in Plaintiffs' Complaint; the Classes are defined as follows:

    a.  An EPSDT Class of all current or future Medicaid-eligible children in New York State under the age of 21 (a) who have been diagnosed with a mental health or behavioral health condition, not attributable to an intellectual or developmental disability, and (b) for whom a licensed practitioner of the healing arts acting within the scope of practice under state law has recommended intensive home and community-based mental health services (as defined in Appendix A of this Settlement Agreement) to correct or ameliorate their conditions.

    b.  An ADA Class of all current or future Medicaid-eligible children in New York State under the age of 21 (a) who have been diagnosed with a mental health or behavioral health condition, not attributable to an intellectual or developmental disability, that substantially limits one or more major life activities, (b) for whom a licensed practitioner of the healing arts acting within the scope of practice under state law has recommended intensive home and community-based mental health services (as defined in Appendix A of this Settlement Agreement) to correct or ameliorate their conditions or who have been determined eligible for HCBS Waiver Services (as defined in Appendix A of this Settlement Agreement), and (c) who are segregated, institutionalized, or at serious risk of becoming institutionalized due to their mental health or behavioral health condition.

8. The Parties agree that the best interests of the Classes will be substantially advanced by the settlement of the *C.K.* Litigation based on the provisions reflected in this Settlement Agreement, rather than by a trial on the merits.

9. Nothing in this Settlement Agreement is intended to, nor does it, impair the rights of children to receive EPSDT services as mandated by state and federal law.

10. As more fully laid out below, Defendants have agreed to substantially redesign their mental and behavioral health service offerings to more specifically and appropriately address the needs of children in the certified Classes. The redesign will address all the Relevant Services, will take into account the concerns and criticisms that Plaintiffs have expressed, and will review and adapt effective practices from Washington, Massachusetts, and California, three states that have implemented intensive home and community-based services in response to litigation similar to the *C.K.* Litigation.

11. The Parties agree that Suzanne Fields shall serve as the Independent Reviewer in this matter and shall perform the functions specified in this Settlement Agreement.

    a. If Suzanne Fields becomes unable or unwilling to continue serving as the Independent Reviewer, Defendants and Plaintiffs will mutually agree upon an alternative Independent Reviewer who has substantial experience in the field of children's mental health services and Medicaid law, in particular EPSDT. If Defendants and Plaintiffs are unable to agree upon an alternative Independent Reviewer, the Parties will submit such dispute to the Court, which will select an alternative Independent Reviewer.

    b. The Independent Reviewer shall be retained by Defendants, at Defendants' expense, pursuant to the New York State Finance Law. (The Independent Reviewer, together with any additional identified subject matter experts retained by Defendants at their expense, at the recommendation of the Independent Reviewer in accordance with Section VIII of this Settlement Agreement, are collectively referred to as the "Independent Reviewer.")

## III.    OBLIGATION TO PROVIDE THE RELEVANT SERVICES

12. Defendants shall provide timely access to the following Medicaid-covered services to Class Members for whom such services are necessary to correct or ameliorate a behavioral or mental health condition: (1) Intensive Care Coordination,

(2) Intensive Home-Based Behavioral Health Services, and (3) Mobile Crisis Services. Defendants will redesign the current Children and Family Treatment and Support Services ("CFTSS") program and the HCBS Waiver Services program to create a more appropriate model of support for Class Members who meet the respective eligibility criteria.

13. This comprehensive intensive service array for the Classes will be referred to as the "Relevant Services"; each service is described in detail in Appendix A.

14. The Relevant Services will be provided in accordance with each child's needs and will be available in a timely manner and at the intensity (including frequency and duration) necessary to meet the individual needs of eligible children and their families.

15. Consistent with their obligations under the EPSDT provisions of the Medicaid Act, Defendants shall ensure sufficient numbers of providers are available to provide the Relevant Services to meet the needs of eligible children on a timely basis in all regions and areas of New York State. Defendants shall make training and technical assistance available to providers to meet the needs of specific populations having specialized needs.

## IV.    THE IMPLEMENTATION PLAN

16. Defendants shall develop and implement a Unified Implementation and Improvement Plan for the Relevant Services (the "Implementation Plan"), under which Defendants will provide timely access to the Relevant Services to Medicaid-enrolled children in New York State. The Implementation Plan shall be consistent with the provisions of Sections I and III of this Settlement Agreement and shall be developed in accordance with the timeline specified in Appendix B.

### A.    **Implementation Plan Requirements**

#### 1.    **The Process for Developing the Implementation Plan**

17. In developing the Implementation Plan, Defendants will work cooperatively with Plaintiffs and the Independent Reviewer. Defendants shall regularly provide Plaintiffs and the Independent Reviewer with information and documentation relevant to the development of the Implementation Plan, and timely updates on Defendants' progress. The Parties and the Independent Reviewer shall meet on a monthly basis, or more frequently as the Parties may agree, to discuss the status of the Implementation Plan. Defendants shall provide Plaintiffs and the Independent

Reviewer with drafts of the Implementation Plan, and sections thereof, in accordance with the schedule set forth in Appendix B of this Settlement Agreement.

18.  The Independent Reviewer and Plaintiffs shall have 15 days (or such longer period that the Parties may agree upon) to provide written feedback on such drafts, with subsequent drafts to be exchanged between the Parties and the Independent Reviewer prior to completion of the Implementation Plan.

19. The Parties, working together with the Independent Reviewer, will seek to reach agreement on the terms of the Implementation Plan. To the extent the Parties are unable to reach agreement, disputes as to the terms of the Implementation Plan shall be resolved as set forth in Section X of this Settlement Agreement. The Implementation Plan shall be subject to approval by the Court.

### 2. Detailed Standards and Requirements for Each of the Relevant Services

20. The Implementation Plan shall include detailed standards and requirements for each of the Relevant Services (the "Standards and Requirements"). The Standards and Requirements shall:

   a. Describe in detail the proposed service descriptions, provider requirements, intensity (including frequency and duration) with which services are provided, staff qualifications, supervisory qualifications, settings, limitations, rates, and required training, and the training and technical assistance workplan.

   b. Include a sufficient level of detail to provide clarity on the scope and expectations of the services to be provided and for which providers may submit a claim for Medicaid reimbursement.

   c. Ensure that Defendants provide intensive home and community-based mental health services consistent with its obligations under the EPSDT provisions of the Medicaid Act, and any approved HCBS Waiver Services.

21. For each of the Relevant Services, the Standards and Requirements shall be consistent with the following:

22. **Intensive Care Coordination**. The Implementation Plan shall specify that Defendants will provide Intensive Care Coordination ("ICC") to eligible children through High Fidelity Wraparound ("HFW") and Second Tier Intensive Care

Coordination ("ICC/2nd Tier"). Defendants may also provide Intensive Care Coordination through Youth Assertive Community Treatment services ("Youth ACT") to children eligible for Youth ACT.

23. The Standards and Requirements for HFW in New York shall provide that HFW will be in conformance and consistent with the fidelity standards of the High-Quality Wraparound Practice outlined in the Wraparound Implementation and Practice Quality Standards of the National Wraparound Initiative ("NWI Standards"). Defendants may impose additional standards and requirements for HFW, so long as they are not inconsistent with the NWI Standards.

24. The Standards and Requirements for ICC/2nd Tier and ICC provided through Youth ACT shall be consistent with the service description of ICC set forth in Appendix A. Defendants shall examine and adapt the effective standards and requirements used for ICC in Washington State, California, Massachusetts, and Ohio, and shall include a similar level of detail, including in proposed service descriptions, provider requirements, the intensity (including frequency and duration) with which services are provided, staff qualifications, supervisory qualifications, settings, limitations, rates, required training, and the training and technical assistance workplan.

25. The Standards and Requirements for HFW, ICC/2nd Tier, and ICC provided through Youth ACT shall also include the following:

   a. At any given time, as medically necessary, children and youth with complex mental and behavioral health needs may need more intensive care coordination services than any minimum specified by DOH, OMH, or their contractors. ICC providers shall be expected to provide such services at the intensity (including frequency and duration) needed by the child or youth they serve. OMH/DOH policy and guidance will outline expectations that providers of ICC shall provide the services described in the Standards and Requirements for ICC that specifically account for the individual needs of each child or youth.

   b. The requirements for in-person ICC cannot be waived or eliminated, and will not be satisfied by virtual, telehealth communications, except in accordance with the existing DOH Medicaid and OMH Telehealth Guidance permitting waiver of in-person requirements due to the "presence of a new or worsening declared public health emergency or other significant occurrence, such as a natural disaster, which impacts all or a specific segment of the population's ability to receive services in person, including the Telehealth Practitioner's ability to mitigate the

6

specific health risks, such as through the use of personal protective equipment or other environmental accommodations at the site of care" or similar exceptional circumstances. In particular, except as specified in ¶ 25.b, Defendants shall not permit providers to waive in-person ICC where the member receives other mental or behavioral health services in the home and is having regular contact with providers.

c. The ICC provider shall be responsible for providing or coordinating/arranging for the services that eligible children receive, including Intensive Home-Based Behavioral Health Services and other mental and behavioral health services, including Mobile Crisis Services as needed.

26. **Intensive Home-Based Behavioral Health Services ("IHBBHS")**. The Standards and Requirements for IHBBHS in New York shall be consistent with the service description of IHBBHS set forth in Appendix A. Defendants shall review and adapt the standards and requirements used for home and community-based services in Washington, Massachusetts, Ohio, and California, and shall include a similar level of detail, including in proposed service descriptions, provider requirements, the intensity (including frequency and duration) with which services are provided, staff qualifications, supervisory qualifications, settings, limitations, rates, required training, and the training and technical assistance workplan.

27. IHBBHS shall be available through Child and Family Treatment and Support Services ("CFTSS") and Youth ACT or through a new delivery mechanism developed in cooperation with the Independent Reviewer and Plaintiffs to meet the terms of this Settlement Agreement. With regard to CFTSS, Defendants shall redesign the program model for CFTSS to create capacity for an intensive service and level of support specifically tailored to meet the needs of Class Members. Defendants shall outline training and staffing requirements for the redesigned service, which shall be reflected in the Standards and Requirements for IHBBHS. The same Standards and Requirements shall apply to IHBBHS provided through Youth ACT.

28. Defendants will make available, through Youth ACT, a package of services provided by the interdisciplinary team that meets the requirements of ICC, IHBBHS, and Mobile Crisis Services set forth in Appendix A.

29. All children eligible for IHBBHS will receive IHBBHS through CFTSS or Youth ACT or through a new delivery mechanism developed in cooperation with the Independent Reviewer and Plaintiffs to meet the terms of this Settlement Agreement.

30. **Mobile Crisis**. The Standards and Requirements for Mobile Crisis Services in New York shall be consistent with the service description of Mobile Crisis Services set forth in Appendix A and shall be specifically designed to meet the needs of children and youth with mental and behavioral health conditions. Defendants shall review and adapt the standards and requirements used for mobile crisis services in Washington, Massachusetts, New Jersey, and California, and shall include a similar level of detail, including in proposed service descriptions, provider requirements, the intensity (including frequency and duration) with which services are provided, staff qualifications, supervisory qualifications, settings, limitations, rates, required training, and the training and technical assistance workplan.

31. The Standards and Requirements for Mobile Crisis Services shall provide (a) that Mobile Crisis Services will be available statewide on a 24/7 basis for Class Members, and (b) for a data gathering system to continually assess the utilization rates of Mobile Crisis Services for Medicaid-enrolled children. (*See* ¶ 69.)

32. **HCBS Waiver Services**. Defendants shall redesign the program model for the HCBS Waiver program to create an intensive model of support specifically to address the needs of children with significant mental health conditions, and shall outline training and staffing requirements for high intensity specialty services for Class Members. Defendants shall include intensive services through the HCBS Waiver for Class Members with Serious Emotional Disturbance ("SED").

33. HCBS Waiver Services will include services such as respite, caregiver support and training, in-home response, and additional intensive services that may be identified in connection with the development of the Implementation Plan. HCBS Waiver Services do not include medically necessary mental health services that are covered under the State Plan. Defendants will engage in a process with stakeholders including youth and families to identify additional intensive services that may be offered through the HCBS Waiver for children with SED and their families/caregivers.

34. The Implementation Plan shall include Standards and Requirements for each HCBS Waiver Service.

### 3. Eligibility Criteria

35. The Implementation Plan shall include eligibility criteria for each of the Relevant Services (the "Eligibility Criteria"). The Eligibility Criteria shall be designed to identify those children for whom the Relevant Services are necessary to correct or ameliorate a mental or behavioral health condition, and ensure that all children for whom the Relevant Services are medically necessary will be entitled

to the Services. The Eligibility Criteria shall not include any requirements for eligibility or exclusionary criteria, unless such requirements have a sound clinical basis.

36. The Eligibility Criteria for ICC and IHBBHS shall provide that a child will be eligible for such services when a Licensed Practitioner of the Healing Arts, acting within the scope of their license, recommends the service is necessary to correct or ameliorate a mental or behavioral health condition. The Eligibility Criteria shall also provide that:

   a. Upon such a recommendation, prior authorization by a managed care plan shall not be required for an initial delivery of services, not to exceed sixty (60) days.

   b. Defendants shall educate the provider community, local governmental units, and families about this path to eligibility for the Relevant Services and encourage practitioners to recommend the services when medically necessary for children with complex behavioral health conditions.

   c. Defendants also shall ensure that sufficient points of access are available to accept direct referrals from family members/caregivers, providers, managed care plans, and community or other stakeholders for the Relevant Services.

37. Defendants shall require the use of consistent procedures statewide to identify, screen, assess, refer, and link Medicaid-enrolled children for possible eligibility for ICC and IHBBHS.

38. The Eligibility Criteria may permit use of an assessment tool, such as Child and Adolescent Needs and Strengths, or "CANS," to identify children for whom ICC or any other Relevant Services may be medically necessary, but assessment scores shall not be used as a basis for excluding a child from receiving ICC or any other Relevant Service when other factors demonstrate that such Relevant Services are medically necessary.

39. The Eligibility Criteria shall not include any requirement that a Medicaid-enrolled child be age six or older to receive HFW or any other Relevant Services.

40. Defendants will ensure a Class Member is provided with a notice of any adverse benefits determination, grievance, appeal, or fair hearing rights, as applicable when Defendants or their Contractor denies or terminates a Relevant Service to a Class Member.

### 4.   Reimbursement Rates

41. For each Relevant Service, the Implementation Plan shall include (a) proposed reimbursement rates at which providers will be paid for delivering the service; (b) the proposed rate build, or other mathematical or actuarial model used for determining the reimbursement rate; and (c) all assumptions used in calculating the proposed reimbursement rates, and the basis for such assumptions. To the extent information related to such rate build, actuarial model, or assumptions is deemed confidential by Defendants, such confidential information will be shared with Plaintiffs, the Independent Reviewer, and the Court, but will not be made publicly available in the Implementation Plan or subsequent published reports.

42. The reimbursement rates reflected in the Implementation Plan, and the actual rates, which will be provided in any future iteration of the Implementation Plan, shall be set at amounts to ensure that payments to providers are consistent with efficiency, economy, and quality care and are sufficient to enlist enough providers to meet the needs of eligible children on a timely basis in all regions and areas of New York State, at least to the extent that they are available to the general population in the geographic area. There shall be a reasonable and sound basis for any models or analyses used to determine reimbursement rates, and for all assumptions used in connection with such models or analysis. The proposed and actual rates shall ensure that the goals of this Settlement Agreement are met, shall not negatively impact them, and shall be reviewed regularly in accordance with ¶ 90.

43. Nothing in this provision, or any other provision of this Settlement Agreement, shall relieve Defendants from (a) their statutory obligations to provide or arrange for the Relevant Services to be delivered to children under 42 U.S.C § 1396a(a)(43); 42 U.S.C. § 1396d(a)(4)(B); 42 U.S.C § 1396d(r)(5) or (b) their obligations under this Settlement Agreement to take Corrective Action to address Barriers to Access that are identified through the implementation of Defendants' Quality Improvement Plan.

### 5.   Initial Quality Improvement Plan

44. The Implementation Plan shall include an initial Quality Improvement Plan in accordance with Section V below.

### 6.   Public or Stakeholder Access to Data

45. The Implementation Plan shall address access to the data, and describe in detail how data regarding the Relevant Services shall be made available to relevant

persons, including the individual child service provider agency, managed care plan, and statewide and local entities.

46. The Implementation Plan shall require Defendants to develop, maintain, and update a publicly available data dashboard(s) containing data points related to the provision of the Relevant Services to children in New York, and will include a timeline for developing such data dashboard(s).

### 7.  Service Delivery in the Least Restrictive Setting

47. The Implementation Plan shall include the targeted strategies Defendants will undertake for providing all Class Members with medically necessary mental or behavioral health services in the least restrictive setting appropriate to their needs.

48. The Implementation Plan shall include the targeted strategies Defendants will undertake to avoid unnecessary admissions of Class Members to psychiatric hospitals, emergency departments, psychiatric residential treatment facilities, or other congregate settings for children with mental health conditions and children experiencing mental or behavioral health crises.

49. The Implementation Plan shall include the targeted strategies Defendants will undertake for ensuring that Class Members discharged from residential or institutional settings, emergency departments, or other out-of-home placements, timely receive the Relevant Services that they are eligible for, to prevent unnecessary readmissions to these institutions or residential settings.

### 8.  Input into the Development of the Implementation Plan

50. Defendants, the Office of Mental Health in collaboration with the Department of Health, will engage state agency partners OASAS, OCFS, OPWDD, and other state agencies as appropriate to inform and provide direction regarding the development of the Implementation Plan.

51. The Implementation Plan shall promote improved collaboration and coordination by child-serving agencies, state agencies, counties, and providers that deliver care to Medicaid-eligible children with mental or behavioral health conditions to ensure that the requirements of this Settlement Agreement are met.

52. Defendants will also convene an Implementation Advisory Committee comprised of relevant child-serving system and service stakeholders, such as local government personnel, family and youth representatives, and provider agencies, to make recommendations on the development of the Implementation Plan.

### 9.   Network Adequacy Requirements

53. The Implementation Plan shall specify revisions to the network adequacy requirements currently in place, so as to ensure that Medicaid managed care plans take into account the results of needs assessments and other relevant information (such as utilization and expenditures) to identify potential gaps in the provision of the Relevant Services or difficulties in accessing the Relevant Services.

54. The Implementation Plan shall include network adequacy requirements for providers of all the Relevant Services to ensure sufficient numbers of qualified and appropriately trained providers are available to provide all the Relevant Services to meet the needs of eligible children on a timely basis.

55. The Implementation Plan shall specify that network adequacy requirements for the Relevant Services for Medicaid managed care plans will not rely on a specific number or fixed percentage of providers operating in the county or other catchment area. The Medicaid managed care plans shall have an adequate network of providers who provide the specific Relevant Services, and shall identify such providers in their network directories and keep such directories current.

### 10. Educating Families and Other Stakeholders

56. The Implementation Plan shall include a description of how Defendants will inform eligible children and their families/caregivers, and educate and involve the provider community and relevant state and local public child-serving agencies, regarding availability and delivery of the Relevant Services.

57. The Implementation Plan shall include plans to address particular service deficiencies that affect underserved communities, such as populations having specialized needs, which include, but are not limited to, BIPOC and LGBTQIA+ populations, and youth involved in the child welfare and juvenile legal systems.

### 11. Disputes Regarding the Implementation Plan

58. In the event of any dispute between Plaintiffs on the one hand and Defendants on the other hand regarding the terms or potential terms of the Implementation Plan, such dispute shall be resolved in accordance with the dispute resolution mechanism set forth in Section X of this Settlement Agreement. After the Implementation Plan is approved by the Court, any substantive modification to the Implementation Plan shall require the approval of Plaintiffs and the Court.

### B.  The Timeline for Development of the Implementation Plan

59. The Parties shall use their best efforts to adhere to the timeline as set forth in Appendix B for (a) Defendants' delivery of initial drafts, together with supporting documentation, for the standards and requirements, eligibility criteria, reimbursement rates, benchmarks and interim targets, and other requirements of the Implementation Plan; (b) Plaintiffs' responses; and (c) monthly or other meetings of the Parties and the Settlement Consultant regarding these issues.

60. The Parties shall use their best efforts to adhere to the schedules and timelines in Appendix B and those the Parties may subsequently establish.  An agreement to modify timelines, without more, does not alter the substantive intent of this Settlement Agreement, but only extends the time by which the requirements will be accomplished.

61. The Parties anticipate that the Parties will finalize and Defendants will seek approvals for the Implementation Plan within 18 months from the Effective Date of this Settlement Agreement.

## V.    THE QUALITY IMPROVEMENT PLAN

62. The Implementation Plan shall include an initial Quality Improvement Plan ("QIP"), which will establish a system of data-driven quality improvement that reviews, measures, and reports on a set of Performance Indicators related to the Relevant Services.

63. On an annual basis thereafter, and continuing until the termination of this Settlement Agreement, Defendants shall issue an updated QIP, reflecting Defendants' experience in providing the Relevant Services to Class Members. The Parties anticipate that the QIP will evolve over time during the Rollout of the Relevant Services.

64. The initial QIP and the updated QIPs will be developed in consultation with the Independent Reviewer, Plaintiffs, and the Implementation Advisory Committee (and state agency partners, as needed), for the purpose of providing transparency and accountability to Class Members and their families/caregivers. Court approval of the initial QIP and annual updated QIPs shall be required.

65. As the QIP evolves during the course of the Rollout, the QIP will come to include the (a) Performance Indicators; (b) Interim Utilization Targets; and (c) Quality Improvement Procedures specified in this section of the Settlement Agreement. The Parties do not anticipate that all the requirements set forth herein

13

will be included in the initial QIP. The timing and sequencing for updating the QIP to include requirements not set forth in the initial QIP shall be determined by the Parties in consultation with the Independent Reviewer. Any disputes over the timing and sequencing of the QIP requirements or the substance of the initial or updated QIPs shall be resolved in accordance with Section X of this Settlement Agreement.

### A. **QIP Performance Indicators**

66. The Performance Indicators shall include measures of the provision, timeliness, sufficiency, and effectiveness of the Relevant Services. The QIP shall describe the Performance Indicators in sufficient detail to reflect the manner in which each indicator will be calculated and presented.

67. The Performance Indicators shall include measures such as those described generally below, which shall be described with more specificity in the QIP and presented in a user-friendly format. The Parties anticipate that the QIP will include other Performance Indicators not listed below, to be agreed upon in the Implementation Plan, or thereafter.

68. When Performance Indicators require the development of new data collection systems or processes not currently available, the QIP shall outline the steps that will be taken to create and build such systems and processes, to be agreed upon by the Parties in the Implementation Plan, or thereafter.

69. If alternative Performance Indicators that more reliably capture performance are identified through the process of Implementation and are recommended by the Independent Reviewer, then those recommended indicators will be used.

**Utilization Indicators**

(1) The numbers of unique Medicaid-enrolled children receiving each Relevant Service in each county.
(2) The period of time over which Medicaid-enrolled children receive each Relevant Service, except Mobile Crisis Services, and the quantity of each service received during that period.
(3) The average intensity (including frequency and duration) of each Relevant Service received by Medicaid-enrolled children, and visual representations showing the distribution of Medicaid-enrolled children receiving Relevant Services at various levels of intensity.

14

(4) The dollar expenditure for each of the Relevant Services, per child on average and in the aggregate.

(5) The percentage of Medicaid-enrolled children who receive ICC who also receive other Relevant Services, except Mobile Crisis Services, and the percentage of Medicaid-enrolled children who receive other Relevant Services, except Mobile Crisis Services, who also receive ICC.

(6) The demographic breakdown of Medicaid-enrolled children receiving each of the Relevant Services.

(7) The number of children enrolled in Medicaid receiving Relevant Services in their homes or where otherwise naturally located, by service type.

(8) The approval (as applicable), denial, and appeal rates for each of the Relevant Services at the aggregate service level, and the principal reasons for denial.

(9) The paid and denial rates for each of the Relevant Services at the aggregate claim level, and the principal reasons for denial.

**Mobile Crisis Service Indicators**

(10)  The number of requests for Mobile Crisis Services for a Medicaid-enrolled child. The Implementation Plan will define the terms "request" and "referral" in the context of Mobile Crisis services and corresponding measures.

(11)  The number and percentage of requests that resulted in a Mobile Crisis Service being provided to a Medicaid-enrolled child, and the number of such services that were provided in the home/ community and via telehealth.

(12)  The number of unique Medicaid-enrolled children who received a mobile crisis service, including the length of the intervention.

(13)  For requests that resulted in a Mobile Crisis Service being provided to a Medicaid-enrolled child, the average response time (*i.e.,* the time between the initial request for Mobile Crisis Services and when the child received the Mobile Crisis Service), and user-friendly data showing the distribution of response times, including the number and percentages of responses meeting or exceeding any required response time.

(14)  The number of Medicaid enrolled children who are referred to Mobile Crisis Services from (i) hospitals or emergency departments; (ii) schools; (iii) the child or family members/caregivers; (iv) law enforcement; (v) other community

15

providers, including providers of ICC and IHBBHS; and (vi) child welfare authority or juvenile legal authority referrals to the extent possible.

(15)  The number of Medicaid-enrolled children who received Mobile Crisis Services that resulted in any of the following: (i) ER/ED visits for mental or behavioral health reasons; (ii) inpatient hospital care; and (iii) crisis stabilization or crisis residential treatment.

**Timeliness Indicators**

(16)  The average time between the referral of a Medicaid-enrolled child for a Relevant Service, except Mobile Crisis, and the time an eligibility determination is made for the child (the "Time to Determination"), and visual representations showing the distribution of Medicaid-enrolled children referred for a Relevant Service at various Times to Determination. The Implementation Plan shall define the term "referral," and specify the start time for calculating the Time to Determination.

(17)  The average time between the determination that a Medicaid-enrolled child is eligible for a Relevant Service and the time the Service is first provided (the "Time to Service") and visual representations showing the distribution of Medicaid-enrolled children at various Times to Service, including the number and percentages of Medicaid-enrolled children for whom the Time to Service met or exceeded any requirement for the Time to Service.

**Consumer Experience and Satisfaction Indicators**

(18)  Results of standardized experience surveys from the families/caregivers of Medicaid-enrolled children receiving the Relevant Services.
   - The standardized survey instrument should be specifically designed to capture the experience of family members/caregivers, as well as young adults and youth, with behavioral health, mental health, and/or substance abuse services, such as the Consumer Assessment of Healthcare Providers and Systems ("CAHPS") Outpatient Mental Health Survey and the CAHPS Experience of Care and Health Outcomes ("ECHO") Survey.

16

- The standardized survey instrument should be specifically designed to encourage family members/caregivers to provide accurate information about services during and/or after hospitalization.

(19) Results of a consumer satisfaction survey utilizing a standardized tool to measure the level of satisfaction among patients/families using mental health services, including Relevant Services, such as the tool reflected at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10267972/.

(20) The Implementation Plan may provide for the standardized experience survey and the consumer satisfaction survey referenced above to be incorporated in one single tool.

**Inpatient, Residential, and ER/ED Treatment Indicators**

(21) "Inpatient, Residential, or ER/ED Treatment" for the purpose of this Settlement Agreement shall mean treatment in an inpatient hospital or psychiatric residential treatment facility, and other hospital-based treatment (including without limitation emergency room or emergency department), or in a residential facility as may be agreed upon in the Implementation Plan, to treat or evaluate psychiatric or mental or behavioral health conditions.

(22) The numbers and percentages of Medicaid-enrolled children diagnosed with mental or behavioral health conditions who receive Inpatient, Residential, or ER/ED Treatment; and the numbers and percentages of such children who also received the Relevant Services prior to admission and following discharge.

(23) The numbers and percentages of Medicaid-enrolled children diagnosed with mental or behavioral health conditions who receive multiple episodes of Inpatient, Residential, or ER/ED Treatment and the numbers and percentages of such children who also received the Relevant Services prior to each admission and following discharge.

(24) For the children described in ¶¶ (22) and (23) above, (a) the dollar expenditure for Inpatient, Residential, or ER/ED Treatment and (b) the dollar expenditure for each of the Relevant Services in the aggregate.

(25) The approval (as applicable), denial, and appeal rates for Inpatient, Residential, Outpatient, and ER/ED services to treat

psychiatric or mental or behavioral health conditions at the aggregate service level.

70. At an appropriate time as determined by the Parties in consultation with the Independent Reviewer, an updated QIP shall specify Baseline Data from the data sources from which improvements, including improvements in providing the Relevant Services to Class Members, can be measured.

71. Defendants will routinely and transparently measure, analyze, and communicate the Performance Indicators to the Independent Reviewer and Plaintiffs. The QIP shall specify the process by which Defendants will review and analyze the data.

**B.  QIP Interim Utilization Targets**

72. At an appropriate time as determined by the Parties in consultation with the Independent Reviewer, an updated QIP shall include interim targets for the Utilization Indicators ("Interim Utilization Targets") to assess progress of the Rollout of the Relevant Services.  The Interim Utilization Targets shall reflect the levels of service utilization that Defendants believe will be achieved during each successive six-month period of the Rollout.

**C.  QIP Quality Improvement Procedures**

73. The QIP shall identify procedures for assessing Defendants' progress toward providing the Relevant Services to Class Members with continuing improvement as necessary, and for identifying the need for appropriate Corrective Action, including without limitation the procedures specified in ¶¶ 74 to 77 below. The Parties do not anticipate that all the requirements for all the quality improvement procedures set forth herein will be included in the initial QIP. The timing and sequencing for updating the QIP to include requirements not set forth in the initial QIP shall be determined by the Parties in consultation with the Independent Reviewer. Any disputes over the timing and sequencing of the QIP requirements or the substance of such requirements shall be resolved in accordance with Section X of this Settlement Agreement.

74. **Provider Review**. For providers of the Relevant Services, an updated QIP shall specify policies and procedures for regularly evaluating the extent to which the provider is providing Relevant Services in accordance with the Standards and Requirements for each service, and the type of license/certifications of the persons providing the Relevant Services. The updated QIP shall specify:

   a.   The number of providers to be reviewed each year, and the manner in which the providers shall be selected for review.

   b.   The methodology for evaluating the provider's provision of the Relevant Services.

   c.   The criteria for determining whether Corrective Action is required, or for requiring the provider to take remedial action specific to the particular provider, to address service provision issues identified in the review.

75. **Service Recipient Review**. For Medicaid-enrolled children who receive the Relevant Services, an updated QIP shall specify procedures for regularly evaluating, at least on an annual basis, the extent to which such children timely received (i) appropriate assessments and service plans related to the Relevant Services, and (ii) the Relevant Services specified in the child's services plan, (iii) at the required intensity (including frequency and duration), and (iv) in the child's home or where the child is otherwise naturally located. The updated QIP shall specify:

   a.   The basis for selecting the sample of children receiving the Relevant Services, and the sample size, for the purpose of such review.

   b.   The methodology for evaluating the timeliness, scope, intensity (including frequency and duration), and location of the Relevant Services received by each child under review, and the quality of assessments and service plans relating to the Relevant Services. The methodology shall include use of the Wraparound Fidelity Index ("WFI"), and the Document Assessment and Review Tool ("DART"), included in the Wraparound Fidelity Assessment System promulgated by the National Wraparound Initiative. Defendants will work with national experts to adapt the WFI and DART tools, to the extent they are capable of being adapted, to evaluate ICC/2nd Tier not provided through HFW.

   c.   The methodology and tools must also be capable of measuring the effectiveness of the Relevant Services by addressing key outcomes of children receiving the Relevant Services.

   d.   The criteria for determining whether Corrective Action is required as a result of the evaluation described above, including a methodology for

using the results of the WFI, DART, or other appropriate tools to determine the need for Corrective Action.

  e.  The results of the WFI, DART, or other appropriate tools necessary to satisfy the Exit Criteria set forth in Section IX of this Settlement Agreement.

76. **Referred-But-Not-Received Review**. For Medicaid-enrolled children who were referred for the Relevant Services but did not receive them, an updated QIP shall specify procedures for evaluating whether the child did not receive the service as a result of Barriers to Access as defined below. The updated QIP shall specify:

  a.  The criteria for defining and identifying "Referred-But-Not-Received" for purposes of this evaluation. The criteria shall be determined with the assistance of the Independent Reviewer.

  b.  The data to be used in conducting such evaluation, including whether a sample set of data will be used. If so, the Implementation Plan shall specify the methodology for selecting the sample, and the sample size.

  c.  The methodology for evaluating whether the failure to provide services resulted from Barriers to Access affecting Medicaid-eligible children referred for the Relevant Services but did not receive them.

  d.  The criteria for determining whether Corrective Action is required as a result of such evaluation.

77. **Inpatient, Residential, or ER/ED Treatment Review**. For Medicaid-enrolled children who received Inpatient, Residential, or ER/ED Treatment for mental or behavioral health reasons meeting certain criteria to be specified in accordance with subsection a. below, an updated QIP shall specify procedures for evaluating whether the child did not receive or was not recommended for Relevant Services as a result of Barriers to Access, as defined below. The updated QIP shall specify:

  a.  The criteria for including Inpatient, Residential, or ER/ED Treatment for purposes of this evaluation. For example, the Parties may determine to focus primarily on children who had two or more hospital admissions or emergency treatments within a specified period of time, or who met some alternative criteria. The criteria shall be determined with the assistance of the Independent Reviewer.

20

b.  The information to be used in conducting such evaluation, including whether a sample set of data will be used. If so, the Implementation Plan shall specify the methodology for selecting the sample, and the sample size.

c.  The methodology for evaluating whether the failure to receive or be recommended for the Relevant Services resulted from Barriers to Access impacting Medicaid-eligible children.

d.  The criteria for determining whether Corrective Action is required as a result of the procedures described above.

78. "Barriers to Access" for the purpose of this Settlement Agreement and the initial QIP shall mean:

Obstacles to obtaining the Relevant Services resulting from the system of providing such Services to children, which may include without limitation, the need for additional education to families regarding the availability of the Relevant Services; the need for additional education and training to providers or MCOs regarding the Relevant Services; inappropriate or unduly restrictive eligibility determinations; eligibility criteria that, in policy or practice, are too restrictive and are excluding Medicaid-eligible children who need the Relevant Services to correct or ameliorate their conditions; lack of coordination among service providers or MCOs; polices or practices of DOH, OMH, the MCOs, service providers, or other health care partners hindering access to the Relevant Services; insufficient reimbursement rates or other factors contributing to an insufficient number of service providers; and other similar obstacles to obtaining care.

The Parties anticipate that this definition may evolve in updated QIPs, as informed by ongoing quality improvement procedures, stakeholder discussions, and community feedback.

79. Updated QIPs shall specify the process by which Defendants shall perform the evaluation identified above. The Parties and the Independent Reviewer will cooperate in determining whether Corrective Action is necessary under the criteria identified in the QIP.

80. Updated QIPs shall also outline how the quality improvement procedures, along with the data collected from the performance indicators, will inform the

overall achievement of qualitative and quantitative measures outlined in the annually updated QIP for the purposes of meeting Exit Criteria.

## VI.    THE AUDIT

81. In conjunction with the Independent Reviewer, Defendants shall conduct an annual audit (the "Audit") of their provision of the Relevant Services. The purpose of the Audit is as follows:

    a.  During the Rollout Period:

        i.  To allow the Independent Reviewer and the Parties to evaluate the Performance Indicators agreed upon in the QIP and determine the extent to which Defendants have met the Interim Utilization Targets to the extent they have been specified.

        ii.  To allow the Independent Reviewer and the Parties to evaluate whether providers are providing Relevant Services in accordance with the Standards and Requirements for such Services.

        iii.  To allow the Independent Reviewer and the Parties to evaluate whether recipients of the Relevant Services are timely receiving the Relevant Services recommended by an LPHA, at the required intensity (including frequency and duration), and in the child's home or where the child is otherwise naturally located¸ and that recipients of the Relevant Services also have received appropriate assessments related to such Services.

        iv.  To allow the Independent Reviewer and the Parties to determine whether Corrective Action is required under the QIP then in effect, or otherwise under this Settlement Agreement.

        v.  To allow Defendants to determine whether other improvements are necessary.

    b.  After the Rollout Period:

        i.  To allow the Independent Reviewer and the Parties to evaluate whether (i) the Relevant Services are being sufficiently and timely provided to the population of Medicaid-eligible children for whom such Services are medically necessary, so as to meet the needs of the population; (ii) that providers are providing

Relevant Services in accordance with the Standards and Requirements for such Services; and (iii) that the recipients of the Relevant Services are timely receiving the Relevant Services specified in their services plans, at the required intensity (including frequency and duration), and in the child's home or where the child is otherwise naturally located, and that recipients of the Relevant Services also have received appropriate assessments related to such Services.

ii.    To allow the Independent Reviewer and the Parties to determine whether Defendants have substantially complied with the Exit Criteria specified in the Termination Provisions of this Settlement Agreement, including without limitation the exit criteria based on the results of the WFI, DART, or other appropriate tools specified in accordance with ¶ 75 of this Settlement Agreement.

iii.    To allow the Independent Reviewer and the Parties to determine whether Corrective Action under this Settlement Agreement is required.

iv.    To allow Defendants to determine whether other improvements are necessary.

82. Defendants shall conduct the Audit in accordance with the audit plan established in the Implementation Plan, except that Defendants may conduct additional audit procedures beyond those specified in the audit plan. The audit plan may be adapted as necessary with input from the Independent Reviewer and Parties. The Independent Reviewer and Plaintiffs will have access to the data on which the Audit is based.

83. Defendants will provide the Independent Reviewer and Plaintiffs with a draft of the audit report, and the opportunity to comment on the draft before it is finalized.

84. The Audit will be completed, and the final audit report delivered to the Independent Reviewer and Plaintiffs, at least two months before the Independent Reviewer is required to submit its annual report to the Court, so that the Independent Reviewer has sufficient time to evaluate the audit results and address them in the Independent Reviewer's report to the Court.

a.  The initial Audit shall cover the first twelve (12) months of the Rollout Period and shall be delivered to the Independent Reviewer and Plaintiffs within 21 months of the commencement of the Rollout Period. Defendants shall provide Plaintiffs and the Independent Reviewer with the QIP Performance Indicators and the results of QIP Quality Improvement Procedures on a regular and ongoing basis, as such information becomes available.

b.  Successive Audits shall cover successive 12-month periods until the Termination of this Settlement Agreement, except that after completion of the Rollout Period, Defendants will conduct an Audit covering the 12-month period following the end of the Rollout Period (the "Post Rollout Audit.")

## VII.  ROLLOUT AND DELIVERY OF THE RELEVANT SERVICES

### A.  <u>Obligation to Put the Implementation Plan into Effect</u>

85. Defendants shall be obligated to put the approved Implementation Plan and the initial and updated QIPs into effect, take the actions described in the Implementation Plan, and provide the Relevant Services to Class Members in accordance with the Implementation Plan.

86. Defendants shall draft proposed amendments to the New York State Medicaid Plan and other related documents to be consistent with the Standards and Requirements, Eligibility Criteria, and other applicable provisions of the Implementation Plan. Defendants shall seek any necessary federal or state approvals for these amendments.

87. DOH shall draft and propose amendments to the Medicaid managed care contracts, and DOH and OMH shall amend services, programs, practices, and policies as necessary, to be consistent with the Standards and Requirements, Eligibility Criteria, and other applicable provisions of the Implementation Plan in order to comply with the terms and conditions of this Settlement Agreement.

### B.  <u>Other Reporting Requirements</u>

88. Beginning twelve (12) months after the commencement of the Rollout Period, and continuing quarterly thereafter until Termination of this Settlement Agreement, and subject to applicable federal and state confidentiality requirements, including privacy standards set forth in federal regulations implementing the Health Insurance Portability and Accountability Act of 1996 (HIPAA), as amended, and

24

codified in 45 CFR § 164.514, Defendants shall report the Relevant Services data, including relevant data from a variety of sources (*e.g.*, Medicaid claims, encounter, utilization, and expenditure data), to the Independent Reviewer and Plaintiffs, as the data pertains to the Relevant Services as operationalized in the Implementation Plan.

89. Beginning twelve (12) months after the commencement of the Rollout Period and continuing quarterly thereafter until Termination of this Settlement Agreement, Defendants shall report to the Independent Reviewer and Plaintiffs, including the demographic information referred to in ¶ 69, the data enumerated in the QIP Performance Indicators in Section V of this Settlement Agreement, and in the Implementation Plan. This data will be provided within ninety (90) days of the end of each quarter, using data available as of the end of the quarter for which the report applies.

### C. <u>Regular Review of Reimbursement Rates</u>

90. In cooperation with the Independent Reviewer and Plaintiffs, Defendants shall conduct a regular review of reimbursement rates for the Relevant Services at a frequency determined in the Implementation Plan or subsequent version of the QIP to determine whether the current reimbursement rates constitute a Barrier to Access requiring Corrective Action, or adjustments to the reimbursement rates are necessary to meet the requirements set forth in ¶ 42 of this Settlement Agreement.

### D. <u>Corrective Action</u>

91. Defendants will work cooperatively with the Independent Reviewer and Plaintiffs to develop a plan for Corrective Action in the event that (a) Defendants do not meet the Interim Utilization Targets during the Rollout Period; or (b) the Independent Reviewer determines that Corrective Action is required based upon the procedures specified in the QIP, the Performance Indicators, or the Audit.

92. The Corrective Action plan shall identify all applicable Barriers to Access and specify the steps that Defendants will take to address such Barriers to Access.

## VIII.  POWERS AND DUTIES OF THE INDEPENDENT REVIEWER

93. The Independent Reviewer will work with the Parties to develop the Standards and Requirements, Eligibility Criteria, Reimbursement Rates, the initial and updated QIPs (including Performance Indicators, Interim Utilization Targets, and Quality Improvement Procedures) and other elements of the Implementation Plan. The Independent Reviewer shall have the responsibilities outlined in this

Settlement Agreement in connection with the Audit; the determination of whether Corrective Action is necessary, and if so the nature of such Corrective Action; the termination and exit from the Settlement Agreement, and the resolution of disputes between the Parties.

94. During the Rollout Period and thereafter until the Settlement Agreement is terminated, the Independent Reviewer will issue annual reports to counsel for both Parties. The Parties will be given the opportunity to submit written responses to this report, which will be incorporated into the annual report and shall be submitted to the Court, regarding the status of the Settlement Agreement and the Implementation Plan.

95. The Independent Reviewer shall conduct an annual review of the auditing process described in Section VI to determine whether the processes and controls used by Defendants to collect and report data are reasonable, and whether the data reported by Defendants can be relied on in assessing Defendants' compliance with this Settlement Agreement and the Implementation Plan.

96. Before Termination of the Settlement Agreement in accordance with Section IX, the Independent Reviewer shall confirm that Defendants have substantially complied with the provisions of this Settlement Agreement, that Defendants have put the Implementation Plan into effect and taken the actions required therein consistent with the time periods reflected in ¶¶ 103 and 104, and that the Exit Criteria set forth in Section IX have been satisfied.

97. Defendants shall supply the Independent Reviewer with information and documentation reasonably requested by the Independent Reviewer to perform its duties under this Settlement Agreement. A request by the Independent Reviewer for relevant information shall not be unreasonably denied. The Parties shall negotiate in good faith any areas of disagreement as to whether and when such information shall be made available.

98. The Parties may have *ex parte* communications with the Independent Reviewer, and the Independent Reviewer is expressly authorized to communicate directly and separately with each Party, without the presence of any representative of the other Party.

99. The Independent Reviewer may communicate with the court on an *ex parte* basis, provided that the Independent Reviewer shall thereafter provide the Parties with a summary of the substance of the communication orally or in writing, subject to the Court's approval.

100. The Independent Reviewer shall have the authority to retain additional subject matter experts. Any subject matter experts retained by the Independent Reviewer will be bound by the Qualified Protective Order (Dkt. No. 26) governing this action.

101. All expenses associated with the Independent Reviewer and any subject matter experts retained by the Independent Reviewer shall be borne solely by Defendants, subject to all necessary state approvals (*see* ¶ 11). Notwithstanding Defendants' payment obligations, the Independent Reviewer will conduct its activities independently, and no Party will have supervisory authority over the Independent Reviewer.

## IX.    TERMINATION OF THE SETTLEMENT AGREEMENT

102. The Effective Date of this Settlement Agreement shall be the date on which it is entered as an order of the Court.

103. The Rollout Period shall end on the later of (i) eight years after the Effective Date of this Settlement Agreement or (ii) the date on which all Relevant Services are available on a timely basis to all Class Members, in all geographic regions of the State, who meet the eligibility requirements, and all QIP Quality Improvement Procedures have been implemented and have been performed for at least three years.

104. Following the completion of the Rollout Period, the Parties will engage in an evaluation period to determine whether Defendants have met the Exit Criteria specified below.

  a. Unless otherwise extended pursuant to this Settlement Agreement, the evaluation period will end on the "Termination Date," defined as the last day of the ninth month after Defendants submit the Post Rollout Audit covering the full 12 months following the completion of the Rollout Period. By way of example, if the Rollout Period ends on October 31, 2032, the Termination Date shall be on the last day of the ninth month after Defendants submit an audit report covering the 12-month period from November 1, 2032, to October 31, 2033.

105. Therefore, the Court shall retain jurisdiction of this action to assure compliance with the Settlement Agreement through the Termination Date, at which time this Settlement Agreement and the Court's jurisdiction shall expire; provided, however, that Plaintiffs may move to extend the term of this Settlement Agreement,

the Evaluation Period, and the Court's continuing jurisdiction in the event that Defendants have not substantially complied with the Exit Criteria specified below.

106. Defendants shall substantially comply with the following Exit Criteria:

a. The Post Rollout Audit confirms that (i) the Relevant Services are being sufficiently and timely provided to the population of Medicaid-eligible children for whom such Services are medically necessary, so as to meet the needs of the population; (ii) that providers are providing Relevant Services in accordance with the Standards and Requirements for such Services; and (iii) that the recipients of the Relevant Services are timely receiving the Relevant Services specified in their services plans, at the required intensity (including frequency and duration), and in the child's home or where the child is otherwise naturally located¸ and that recipients of the Relevant Services also have received appropriate assessments related to the Relevant Services.

b. The Post Rollout Audit confirms that Defendants have met the exit criteria based on the results of the WFI, DART, or other appropriate tools specified in accordance with ¶ 75 of this Settlement Agreement.

c. Defendants have received court approval of the Implementation Plan, as described in Section IV; have put the Implementation Plan into effect; and have taken the actions required therein, including:

  i. The Post Rollout Audit and other Audits utilize processes and controls that are reasonable, and the data reported by Defendants can adequately assess Defendants' compliance with this Settlement Agreement, the QIP, and the Implementation Plan.

  ii. Defendants have adopted and are using consistent procedures and tools statewide to assess Medicaid-enrolled children for possible eligibility for the Relevant Services.

  iii. Defendants have adopted and are using consistent procedures and methodologies statewide to link referred Medicaid-enrolled children who meet eligibility criteria to the Relevant Services, and report process and outcome measures for children using the Relevant Services.

  iv. Defendants have developed and implemented standardized education and training on identification, referral, and

28

> recommendation of children to the Relevant Services for the provider community and related stakeholders.

> v.    Defendants have developed and are using a Quality Improvement Plan regarding the Relevant Services and are presently operating a quality improvement system consistent with the Quality Improvement Plan specified in the Settlement Agreement.

> vi.    Defendants measure and report on a public data dashboard(s) concerning utilization of the Relevant Services set forth in the Implementation Plan (*see* ¶ 46).

107. Prior to the Termination Date, the Parties and the Independent Reviewer will meet to determine whether there is any dispute as to whether Defendants are in substantial compliance with their obligations under the Settlement Agreement. This meeting will occur after Defendants provide to Plaintiffs and the Independent Reviewer the Post Rollout Audit report, and Plaintiffs and the Independent Reviewer have sufficient time to review such report.

108. If either party brings a motion for enforcement of this Settlement Agreement or to extend the duration of this Settlement Agreement prior to the Termination Date, the Settlement Agreement will remain in effect and the Court will retain jurisdiction until the motion is decided and through the expiration of any subsequent period the Court deems necessary to ensure compliance.

## X.    DISPUTE RESOLUTION AND ENFORCEMENT MECHANISMS

### A.   <u>Mediation of All Disputes by the Independent Reviewer</u>

109. All disputes arising out of or in connection with the Implementation Plan or the Settlement Agreement shall be mediated with the Independent Reviewer as set out in this Section before a Party may seek relief from the Court.

110. To raise a dispute regarding the Implementation Plan or compliance with the Settlement Agreement, a Party shall raise the dispute in writing, at a regular monthly meeting of the Parties, or in writing in advance of such a meeting. If raised in writing, such written notice shall contain sufficient details to put the Parties on notice of the nature of the dispute.

111. In the event of a dispute arising from Defendants' contention that it is not possible to perform any provision of this Settlement Agreement or the

Implementation Plan for any reason, including because a federal or New York State agency or government official has not provided approvals Defendants claim are required for Defendants to perform such provision or because the actions of any other persons, entities, or agencies render performance of such settlement provision impossible, Defendants shall, within twenty (20) business days of learning that such performance is not possible, specify in writing:

    a.  The specific requirement(s) of the Settlement Agreement or Implementation Plan that Defendants contend it is not possible for them to perform;

    b.  The detailed basis for Defendants' contention, including:

        i.  Where a New York State agency or government official has allegedly not provided approvals Defendants claim are required for Defendants to perform such requirement, such writing must identify:

            1.  the specific "approvals" sought by Defendants;

            2.  all steps Defendants have taken to exhaust their ability to obtain such approvals, including steps to cause or convince such New York State agency or government official to provide the requisite approvals; and

        ii.  Where the actions of any other persons, entities, or agencies render performance of such settlement requirement impossible, such writing must identify:

            1.  the specific actions that Defendants contend render performance of such settlement requirement impossible and explain how such actions allegedly render performance of such settlement requirement impossible;

            2.  all steps Defendants have taken to cause such persons, entities, or agencies to cease and desist from taking the actions that allegedly render performance of such settlement requirement impossible.

    c.  Defendants' proposed plans to meet the goals of the Settlement Agreement or Implementation Plan notwithstanding Defendants' contentions.

112. After a dispute is raised, the Parties shall then engage in a sixty (60)-day period of mediation and good faith negotiation overseen by the Independent Reviewer. This Mediation Period will be extended only if the Parties mutually agree in writing to extend it.

113. If the Parties cannot come to resolution of the dispute during the mediation period, the Independent Reviewer shall prepare a recommendation as to how the Independent Reviewer would resolve the Parties' dispute, along with an explanation supporting such recommendation (the "Independent Reviewer's Recommendation"). The Parties will then have twenty (20) days to respond to the Independent Reviewer's Recommendation, prior to its submission to the Court. Following this period, the Independent Reviewer's Recommendation and any responses by the Parties shall be simultaneously submitted to the Court by the Independent Reviewer. The Court may set a conference and if necessary, order a resolution to the dispute pursuant to the Court's legal and equitable powers.

**B. <u>Court Enforcement and Appeal</u>**

114. Beginning six (6) months after the Rollout Period begins, the Independent Reviewer shall submit to the Court the annual reports referenced in ¶ 94.

115. The Parties and the Independent Reviewer shall meet with the Court at status conferences held at least once a year, and more frequently as needed, and subject to the Court's availability. Any Party may request a conference with the Court.

116. Any Party may request relief from the Court regarding any recommendation of compliance, noncompliance, or remedy by the Independent Reviewer. The Court retains all legal and equitable powers of the Court to enforce the Settlement Agreement.

    a.  In connection with any such application, the Independent Reviewer's Recommendation and any responses by the Parties shall be presented to the Court.

    b.  Upon review of the Independent Reviewer's Recommendation and any responses by the Parties, and upon finding noncompliance with this Settlement Agreement, the Court may issue an Order setting forth its

finding of noncompliance and adopting any remedy within the Court's discretion, as described in ¶ 113. The Court shall retain jurisdiction to enforce such an Order through its power of contempt.

c. If the Independent Reviewer determines that Defendants are not in substantial compliance in accordance with Section IX, then the Independent Reviewer shall recommend an appropriate remedy. Either Party may request relief from any such recommendation.

117. If Plaintiffs allege that a violation of this Settlement Agreement has caused or threatens to cause an imminent danger of substantial harm to the Class Members, Plaintiffs may bypass these dispute resolution provisions and directly present a matter to the Court for resolution, including declarative or injunctive relief. In such case, Plaintiffs shall give emergency notice of their allegations to Defendants.

## XI.    COURT APPROVAL

118. The United States District Court has jurisdiction over the claims against all Defendants pursuant to 28 U.S.C. §§ 1331, 1343(a). Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b).

119. This Settlement Agreement settles all claims against Defendants in this lawsuit.

120. As soon as practical after the date of this Settlement Agreement, the Parties will file a joint or unopposed motion seeking preliminary approval of this Settlement Agreement. The motion will request that the Court set a schedule for a fairness hearing on the settlement, a process for providing notice to interested parties, and a schedule for moving for a judgment and order granting final approval of the Settlement Agreement. The Parties shall use their best efforts to cause this Settlement Agreement to receive final approval from the Court.

121. The Parties' proposed judgment and order granting final approval of this settlement will:

a. Grant final approval of the settlement without modification of its terms as fair, reasonable, and adequate to the Classes under Fed. R. Civ. P. 23(e);

b. Find that the Settlement Agreement resulted from extensive arm's length, good faith negotiations between the Parties through experienced counsel;

32

c. Comply with the content and scope requirements of Fed. R. Civ. P. 65(d)(1), expressly incorporate the actual terms of this Settlement Agreement, and make the Parties' compliance with the terms of this Settlement Agreement part of the order;

d. Include a finding that by agreeing to settle the action, Defendants do not admit, and specifically deny, any and all liability in the action; and

e. Incorporate the entirety of the express terms of the Settlement Agreement and provide (i) that the Court has and will retain jurisdiction over the judgment and order to monitor compliance with and enforce the Settlement Agreement; (ii) that Plaintiffs shall not be obligated to file an additional or separate action to enforce any part of this Settlement Agreement in this or any other court; and (iii) that the Court may dismiss the action with prejudice.

122. This Settlement Agreement will be effective on the date of final approval by the Court.

123. Defendants represent that as of the Effective Date of this Settlement Agreement, they have received the consent to enter into this Settlement Agreement from all New York State government agencies and officials whose consent is required.

## XII.   MISCELLANEOUS

124. <u>Attorneys' Fees and Costs</u>. Upon entry of this Settlement Agreement, Plaintiffs will be entitled to seek reasonable attorneys' fees and costs awarded by the Court on application by Plaintiffs. The Court's award of fees and costs may include a determination of the level of success and benefit achieved by Plaintiffs in connection with this litigation. Plaintiffs will also be entitled to seek reasonable attorneys' fees and costs for monitoring and enforcement of this Settlement Agreement. Defendants retain all rights to challenge the amount of such fees and costs.

125. This Settlement Agreement shall have no precedential value or effect whatsoever in any other action or proceeding as evidence or for any other purpose, except in an action or proceeding to enforce this Settlement Agreement and Order. Nothing in this Settlement Agreement shall be construed to mean that Defendants are violating any law, or that Defendants are not presently taking actions consistent with this Settlement Agreement's requirements. Rather, Defendants enter into this

Settlement Agreement to avoid further protracted litigation and to resolve and settle all disputes with Plaintiffs.

126. In the event of any change in federal, state, or local laws, statutes, ordinances, rules or regulations, including Centers for Medicare and Medicaid Services ("CMS") requirements, which Defendants believe conflicts with their responsibilities pursuant to this Agreement, Defendants shall so notify Plaintiffs' counsel in writing, and the Parties shall attempt to agree on modifications of the Agreement necessitated by any such change. In the event that the Parties cannot agree on modifications to the Agreement, the Parties shall comply with the Dispute Resolution provisions set forth in Section X. During the pendency of the Dispute Resolution process, Defendants' actions taken to ensure compliance with new, altered, or reconstrued federal or state laws, rules, or regulations, including CMS requirements, will not automatically be deemed an instance of noncompliance with the Settlement Agreement, if determined reasonable and necessary by the Court or by Plaintiffs working in cooperation with the Independent Reviewer.

127. As of the Effective Date, for and in consideration of the obligations specified in this Settlement Agreement, Plaintiffs hereby release DOH, OMH, and the State of New York, together with all of their present and former officials, employees, agents, attorneys, subdivisions, and assigns, whether in their individual or official capacities (collectively, the "Released Parties"), from all claims that seek injunctive and/or declaratory relief on a systemwide basis based on acts or omissions occurring prior to the Termination Date and that arise from the facts alleged in the First Amended Complaint (the "Released Claims"). The Released Claims do not include individual claims for non-systemic relief, or claims for damages.

128. Confidentiality Order. The Qualified Protective Order entered by the Court on July 8, 2022 (Dkt. No. 26) will remain in full force and effect until the Court enters an order granting final termination of jurisdiction over and Termination of the Settlement Agreement and the final judgment and order. All communications concerning the negotiation of the Settlement Agreement, including, but not limited to, its content or any details conveyed to or by the Parties during its negotiation are confidential. Nothing in this Settlement Agreement prohibits or restricts any Party or their representatives from publicly communicating the fact that the Parties have entered a Settlement Agreement. The Parties acknowledge that the terms of the Settlement Agreement will be made public when the settlement is filed with the Court.

129. <u>Funding</u>. Defendants, while empowered to enter into and implement the Settlement Agreement, do not have the legal authority to bind the New York General Legislature, which has the authority under the New York State Constitution and laws to appropriate funds for, and amend laws pertaining to, Defendants' system of services for the Classes. Defendants will make all reasonable efforts to obtain funding and resources to fulfill the terms of this Settlement Agreement. At least annually after court approval of this Agreement, and consistent with existing state budgetary practices and legal requirements and state law, Defendants will request state funds sufficient to effect the terms set forth in this Settlement Agreement in connection with any budget, funding, or allocation request to the executive or legislative branches of state government. Consistent with existing state budgetary practices and legal requirements and state and federal law, Defendants will also maximize all available federal funding opportunities necessary to provide the Relevant Services to Class Members.

130. <u>Governing Law</u>. Federal law to the extent applicable, otherwise New York law without regard to its choice of law or conflict of law provisions, governs this Settlement Agreement.

131. <u>Counterparts</u>. This Settlement Agreement may be executed in counterparts, each of which will be deemed to be an original, but all of which, taken together, will constitute one and the same agreement. Execution by scanned attachments or by electronic signature has the same force and effect as an original.

132. <u>Severability</u>. Each of the provisions in this Settlement Agreement is separately and independently enforceable. Every position in this Settlement Agreement applies to all Class Members.

133. The obligations of Defendants are binding regardless of whether they are performed, delivered, implemented, or managed directly by Defendants or by grantees, subcontractors, or agents.

134. <u>Successors and Assigns</u>. This Settlement Agreement binds and inures to the benefit of the successors and assigns of the Parties, including any agency or agencies with any of the responsibilities of DOH or OMH.

135. <u>Entire Agreement</u>. This Settlement Agreement is the final and exclusive agreement between the Parties with respect to its subject matter.

136. <u>Modification</u>. Before the final judgment and order of the Court, no amendment to this Settlement Agreement will be effective unless it is in writing and signed by the Parties. After the final judgment and order, no modification of

this Settlement Agreement will be effective unless it is in writing, signed by the Parties, and approved by the Court.

137. The Parties and their counsel have each contributed to the preparation of this Settlement Agreement. No provision will be construed against a Party on the ground that one of the Parties or their counsel drafted the provision.

138. All signatories state that they are fully authorized to execute this Settlement Agreement on behalf of the Party for which they sign.

139. The Parties agree that those materials contained in the appendices to this Settlement Agreement, as referenced in the main body of the Settlement Agreement, are included and incorporated into this Settlement Agreement as if fully set forth herein.

140. This Settlement Agreement contains all the terms and conditions agreed upon by the Parties. No other understandings, oral or otherwise, regarding the subject matter of this Settlement Agreement shall be deemed to exist or to bind any of the Parties hereto.

141. <u>Frustration of Purpose/Force Majeure</u>. If Defendants are unable to accomplish any of their obligations or meet timeframes under this Settlement Agreement due to events beyond their reasonable control (such as natural disaster, labor disputes, war, or governmental action beyond state control), Defendants shall notify Plaintiffs within twenty (20) business days of the date upon which Defendants become aware of the event and describe the event and its effect on performance. If performance is expected to be delayed or the event frustrates the purpose of the Settlement Agreement, the Parties shall negotiate in good faith to amend the Settlement Agreement and seek approval of the Court for such amendment.

142. Nothing in this Settlement Agreement shall limit the ability of any individual Plaintiff or Class Member to pursue any legal or administrative remedies to which they would otherwise be entitled under state or federal law other than the claims for systemic injunctive and declaratory relief adjudicated by this action.

143. In computing any time period specified by this Settlement Agreement, the following rules apply: (i) exclude the day of the event that triggers the period; (ii) count every day, including intermediate Saturdays, Sundays, and New York State legal holidays, unless business days are specified; and (iii) include the last day of the period, but if the last day is a Saturday, Sunday, or New York State legal

holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or such New York State legal holiday.

144. Nothing in this Settlement Agreement shall be deemed to limit the Court's powers of contempt or any other power possessed by the Court.

## XIII.  DEFINITIONS

145. For purpose of this Settlement Agreement, "Behavioral Health" does not include addiction or intellectual/developmental disabilities in the absence of a mental health condition.

146. "Emergency room," "emergency department," "ER/ED," and "CPEP" are used interchangeably to mean a hospital emergency setting.

147. A "Licensed Practitioner of the Healing Arts" or an "LPHA" is an individual professional acting within their scope of practice under state law consistent with the Medicaid State Plan.

148. "Home and community-based setting" shall be the child's home or any non-institutional setting where the child is naturally located and may also include other settings when a child or their family/caregiver requests to receive the Relevant Services in such setting.

SIGNATURE PAGES FOLLOW

**FOR AND ON BEHALF OF DEFENDANTS:**

LETITIA JAMES
Attorney General
State of New York

By: *Adam Sansolo*                    Dated: __8/7/2025__
Adam J. Sansolo
Yuval Rubinstein
Assistant Attorneys General
28 Liberty Street
New York, NY 10005
212-416-6165
adam.sansolo@ag.ny.gov
yuval.rubinstein@ag.ny.gov

NEW YORK STATE DEPARTMENT OF HEALTH

By:                                   Dated: *August 6, 2025*
James V. McDonald, M.D., Commissioner
New York State Department of Health
Corning Tower
Empire State Plaza
Albany, NY 12237

38

**FOR AND ON BEHALF OF DEFENDANTS:**

\

NEW YORK STATE OFFICE OF MENTAL HEALTH

By: _Ah Mi I Smunuts_                          Dated: _8/7/25_

Ann Marie T. Sullivan, M.D., Commissioner
New York State Office of Mental Health
44 Holland Avenue
Albany, NY 12229

**FOR AND ON BEHALF OF PLAINTIFFS:**

By: _____                    Dated: 7/31/25

Harry Frischer
Daniele Gerard
Claire Glasspiegel
Valerie Achille
Eugénie Iseman
CHILDREN'S RIGHTS, INC.
88 Pine Street, Suite 800
New York, New York 10005
212-683-2210
hfrischer@childrensrights.org
dgerard@childrensrights.org
cglasspiegel@childrensrights.org
vachille@childrensrights.org
eiseman@childrensrights.org


By: _____                    Dated: 7/31/25

Brandy L.L. Tomlinson
DISABILITY RIGHTS NEW YORK
279 Troy Road, Ste 9
PMB 236
Rensselaer, NY 12144
518-432-7861
brandy.tomlinson@drny.org


By: _____                    Dated: 7/31/25

Kimberly Lewis (admitted *pro hac vice*)
Jane Perkins (admitted *pro hac vice*)
NATIONAL HEALTH LAW PROGRAM
3701 Wilshire Blvd, Suite 750
Los Angeles, CA 90010
310-204-6010
lewis@healthlaw.org
perkins@healthlaw.org


39

By: _____                    Dated: _8.4.25_

Steven H. Holinstat
Jacob Wonn
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036-8299
212-969-3183
sholinstat@proskauer.com
jwonn@proskauer.com

## APPENDIX A

### Intensive Home and Community-Based Mental and Behavioral Health Services, the "Relevant Services," for the Classes

As described in the Amended Complaint and Plaintiffs' expert reports, children with serious mental and behavioral health conditions benefit from specific intensive mental and behavioral health services, provided in their homes and communities, to correct or ameliorate their conditions. These Medicaid-required services, collectively referred to as Intensive Home and Community-Based Services, include Intensive Care Coordination ("ICC"), Intensive In-Home Services, sometimes referred to as Intensive Home-Based Behavioral Health Services ("IHBBHS"), and Mobile Crisis Services.

### A. Intensive Home and Community-Based Services

1. <u>Intensive Care Coordination</u>

ICC is an assessment and service planning process conducted through a child and family team that coordinates services across multiple systems that serve the child and family, and manages the care and services they need. This includes assessment and service planning, assistance in accessing and arranging for mental or behavioral health services, coordinating multiple mental or behavioral health services, advocating for the child and the child's family, monitoring the child's progress, and transition planning.

- A single point of accountability for ensuring that medically necessary Medicaid services are accessed, coordinated, and delivered in a strength-based, individualized, family-driven, child-guided, culturally and linguistically relevant manner;

- Services and supports that are guided by the needs of the child;

- Facilitation of a collaborative relationship among a child, the family, and child-serving systems;

- Support for the family/caregiver in meeting the child's needs;

- A care planning process that ensures that a single, consistent care coordinator coordinates care across providers and child-serving systems to allow the child to be served in the home and community; and

- Facilitated development of an individual's child and family team, including individuals selected by the child and family who are committed to them through informal, formal, and community support and service relationships. ICC will facilitate cross-system involvement and a child and family team.

ICC service components consist of:

*Assessment:* The ICC performs or coordinates the performance of assessments and assessment-based care coordination activities, including, but not limited to:

- A strengths-based, needs-driven, comprehensive assessment that identifies the needs of the child for medical, school-related, social, or mental or behavioral health services, to organize and guide the development of a Person-Centered Plan and a risk management/safety plan;

- Planning and coordination of urgent needs before the comprehensive assessment is completed; and

- Further assessments as necessary within the scope of ICC.

*Planning and Development of a Family-Driven, Child-Guided, Person-Centered Plan ("PCP"):* ICC providers will maintain a family-driven, child-guided, person-centered planning process, which includes:

- Having the care coordinator use the information collected through an assessment, to convene and facilitate the child and family team meetings;

- Having the child and family team develop a child-guided and family-driven PCP that specifies the goals and actions to address the medical, school-related, social, mental or behavioral health, and other services needed by the child and family; and

- Ensuring that the care coordinator works directly with the child, the family, and others significant to the child to identify strengths, goals, and needs of the child and family, to inform the PCP.

*Crisis Planning:* The ICC provider will provide or coordinate crisis planning that, based on the child's history and needs, (a) anticipates the types of crises that may occur, (b) identifies potential precipitants and creates a crisis plan to reduce or eliminate them, and (c) establishes responsive strategies by family or caregivers

and members of the child's team to minimize crises and ensure safety through the development of the risk management/safety plan.

*Referral, monitoring, and related activities:* The ICC provider must do the following:

- Work directly with the child and family team to implement elements of the PCP;

- Prepare, monitor, and modify the PCP in concert with the child and family team and determine whether services are being provided in accordance with the PCP and whether services in the PCP are adequate to meet the child's needs; and if not, or if there are changes in the needs or status of the child, adjust the PCP as necessary, in concert with the child and family team; and

- Actively assist the child and family to obtain available services, including medical, school-related, mental or behavioral health, social, therapeutic and other services, and monitor the provision of such services, including by ensuring receipt of available services in accordance with the PCP.

- Coordinate with local governmental units (the counties) to ensure that children receive available services.

*Transition:* The ICC provider will:

- Develop a transition plan with the child and family team, and implement such plan when the child has achieved the goals of the PCP; and

- Collaborate with the other service providers and agencies on behalf of the child and family in order to effectuate the transition plan.

*Settings:* ICC may be provided to children living and receiving services at home and in the community, including foster care placements, as well as to children who are currently in a hospital, group home, or other congregate or institutional placement as part of discharge or transition planning. Notwithstanding the foregoing, ICC will not be provided to children in juvenile detention centers.

*Providers:* ICC is provided by a qualified provider.

43

2.  <u>Intensive Home-Based Behavioral Health Services</u>

IHBBHS are intensive behavioral health services and supports, including individualized therapeutic interventions, provided on a frequent and consistent basis and delivered to children and families in the child's home or appropriate community-based setting. Interventions help the child to build skills necessary for successful functioning in the home and community and improve the family's or caregiver's ability to help the child successfully function in the home and community.

IHBBHS are delivered according to a care plan developed by the child and family team. The IHBBHS treatment plan shall develop goals and objectives for all life domains in which the child's mental or behavioral health condition causes impaired functioning, including family life, community life, education, vocation, and independent living, and identifies the specific interventions that will be implemented to meet those goals and objectives.

Providers of IHBBHS should engage the child and other family members or caregivers in home and community activities where the child has an opportunity to work towards identified goals and objectives in the child's home or appropriate community-based setting.

IHBBHS may be provided by telehealth, as appropriate and where identified in the individual's IHBBHS treatment plan.

IHBBHS include, but are not limited to:

- Educating the child's family about, and training the family in addressing, the child's needs;

- Comprehensive mental health assessments;

- Behavioral supports, provided based on the PCP, which offer interventions, supports, and modeling for the child's family and others on how to implement strategies to guide and support a child's positive behaviors. These services provided by in-home non-licensed practitioners, assist in implementing the goals of the treatment plan, monitor its effectiveness, and report the interventions' effectiveness to clinical professionals;

- Therapeutic services delivered in the child's home and community, including, but not limited to, therapeutic interventions such as

44

individual and/or family therapy, including evidence-based practices. These services:

- o Improve wellness, including addressing behaviors and social skills deficits that limit the child's ability to function in the child's natural environment;

- o Improve self-management of symptoms, including teaching self-administration of medications, as developmentally appropriate;

- o Improve psychosocial functioning, including addressing social skills deficits, anger management, and emotional regulation skills, as developmentally appropriate;

- o Support the development and maintenance of social support networks and the use of community resources, as developmentally appropriate;

- o Support identifying and addressing behaviors that interfere with success in other settings, such as employment or school; and

- o Support independent living objectives by identifying and addressing behaviors that interfere with seeking and maintaining housing and living independently, as developmentally appropriate.

*Settings:* IHBBHS may be provided to children living and receiving services at home and in the community, including foster care placements.

*Providers*: IHBBHS are provided by a qualified provider.

3. <u>Mobile Crisis Services</u>

Mobile crisis services ("MCS") are mental or behavioral health services designed to interrupt and ameliorate a child or youth's crisis episode, wherever the crisis occurs outside of an institutional setting, through crisis intervention and/or resolution, de-escalation, and safety planning. Mobile crisis services work to stabilize the child by providing interventions to minimize or prevent the crisis in the future, with the intent of diverting emergency room visits or inpatient admissions, and/or avoiding other behavior-related disruptions. Prior approval by

a managed care plan or any other entity shall not be required for a child to receive MCS.

Services include, but are not limited to:

- Responding to the immediate crisis and assessing child and family safety, and the resources available to address immediate problems;

- Stabilization of functioning by reducing or eliminating immediate stressors and providing counseling to assist the child, family, and caregivers in de-escalating behaviors and interactions;

- Referral and coordination with (a) other services and supports necessary to continue stabilization or prevent future crises from occurring, and (b) any current providers and team members, including, but not limited to, the care coordinator, therapists, family members, primary care practitioners, and school personnel; and

- Follow-up mobile crisis services, which include:

  - Therapeutic communication and interactions to maintain stabilization following a crisis episode and prevent escalation of mental and behavioral health symptoms;

  - Facilitation of engagement in mental and behavioral health services, care coordination, medical health, or basic needs related to the original crisis service; and

  - Confirmation with service providers to ensure crisis services are in place while the child/youth is awaiting initiation or resumption of other services.

*Settings:* During a crisis, MCS should be provided at the location where the crisis is occurring, including the home (biological, foster, relative, or adoptive) or any other setting where the child is naturally located, including schools, recreational settings, child-care centers, and other community settings.

*Availability:* MCS are available 24 hours a day, seven days a week, 365 days a year.

*Providers:* MCS are provided by a trained and experienced mobile crisis professional or team. MCS providers include both licensed and unlicensed staff.

**B.  Waiver Services to Ensure Receipt of Services in the Least Restrictive Setting**

These services are used in conjunction with covered EPSDT services to support children with serious emotional disturbances and to help maintain them in their homes and communities and avoid higher levels of care and out-of-home placements. These services are currently authorized through a waiver under Section 1915(c) of the Social Security Act and in conjunction with the Section 1115 Demonstration Waiver, allowing New York State to spend federal Medicaid dollars on these services.

These services improve a child's, family's, or caregiver's ability to help the child successfully function in the home and community. Such services include services or supports not required to be covered under Medicaid EPSDT provisions. The specific services provided by New York's Home and Community Based Services ("HCBS") Waiver will include services such as respite, caregiver support and training, in-home response, and additional intensive services that may be identified in connection with the development of the Implementation Plan.

Children receiving waiver services must have an individualized service plan developed collaboratively with the child and family team. This plan documents the agreed upon goals, objectives, and service activities. The individualized service plan must be reviewed and updated to meet the needs of the child and family. The child and family team consists of the child, the child's parents or legal guardians, care coordinator, mental health professionals, and any other persons that the child and family choose to include. The team meets to plan the supports a child and family need to safely maintain the child in the home and community.

## APPENDIX B

### Timeline for Development of the Implementation Plan

| Timeframe | Activity |
|---|---|
| Month 0 | Signed Settlement Agreement |
| Months 1-3 | Complete National Scan and establish initial vision |
| Months 4-6 | Develop draft redesign plan and comprehensive engagement strategy for collecting stakeholder input and community feedback |
| Months 7-9 | Conduct Statewide Community Stakeholder Activities and compile feedback |
| Months 10-12 | Draft service details based on updated redesign plan and required federal authority, including Eligibility Criteria, Standards and Requirements |
| Months 13-15 | Finalize Implementation Plan, including proposed reimbursement methodology and Quality Improvement Plan |
| Months 16-18 | Obtain Implementation Plan approval for submission to the Court |