## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

<table>
<tr>
<td>

C.K. through his next friend P.K.; C.W. through her next friend P.W.; C.X. through her next friend P.X.; C.Y. through his next friend P.Y., for themselves and those similarly situated,

Plaintiffs,

-v-

James V. McDonald, in his official capacity as the Commissioner of the New York State Department of Health; Ann Marie T. Sullivan, in her official capacity as Commissioner of the New York State Office of Mental Health,

Defendants.

</td>
<td>

2:22-cv-1791 (NJC) (JMW)

</td>
</tr>
</table>

## OPINION AND ORDER

NUSRAT J. CHOUDHURY, District Judge:

      This class action is brought by four minors, each of whom proceed through their "Next Friend," on behalf of themselves and as representatives of two certified classes of Medicaid-eligible children with mental health conditions who have been determined by a licensed practitioner to require intensive home and community-based mental health services in order to correct or ameliorate their conditions while remaining safely at home and in their communities. The Amended Complaint seeks declaratory and injunctive relief on behalf of themselves and the two classes of similarly-situated children against the Commissioners of the New York State Department of Health ("DOH") and the Office of Mental Health ("OMH") in their official capacities (together "Defendants"). (Am. Compl., ECF No. 34.) The four "Named Plaintiffs" are

C.K. through his Next Friend P.K.; C.W. through her Next Friend P.W.; C.X. through her Next Friend P.X.; and C.Y. through his Next Friend P.Y.

The Amended Complaint alleges that Defendants are responsible for systemic violations of the Medicaid Act (specifically, the Early and Periodic Screening, Diagnostic, and Treatment Services ("EPSDT") and reasonable promptness provisions), Title II of the Americans with Disabilities Act (the "ADA"), and Section 504 of the Rehabilitation Act ("Section 504"). (Am. Compl. ¶¶ 4– 5, 9–10, 212–37.) The Amended Complaint alleges that the Named Plaintiffs were not timely receiving the intensive home and community-based mental health services that they need to correct or ameliorate their mental health conditions. (*Id.* ¶¶ 18–82.) They further allege that because they were not receiving such services, each of the Named Plaintiffs has been previously institutionalized or was at risk of institutionalization. (*Id.* ¶¶ 34, 50, 64, 81.)

On February 22, 2024, the Court certified the case as a class action on behalf of two classes (hereinafter "the Classes," and members thereof, the "Class Members"):

1. The **"EPSDT Class**[,]**"** . . . defined as consisting of all current or future Medicaid- eligible children in New York State under the age of 21 (a) who have been diagnosed with a mental health or behavioral health condition, not attributable to an intellectual or developmental disability, and (b) for whom a licensed practitioner of the healing arts acting within the scope of practice under state law has recommended intensive home and community-based mental health services ("IHCB-EPSDT Services") to correct or ameliorate their conditions.

2. The **"ADA Class**[,]**"** . . . defined as consisting of all current or future Medicaid-eligible children in New York State under the age of 21 (a) who have been diagnosed with a mental health or behavioral health condition, not attributable to an intellectual or developmental disability, that substantially limits one or more major life activities, (b) for whom a licensed practitioner of the healing arts acting within the scope of practice under state law has recommended IHCB-EPSDT Services to correct or ameliorate their conditions or who have been determined eligible for HCBS Waiver Services (as defined in the Amended Complaint, ECF No. 34, ¶ 10), and (c) who are segregated, institutionalized, or at serious risk of becoming institutionalized due to their mental health or behavioral health condition.

2

(Mem. & Order Certifying Classes ("Cert. Order") at 3–4, ECF No. 73.) Following certification of the Classes, the Court stayed the litigation to permit the parties to explore a potential settlement of the case. (*Id.* at 12–13.)

Before the Court is the Parties' Joint Motion for Preliminary Approval of Class Action Settlement Agreement and for Other Relief ("Joint Motion for Preliminary Approval"). (Joint Mot., ECF No. 77.) After nearly two years of litigation and another one and a half years of extensive negotiations between the Parties on their own and with the assistance of this Court as mediator, the Parties have entered into a proposed Settlement Agreement. The proposed Settlement Agreement seeks to settle all claims on behalf of the EPSDT Class and the ADA Class. The Joint Motion for Preliminary Approval requests that the Court: (1) grant preliminary approval of the proposed Settlement Agreement; (2) approve the Parties' jointly proposed Notice Plan addressing the proposed Notice to Class Members and the manner of providing that notice to Class Members; and (3) set a date for fairness hearing on the anticipated motion for final settlement approval. (Joint Mot. at 1.)

For the reasons discussed below, the Court grants the Motion in its entirety. The proposed Settlement Agreement meets the requirements for preliminary approval of a class action settlement under Rule 23(e) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") and governing authority from the Second Circuit in *Moses v. New York Times Company*, 79 F.4th 235, 242 (2d Cir. 2023), and subsequent cases. The Court therefore preliminarily approves the proposed Settlement Agreement and approves the Parties' Proposed Class Action Notice Plan with Instructions for Posting and Distribution ("Notice Plan") (ECF No. 77-4). The Court has modified the Parties' Proposed Class Action Settlement Notice ("Proposed Notice") (ECF No. 77-3) to make it easier for laypeople to understand, including members of the Classes, their

parents and guardians, and service providers. The modified Notice is approved and set forth as Appendix I to this Opinion and Order. Finally, the Court schedules a fairness hearing to take place on January 6, 2026 and sets associated pre-hearing deadlines as detailed below.

## BACKGROUND AND PROCEDURAL HISTORY

### I.    Litigation and Settlement History

On March 31, 2022, certain Named Plaintiffs filed a Complaint (ECF No. 1) against Mary T. Bassett, in her official capacity as the Commissioner of the New York State Department of Health and Ann Marie T. Sullivan, in her official capacity as the Commissioner of the New York State Office of Mental Health. James V. McDonald, the current Commissioner of the New York State Department of Health, was automatically substituted for former Commissioner Basset pursuant to Rule 25(d), Fed. R. Civ. P. (Defendants Sullivan and McDonald, and former Defendant Bassett, are collectively referred to as the "Defendants."). On October 31, 2022, all of the Named Plaintiffs filed an Amended Complaint against Defendants, alleging that Defendants' policies and practices fail to ensure compliance with the Medicaid Act, ADA, and Section 504 requirements to timely provide, or arrange for, the provision of intensive home and community-based mental health services for children in New York State. (Am. Compl.)

The Parties engaged in substantial discovery and negotiated a Proposed Schedule (ECF No. 20), a Protective Order (ECF No. 25), an ESI Protocol (ECF No. 29), and five revised discovery schedules. (Decl. Daniele Gerard Supp. Joint Mot. Prelim. Approval Settlement Agreement ("Gerard Decl.") ¶ 11.) Both Parties produced hundreds of thousands of pages of documents through initial and supplemental disclosures and in response to requests for production, interrogatories, and rulings by Magistrate Judge James M. Wicks resolving several discovery disputes and motions. (*Id*.) Named Plaintiffs deposed nine fact witnesses and four

additional witnesses designated by Defendants under Rule 30(b)(6). (*Id.*) In addition to producing documents, Defendants produced extensive data and deposed three witnesses. (*Id.*) On November 16, 2023, Named Plaintiffs filed a motion for class certification supported by a memorandum of law, several declarations, hundreds of pages of exhibits, and five expert reports by national leaders in their fields. (ECF Nos. 52–55.)

On January 17, 2024, the Court held a status conference at which the parties reported on their discussions to resolve Named Plaintiffs' class certification motion without a court ruling. (Min. Entry, Jan. 18, 2024.) The Parties reported on their efforts to reach a stipulation as to the definitions of Named Plaintiffs' proposed classes and a stay of discovery to allow the Parties to engage in settlement negotiations. (*Id.*) The Parties further reported their agreement that, if the Court were to oversee settlement negotiations, neither Party would ask for the Court to recuse from adjudicating a bench trial on the merits in the event negotiations did not fully resolve this matter. (*Id.*)

On February 8, 2024, the Parties filed a joint motion to certify Named Plaintiffs' proposed classes, extend litigation deadlines, and stay litigation activity for three months to enable settlement discussions. (Joint Mot. Certify Class, ECF No. 71.) The Parties confirmed that they sought to explore settlement with the Court's assistance (*id*. at 1–2) and filed a stipulation concerning facts material to class certification (Stip. & Proposed Order Class Cert., ECF No. 72.) On February 22, 2024, the Court granted the joint motion and certified the case as a class action brought by the Named Plaintiffs on behalf of the EPSDT and ADA Classes. (Cert. Order.)

From late February 2024 to August 2025, the Parties engaged in frequent and intensive settlement discussions both on their own and with the Court's assistance as mediator on eleven separate occasions. Based on its own observation of the Parties' good faith and the significant

progress made between and during each of the Court-mediated settlement discussions, the Court granted the Parties' joint requests to extend the initial three-month litigation stay for additional periods of time. (Cert Order at 12–13; Min. Entry, Apr. 15, 2024; Elec. Order, Oct. 17, 2024; Elec. Order, Mar. 7, 2025.) During this period of around eighteen months, the Parties held meetings to discuss, draft, review, and negotiate the terms of the proposed Settlement Agreement. (Gerard Decl. ¶¶ 14, 15.) Before each settlement conference with the Court, the Parties submitted separate or joint settlement statements, updating the Court on the status of negotiations and highlighting areas where the Court's input would be most helpful. (*Id*. ¶ 14.)

The Parties executed a final proposed Settlement Agreement on August 7, 2025. (*Id*. ¶ 15.) They filed the Joint Motion for Preliminary Approval the following day, on August 8, 2025. (Joint Mot.)

## II.     Preliminary Approval Submissions

In support of the Joint Motion for Preliminary Approval, the Parties filed a memorandum in support of the Joint Motion for Preliminary Approval of the Parties' Settlement Agreement and the Parties' Plan to Provide Notice of the Settlement to the Class (ECF No. 77-1), the proposed Settlement Agreement (Settlement Agreement, ECF No. 77-2), the Proposed Notice (ECF No. 77-3), the Notice Plan (ECF No. 77-4), a Proposed Order preliminarily approving the class action settlement (ECF No. 77-5), the Declaration of Brandy L.L. Tomlinson (Tomlinson Decl., ECF No. 77-6), the Declaration of Daniele Gerard (Gerard Decl., ECF No. 77-7), the Declaration of Kimberly Lewis (Lewis Decl., ECF No. 77-8), the Declaration of Steven H. Holinstat (Holinstat Decl., ECF No. 77-9).

## III.    The Proposed Settlement Agreement

Pursuant to the proposed Settlement Agreement, the Parties agree to work together to

develop and implement a multi-year plan to provide timely access to intensive home and community-based mental health services across New York to children in the Classes in a manner consistent with the Parties' shared Goals and Objectives outlined in Section I of the proposed Settlement Agreement. (Settlement Agreement § I.) The proposed Settlement Agreement requires that Defendants, among other things, to provide the following Medicaid-covered services to members of the Classes for whom such services are necessary to correct or ameliorate a behavioral or mental health condition: (1) Intensive Care Coordination, (2) Intensive Home- Based Behavioral Health Services, and (3) Mobile Crisis Services, which foster the decriminalization of mental health by resulting in decreased contacts between law enforcement and people with mental health conditions. (Settlement Agreement ¶ 12; Joint Mot. at 5.) The proposed Settlement Agreement also requires Defendants to redesign the current Children and Family Treatment and Support Services ("CFTSS") program and the Home and Community-Based Services ("HCBS") Waiver Services program to meet the needs of members of the Classes who are eligible for the services. (*Id.*) These services are collectively referred to as the "Relevant Services" in the proposed Settlement Agreement and they are each defined in Appendix A to the Settlement Agreement (*Id.* ¶ 14; Appendix I, ECF No. 77-2 at 41–47.)

The proposed Settlement Agreement requires that Defendants: (a) execute the commitments and processes in the Unified Implementation and Improvement Plan for the Relevant Services (the "Implementation Plan"), including how the Relevant Services will be developed and rolled out; (b) ensure that the Relevant Services are available in a timely manner statewide to all Medicaid-enrolled children eligible to receive them; (c) identify eligibility criteria for each of the Relevant Services and identify and implement a

standardized assessment process or processes to determine eligibility for the Relevant

Services; and (d) develop data reporting and quality assurance processes to ensure the

Relevant Services are being provided on a timely basis in accordance with the terms of the

Settlement Agreement. (*Id.* at ¶¶ 14, 16, 35–40, 44–46, 62–80.)

According to the terms of the proposed Settlement Agreement, Defendants have

engaged Suzanne Fields, MSW, LICSW, a clinical social worker with decades of experience

as a national behavioral health expert, as the "Independent Reviewer" that will work with the

Parties to develop the Implementation Plan, monitor Defendants' progress, and mediate

disputes concerning adherence to the terms of the Settlement Agreement. (*Id.* ¶ 11; Gerard

Decl. ¶ 15.) Ms. Fields has extensive experience implementing statewide changes to systems

relating to Medicaid, managed care, mental health and substance use, child and adult

services, and child welfare. (*Id.*)

1. *Redesign of the Relevant Services*

Central to the proposed Settlement Agreement is Defendants' commitment to

substantially redesign their offering of mental and behavioral health services to more

specifically and appropriately address the needs of children in the Classes. The redesign will

draw from and adapt effective practices from Washington, Massachusetts, Ohio, and

California, four states that have implemented intensive home and community-based services

in response to litigation or system reforms similar to this case, and will respond to Named

Plaintiffs' concerns and experiences. (Joint. Mot. at 6.) In the proposed Settlement

Agreement, Defendants commit to ensuring provision of the Relevant Services in accordance

with each child's needs in a timely manner and at the intensity (including frequency and

duration) necessary to meet the individual needs of eligible children and their families.

8

(Settlement Agreement ¶ 14.) Defendants also commit to ensuring that sufficient numbers of service providers are available to provide the Relevant Services to meet the needs of eligible children on a timely basis throughout New York State. (Settlement Agreement ¶ 15.)

2. *The Implementation Plan*

In the proposed Settlement Agreement, the Parties agree to work closely and collaboratively to develop an Implementation Plan that will provide a roadmap for how Defendants will provide timely access to the Relevant Services to Medicaid-enrolled children in New York State. (*Id.* § IV.) Defendants will develop the Implementation Plan over the next 18 months with the collaboration and assistance of Named Plaintiffs and the Independent Reviewer. (*Id.*; Appendix B, ECF No. 77-2 at 48.) The Implementation Plan will identify specific steps that Defendants will take to develop and deliver the Relevant Services to eligible children statewide, and will include:

a. detailed standards and requirements and eligibility criteria for each of the Relevant Services;

b. proposed reimbursement rates to be set at amounts to ensure that payments to providers are sufficient to enlist enough providers to meet the needs of eligible children on a timely basis throughout New York State, at least to the extent that they are available to the general population in the geographic area, and network adequacy requirements;

c. an initial quality improvement plan ("QIP") that will establish a system of data-driven quality improvement that reviews, measures, and reports on a set of performance indicators related to the Relevant Services; subsequent annual QIPs will report on these performance indicators (see below);

d. the targeted strategies Defendants will undertake for providing all Class Members with medically necessary mental or behavioral health services in the least restrictive setting appropriate to their needs; and

e. a description of how Defendants will inform eligible children and their families/caregivers, and educate and involve the provider community and relevant state and local public child-serving agencies, regarding availability and delivery of the Relevant Services.

(*Id.* ¶¶ 20, 42, 47, 53–56, 62–63, 66–72.)

3. *The Quality Improvement Plan*

The proposed Settlement Agreement requires the consistent assessment of Defendants'

progress toward providing the Relevant Services to members of the Classes in order to identify

the need for any appropriate corrective action and promote continued improvement as necessary

to ensure that the Relevant Services are timely provided. (*Id.* ¶¶ 59, 66–80.) It requires

Defendants to conduct an initial Quality Improvement Plan ("QIP") and to issue, on an annual

basis, an updated QIP developed in consultation with the Independent Reviewer, Named

Plaintiffs, and relevant stakeholders and state agencies as set forth in the Settlement Agreement.

(*Id.* ¶¶ 62, 64.) The QIPs will include: (1) performance indicators measuring the provision,

timeliness, sufficiency, and effectiveness of the Relevant Services; (2) benchmarks and interim

utilization targets during the rollout; and (3) quality improvement procedures. (*Id.* ¶¶ 62, 65–80.)

Under the terms of the proposed Settlement Agreement, Defendants will also develop a

publicly available and regularly updated data dashboard to provide transparency and track key

statewide data related to the provision of the Relevant Services. (*Id.* ¶ 46.)

4. *The Audit & Exit Criteria*

Under the proposed Settlement Agreement, Defendants must conduct annual audits of the

provision of the Relevant Services, during both the rollout period and afterwards, to evaluate

whether Class Members are timely receiving the Relevant Services at the required intensity

(including frequency and duration), and in the child's home or where the child is otherwise

naturally located¸ and that recipients of the Relevant Services have received appropriate

assessments related to such Services. (*See generally id.* § VI.) The purpose of the annual audits is

also to allow the Independent Reviewer and the Parties to evaluate, among other things: (a) the

performance indicators agreed upon in the QIP and to determine the extent to which Defendants have met any specified utilization targets; (b) whether providers are providing Relevant Services in accordance with the Standards and Requirements for the Services; (c) whether the members of the Classes receiving the Relevant Services are timely receiving them at the required intensity (including frequency and duration); and d) whether corrective action is required under the quality improvement plan then in effect or otherwise under the Settlement Agreement. (*Id.* ¶ 81.)

Under the proposed Settlement Agreement, the Parties will agree upon clear exit criteria consisting of objective measures to determine whether Defendants have achieved substantial compliance, which will then result in Defendants' exit from this Court's jurisdiction. (*Id.* ¶ 106.) The exit criteria will be established by the Parties in consultation with the Independent Reviewer based on, among other things, a post rollout audit evaluating the provision of the Relevant Services. (*Id.* ¶ 107.)

5.  *Dispute Resolution and Enforcement*

Pursuant to the terms of the proposed Settlement Agreement, six months following the period for rolling out the Relevant Services, the Independent Reviewer will provide the Court annual reports regarding the status of the Settlement Agreement and the Implementation Plan. (*Id*. ¶¶ 94, 114.)

The proposed Settlement Agreement requires the Parties to mediate all disputes arising out of or in connection with the agreement or the Implementation Plan with the Independent Reviewer before seeking relief from the Court. (*Id*. ¶ 109.) If the Parties cannot achieve a resolution during the time period for mediating a dispute, the Independent Reviewer will prepare a recommendation as to how to resolve the dispute, and the Parties may respond to that recommendation within twenty days prior to submission of the recommendation to the Court.

(*Id.* ¶ 113.) The Independent Reviewer will simultaneously submit any such recommendations and the Parties' responses to the Court. (*Id.*)

Under the proposed Settlement Agreement, the Court retains all legal and equitable powers to enforce the terms of the agreement. (*Id.* ¶ 116.) Any party may seek relief from the Court regarding any recommendation of compliance, noncompliance, or remedy by the Independent Reviewer. (*Id.*) Upon a finding of Defendants' noncompliance with the proposed Settlement Agreement, the Court may issue an Order setting forth its finding of noncompliance and adopting any remedy within the Court's discretion following receipt of the Independent Reviewer's recommendation as to a resolution of the dispute and the Parties' responses to that recommendation. (*Id.* ¶¶ 113, 116.) The Court shall retain jurisdiction to enforce its Order to remedy noncompliance through its power of contempt. (*Id.* ¶ 116(b).)

## DISCUSSION

### I.      Class Action Settlement Approval

####      A.      <u>Legal Standard</u>

Where parties seek to settle claims brought by a plaintiff on behalf of a proposed class, the court must review the proposed class action settlement to ensure it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *Kurtz v. Kimberly-Clark Corp.*, 142 F.4th 112, 117 (2d Cir. 2025). Courts apply a three-step process of review. *See* Fed. R. Civ. P. 23(e)(1)–(2). The court first conducts a preliminary evaluation of the fairness of the proposed settlement agreement to determine whether to give notice of the proposal to all class members. Fed. R. Civ. P. 23(e)(1)(A). The second step consists of providing "notice of a hearing . . . to class members" and holding a hearing to ensure that "class members and settling parties are provided the opportunity to be heard[.]" *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,

330 F.R.D. 11, 27 (E.D.N.Y. 2019) (hereinafter "*Payment Card*") (brackets and quotation marks omitted); *see also Whelan v. Diligent Corp.*, 349 F.R.D. 79, 84 (S.D.N.Y. 2025). The court turns to the third step—final approval—only if the Court has granted preliminary approval and afforded notice of the hearing and an opportunity to be heard to all class members. *See id.*

### i.    Preliminary Approval Standard

During the preliminary approval stage, the court must analyze whether it "will likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P.  23(e)(1)(B). "The Court's role in reviewing the proposed settlement 'is demanding . . . because the adversariness of litigation is often lost after the agreement to settle.'" *Whelan*, 349 F.R.D. at 84 (quoting *Zink v. First Niagara Bank, N.A.*, 155 F. Supp. 3d 297, 308 (W.D.N.Y. 2016)). To approve a settlement before class certification, courts "demand a clearer showing of a settlement's fairness, reasonableness and adequacy and the propriety of the negotiations leading to it." *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982); *see also Calibuso v. Bank of Am. Corp.*, 299 F.R.D. 359, 366 (E.D.N.Y. 2014) (acknowledging the "higher degree of scrutiny" courts apply in reviewing class action settlements reached prior to class certification (citing *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001))).

A district court cannot grant preliminary approval of a class action settlement unless it is "likely to able to" grant final approval under Rule 23(e)(2). Fed. R. Civ. P. 23(e)(1)(B); *see Payment Card*, 330 F.R.D. at 28 ("[C]ourts must assess at the preliminary approval stage whether the parties have shown that the court will likely find that the factors weigh in favor of final settlement approval."). Prior to its 2018 amendment, Rule 23 did not provide specific factors for courts to consider in determining whether a proposed class action settlement was

"fair, reasonable, and adequate" under Rule 23(e)(2). *Id.* At that time, courts in the Second Circuit considered both the "negotiating process leading up to the settlement, *i.e.*, procedural fairness, as well as the settlement's substantive terms, *i.e.*, substantive fairness." *McReynolds v. Richards-Cantave*, 588 F.3d 790, 803–04 (2d Cir. 2009) (quotation marks and brackets omitted). To evaluate the procedural fairness of a proposed class action settlement, courts in this Circuit assessed whether "the settlement resulted from arm's-length negotiations, and [whether] plaintiffs' counsel possessed the necessary experience and ability, and have engaged in the discovery[] necessary to effective representation of the class's interests." *Id.* at 804 (quotation marks and brackets omitted). Courts evaluating the substantive fairness of a proposed class action settlement also considered the nine factors in *City of Detroit v. Grinnell Corporation*:

> (1) the complexity, expense and likely duration of the litigation;
> (2) the reaction of the class to the settlement;
> (3) the stage of the proceedings and the amount of discovery completed;
> (4) the risks of establishing liability;
> (5) the risks of establishing damages;
> (6) the risks of maintaining the class action through the trial;
> (7) the ability of the defendants to withstand a greater judgment;
> (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and]
> (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*McReynolds*, 588 F.3d at 804 (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000)).

In 2018, Congress amended Rule 23(e) to identify four "primary procedural considerations and substantive qualities that should always matter to the decision whether to approve [a settlement] proposal." Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018

14

amendment. Under Rule 23(e)(2), a court must explicitly consider whether:

>(A) the class representatives and class counsel have adequately represented the class;

>(B) the proposal was negotiated at arm's length;

>(C) the relief provided for the class is adequate, taking into account:
>(i) the costs, risks, and delay of trial and appeal;
>(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>(iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>(iv) any agreement required to be identified under Rule 23(e)(3); and

>(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).[1] "The first two factors are procedural in nature and the latter two guide the substantive review of a proposed settlement." *Moses v. New York Times Co.*, 79 F.4th 235, 242 (2d Cir. 2023).

In *Moses v. New York Times Company*, the Second Circuit emphasized that district courts "must consider the four factors outlined in Rule 23(e)(2) holistically" in addition to the *Grinnell* factors when evaluating a proposed class action settlement. *Moses*, 79 F.4th at 243. It clarified that:

>[T]he revised Rule 23(e)(2) does not displace our traditional *Grinnell* factors, which remain a useful framework for considering the substantive fairness of a settlement. But the rule now mandates courts to evaluate factors that may not have been highlighted in our prior case law, and its terms prevail over any prior analysis that are inconsistent with its requirements.

*Id*. The Second Circuit also held that courts may no longer presume a settlement to be substantively fair where it arose from an arms-length bargaining process. *Id.* at 243. *Moses* thus

---

[1] Rule 23(e)(1)(B) requires a court considering preliminary approval of a class settlement to find that it "will likely be able to . . . certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B). This requirement is inapplicable here were the Court has already certified two classes: the EPSDT Class and the ADA Class. (Cert. Order.)

confirmed that courts must consider *both* the Rule 23(e) factors and the *Grinnell* factors—to the extent that they differ—in determining whether to approve the proposed settlement of class action claims, as district courts had done following the 2018 amendment of Rule 23(e). *See e.g.*, *Payment Card*, 330 F.R.D. at 29; *LoCurto v. AT&T Mobility Servs. LLC*, No. 13-cv-4303, 2020 WL 13859604, at *4 (S.D.N.Y. June 22, 2020).

Courts have found that Rule 23(e)(2) does not otherwise address the following *Grinnell* factors: the reaction of the class to the settlement (second factor); the stage of the proceedings and the amount of discovery completed (third factor); the ability of the defendants to withstand a greater judgment (seventh factor); the range of reasonableness of the settlement fund in light of the best possible recovery (eighth factor); and the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation (ninth factor). *See, e.g.*, *Payment Card*, 330 F.R.D. at 30 n.22 (discussing the seventh, eighth and ninth *Grinnell* factors); *Amigon v. Safeway Constr. Enters. LLC*, No. 20-cv-5222, 2024 WL 5040436, at *6 (E.D.N.Y. Dec. 9, 2024) (discussing the second, third, seventh, eighth, and ninth *Grinnell* factors).

Accordingly, courts continue to analyze these *Grinnell* factors in combination with the Rule 23(e)(2) factors in evaluating settlement agreements in class actions whether the actions are brought under Rule 23(b)(2) for declaratory and injunctive relief or under Rule 23(b)(3) for damages. *See, e.g.*, *In re Payment Card*, 2024 WL 3236614, at *1, *13 (considering *Grinnell* factors in the Rule 23(b)(2) context); *Amigon*, 2024 WL 5040436, at *3, *6, *10 (considering *Grinnell* factors in the Rule 23(b)(3) context.). Courts differ, however, as to whether certain *Grinnell* factors relating to monetary damages—including the risks of establishing damages (fifth factor) and the amount of damages (seventh, eighth, and ninth factors)—are inapplicable or carry less weight in the context of class actions seeking only injunctive and declaratory relief.

*See In re Payment Card*, 2024 WL 3236614, at *26 (collecting cases on both sides).

Named Plaintiffs brought this class action seeking injunctive and declaratory relief to ensure that Defendants comply with federal civil rights laws. The proposed Settlement Agreement seeks to enact systemic changes in the provision of certain mental and behavioral health services across New York State so that members of the Classes receive tangible services to which they are legally entitled to correct or ameliorate their mental health conditions. Accordingly, the *Grinnell* fifth, seventh, eighth, and ninth factors, which concern monetary damages, need not be analyzed separately from the Rule 23(e)(2) factors and the other, relevant *Grinnell* factors. *See In re Payment Card*, 2024 WL 3236614, at *26 ("In [civil rights] cases, the ability of the defendant to withstand a greater judgment is essentially a non-issue because the defendant need only stop violating the law."); *United States v. New York*, Nos. 13-cv-4165 & 13-cv-4166, 2014 WL 1028982, at *8 ("When, as here, the settlement offers the class members the most important, most tangible form of relief sought by plaintiffs, these [range of reasonableness] factors," the eighth and ninth *Grinnell* factors, "weigh in favor of approval of the settlement.").

### B.    Analysis

The Court grants preliminary approval of the proposed Settlement Agreement as a settlement of the Named Plaintiffs' claims on behalf of themselves and the EPSDT and ADA Classes. The Joint Motion for Preliminary Approval and supporting documents demonstrate that the proposed Settlement Agreement is procedurally or substantively fair, reasonable, and adequate in light of the Rule 23(e)(2) factors and the applicable *Grinnell* factors. Additionally, the Notice Plan is designed to ensure that members of the Classes are notified of the proposed Settlement Agreement and have the opportunity to voice any objections and participate in a fairness hearing before the Court before. The Court has modified the Parties' Proposed Notice as

set forth in Appendix I of this Opinion and Order to make it easier for laypeople to understand, including members of the Classes, their parents and guardians, and service providers, who will play a vital role in ensuring that members of the Classes are notified of the proposed Settlement Agreement and their rights to submit objections and participate in a fairness hearing, among other rights.

### i. Procedural and Substantive Fairness Under Rule 23(e)(2) and *Grinnell*

All of the Rule 23(e) and relevant *Grinnell* factors either weigh in favor of the determination that the proposed Settlement Agreement is fair, reasonable, and adequate, and merits preliminary approval, or are neutral, as discussed in detail below.

### a. *Adequate Representation*

Prior to certifying the Classes, this Court determined that the Named Plaintiffs and Class Counsel would adequately and fairly represent the interests of the then proposed Classes as required by Rule 23(a)(4), Fed. R. Civ. P. (Cert. Order at 9–10.) To determine whether "the class representatives and class counsel have adequately represented the class" under Rule 23(e)(2)(A), courts consider "whether (1) plaintiff's interests are antagonistic to the interests of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Rosenfeld v. Lenich*, No. 18-cv-6720, 2021 WL 508339, at *4 (E.D.N.Y. Feb. 11, 2021) (citing *Cordes & Co. Fin. Servs. v. AG. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007)).

### (1) Adequate Class Representatives

In addition to the requirements of Rule 23(e)(2)(A), "[t]he Due Process Clause . . . requires that the named plaintiff at all times adequately represent the interests of the absent class members." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,

827 F.3d 223, 231 (2d Cir. 2016) (hereinafter "*Payment Card II*") (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985)). As noted in the Court's order certifying the Classes, the "named Class Representatives are teenage Medicaid recipients located throughout New York who have various mental and behavioral conditions requiring mental health care." (Cert. Order at 10 (citing Am. Compl. ¶¶ 18–82).) "The Next Friends are Named Plaintiffs' parents, family members, and guardians." (*Id*. (citing Am. Compl. ¶¶ 18, 36, 52, 66).) The members of the EPSDT and ADA Classes, along with Named Plaintiffs, who serve as class representatives, share an identical interest in attaining the requested injunctive and declaratory relief to ensure that Defendants are complying with their obligations under the Medicaid Act, the ADA, and Section 504 to timely provide, or arrange for, the provision of intensive home and community-based mental health services for children in New York. (*Id.* (citing Stip. & Prop. Order Class Cert. at 6).) "Additionally, the Next Friends are dedicated to representing the best interests of the four minor named Class Representatives." (*Id.*)

Here, there is no conflict of interest between the members of the Classes and the Named Plaintiffs and Next Friends. Moreover, the Named Plaintiffs and Next Friends have adequately represented the Classes since this action has been pending, including since the Court's certification of the Classes in February 2024. (Cert. Order.) The Next Friends have reviewed the language of the proposed Settlement Agreement with Class Counsel at Children's Rights and support its terms and provisions. (Gerard Decl. ¶ 20.) This review demonstrates continued engagement and participation by the Next Friends as required to ensure that the Named Plaintiffs, who are teenagers, adequately represent the Classes.

### *(2) Adequate Class Counsel*

"A court reviewing a proposed settlement must pay close attention to the negotiating

process, to ensure that . . . plaintiffs' counsel have possessed the experience and ability, and have engaged in the discovery[] necessary to effective representation of the class's interests." *D'Amato*, 236 F.3d at 85 (citation and quotation marks omitted); *see also* Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment ("[T]he nature and amount of discovery in this or other cases, or the actual outcomes of other cases, may indicate whether counsel negotiating on behalf of the class had an adequate information base . . . ."). A court may determine that class counsel is adequate based on findings concerning counsel's experience, involvement in other similar litigation, and knowledge in the area of complex class actions. *See D'Amato*, 236 F.3d at 85–86 (upholding district court's adequacy of class counsel finding based on these factors).

Class Counsel have provided exemplary representation to the Named Plaintiffs and the Classes in investigating and bringing this class action and throughout the more than three and a half years that this litigation has been pending. Class Counsel have extraordinary experience litigating class actions involving Medicaid, disability rights, and children's rights as documented in detail by the Gerard, Tomlinson, Lewis, and Holinstat Declarations. Children's Rights, whose staff serve as Lead Class Counsel, is a national advocacy organization that represents children in impact litigation across the country under a variety of federal constitutional and statutory laws, including Medicaid and ADA law. (Gerard Decl. ¶ 3.) Lead Counsel at Children's Rights have extensive experience in litigating complex class actions on behalf of children in Medicaid systems. (*Id.* ¶¶ 6, 8–9.) Disability Rights New York is the federally designated protection and advocacy organization for individuals with disabilities in New York and routinely litigates on behalf of children and adults with disabilities. (Tomlinson Decl. ¶¶ 5–7.) It has authority under federal law to gain broad access to facilities, individuals, and their records in order to investigate and address, among other things, the violation of the rights of individuals with disabilities. (*Id.*

20

¶ 7.) Class Counsel from Disability Rights New York have deep experience litigating on behalf of people with disabilities, including people with mental illness. (*Id*. ¶¶ 11–13.) The National Health Law Program is a nationally recognized expert in Medicaid, the ADA, and Section 504, and has extensive experience litigating and negotiating settlements in similar class actions brought across the country on behalf of children who need intensive home and community-based mental health services. (Lewis Decl. ¶¶ 4–5, 7–9.) Class Counsel at the National Health Law Program has extensive expertise in Medicaid and intensive home and community-based mental health services. (*Id*. ¶¶ 7–12.) Proskauer Rose LLP is a global law firm engaged in pro bono litigation, including complex civil rights cases. (Holinstat Decl. ¶¶ 3–4.)

For more than one and a half years prior to the commencement of this litigation, Class Counsel at Children's Rights and Disability Rights New York engaged in a resource-intensive and lengthy investigation of the potential claims at issue in this case, conducting interviews across New York State, including interviews of impacted children and families. (Gerard Decl. ¶ 10.) Class Counsel at Children's Rights conducted legal and factual research and analysis and public records work to inform the litigation that was filed. (*Id.*)

The collective expertise of Class Counsel in investigating, litigating, and negotiating the resolution of the claims in this class action has been apparent in the high quality oral and written advocacy and successful motion practice conducted by Class Counsel since the commencement of this action. Class Counsel engaged in significant and successful advocacy in the discovery process, negotiating discovery schedules, a Protective Order (ECF No. 25), and an ESI protocol (ECF No. 29), securing hundreds of thousands of pages of documents, defending three depositions of the Next Friends by Defendants, and conducting thirteen depositions, including depositions of DOH and OMH personnel and a stakeholder psychiatrist. (Gerard Decl. ¶ 11.)

21

Named Plaintiffs filed a robust Motion for Class Certification, supported by an extensive legal brief and several hundred pages of exhibits, five expert reports, deposition excerpts, and two declarations from local advocates. (ECF Nos. 52–55.) Class Counsel secured reports from five experts in support of the motion, which examined: (a) the extent to which New York's Medicaid-enrolled children are receiving mental health services, and the relevant policies and practices of DOH and OMH; (b) the effectiveness of intensive home and community-based services; (c) the implementation and assessment of New York's public mental health systems and programs; (d) the services provided to the four Named Plaintiffs; and (e) Defendants' data systems related to the provision of mental health services to Class Members. (ECF Nos. 54-2–54-6.) Class Counsel also filed a motion to compel the depositions of Defendant Commissioners of DOH and OMH, which was granted by Magistrate Judge Wicks (ECF No. 64), and affirmed by this Court (ECF No. 67).

Class Counsel continued to provide effective advocacy on behalf of the Named Plaintiffs and members of the Classes on complex issues of substantive and procedural law in initial settlement discussions leading to the Parties' agreement to stipulate to the class definitions and to file a joint motion for the Court to certify the Parties' agreed-upon class definitions and stay the litigation to facilitate settlement negotiations overseen by the Court. (Gerard Decl. ¶ 13.) Finally, in the course of settlement negotiations, Class Counsel contributed their extensive expertise in Medicaid, disability law, and the drafting and enforcement of settlement agreements involving systemic changes to the provision of mental health services for children, thereby fostering good faith, serious, and productive settlement negotiations. In short, the declarations from Class Counsel underscore that Class Counsel have dedicated thousands of hours to pre-filing investigation and post-filing litigation and discovery work and intensive settlement negotiations,

ensuring exemplary and effective representation for the Classes.

Accordingly, Class Counsel exceed the requirements of Rule 23(e)(2)(A) to adequately represent the Classes based on their deep experience, involvement in similar, complex litigation concerning the rights of children under the relevant federal statutes, and investment of thousands of hours to effectively investigate and litigate this case. *See D'Amato*, 236 F.3d at 85–86.

### b. *Arms-Length Negotiations*

A court must consider whether "the proposal was negotiated at arm's length" in assessing the fairness of a proposed class action settlement. Fed. R. Civ. P. 23(e)(2)(B). It is legal error, however, for a district court to "*presume*[] that [a] proposed settlement [is] fair, reasonable, and adequate because it was reached in an arms length negotiation," even where "the arms-length quality of the negotiations remain[s] a factor in favor of approving the settlement." *Moses*, 79 F.4th at 243.

Here, before reaching the proposed Settlement Agreement in August 2025, the parties engaged in nearly two years of active litigation, which included written fact and expert discovery, depositions, and class certification motion practice. As discussed above, the parties conducted extensive discovery through initial and supplemental disclosures, requests for production, and interrogatories, participated in discovery-related negotiations, and litigated motions to compel certain discovery, which ultimately resulted in the production of more than 900,000 documents. *See supra* Discussion § 1; Gerard Decl. ¶ 11. Named Plaintiffs conducted nine fact depositions of DOH and OMH personnel and a stakeholder psychiatrist, four depositions of Defendants' 30(b)(6) witnesses, and Defendants conducted three depositions of Next Friends and produced voluminous electronic data. (*Id.*) The Parties' vigorously litigated Named Plaintiffs' motion to compel the depositions of Defendant Commissioners of DOH and

OMH, which was granted by Magistrate Judge Wicks (ECF No. 64), and affirmed by this Court (ECF No. 67). (Gerard Decl. ¶ 12.) As discussed, Named Plaintiffs filed a substantial Motion for Class Certification, which was accompanied by five expert reports, seven declarations from stakeholders, and several hundred pages of exhibits, and Defendants were poised to oppose that motion when the Parties reached an agreement to ask for a stay of the litigation to enable settlement discussions. (*See* ECF Nos. 52–55; Min. Entry, Dec. 13, 2023.)

As previously discussed, the Parties also engaged in nearly eighteen months of extensive settlement discussions on their own and with the participation of the Court as mediator. The Court-mediated negotiations took place on the following dates: April 11, 2024; May 30, 2024; July 10, 2024; August 15, 2024; October 17, 2024; December 13, 2024; March 5, 2025; April 11, 2025; May 9, 2025; June 18, 2025; and July 18, 2025.[2] In between each of these Court-involved settlement discussions, the Parties met additional times to explore resolution of the claims in this action and to narrow disputes for the Court's assistance. (*See* Gerard Decl. ¶ 14) The Parties engaged in arms-length negotiations regarding the terms, structure, and implementation posture for the proposed Settlement Agreement throughout this process. (*Id.* ¶ 15.) The Court directly observed how the issues identified by the Parties for discussion with the Court in advance of Court-mediated discussions were the subject of vigorous advocacy by both sides even if ultimately resolved through lengthy negotiations with and without the Court's assistance. The Parties also regularly met with, and sought guidance from, Suzanne Fields, a clinical social worker with decades of experience in Medicaid, managed care, child and adult services, child

---

[2] Min. Entry, Apr. 11, 2024; Min. Entry, May 30, 2024; Min. Entry, July 10, 2024; Min. Entry, August 15, 2024; Min. Entry, October 17, 2024; Min. Entry, December 13, 2024; Min. Entry, March 5, 2025, Min. Entry, April 11, 2025; Min. Entry, May 9, 2025; Min. Entry, June 18, 2025; Min. Entry, July 18, 2025.

welfare, and child and adult mental health systems, to help craft proposed reforms. (*Id.*).

There is no indication in the record, and the Court has not observed, any bad faith or collusion between the Parties. Accordingly, this factor weighs in favor of preliminary approval of the proposed Settlement Agreement.

### c.  *Adequate Relief for the Class*

A court must also consider whether relief for the class is adequate under Rule 23(e)(2), taking into account:

> (i) the costs, risks, and delay of trial and appeal;
> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
> (iv) any agreement required to be identified under Rule 23(e)(3).

Fed. R. Civ. P. 23(e)(2)(C). Because a proposed settlement agreement's provision setting forth a release of liability "affects the determination of the fairness, reasonableness, and adequacy of class relief," the Court will consider the proposed release of liability under this section. *Payment Card*, 330 F.R.D. at 36; *see also Zaslavskiy v. Weltman, Weinberg & Reis Co., LPA*, No. 18-cv-4747, 2020 WL 9814083, at *9–10 (E.D.N.Y. Oct. 19, 2020), *report and recommendation adopted*, Elec. Order, Dec. 1, 2020.

### *(1)  Costs, Risks, and Delay of Trial and Appeal*

In assessing the costs, risks, and delay of trial and appeal, "courts may need to forecast the likely range of possible classwide recoveries and the likelihood of success in obtaining such results." *Payment Card*, 330 F.R.D. at 36 (citing Fed. R. Civ. P. advisory committee's note to 2018 amendment). "This assessment implicates several *Grinnell* factors, including: (i) the complexity, expense and likely duration of the litigation; (ii) the risks of establishing liability . . . and (iv) the risks of maintaining the class through the trial." *Id.* (citing *Grinnell*, 495

F.2d at 463); *see also Cymbalista v. JPMorgan Chase Bank, N.A.*, No. 20-cv-456, 2021 WL 7906584, at *6 (E.D.N.Y. May 25, 2021). Accordingly, courts "use[] these *Grinnell* factors to guide [the] assessment" of costs, risks and delay under Rule 23(e)(2)(C). *Payment Card*, 330 F.R.D. at 36.

(A) <u>Complexity, Expense, and Likely Duration of the Litigation</u>

"Courts favor settlement when litigation is likely to be complex, expensive, or drawn out." *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 693 (S.D.N.Y. 2019). The expense, complexity, and likely lengthy duration of the litigation weigh heavily in favor of preliminary approval of the proposed Settlement Agreement for the reasons discussed in detail below.

As demonstrated by the Amended Complaint and Named Plaintiffs' Motion for Class Certification, this case involves complex issues of substantive and procedural law relating to children's rights to mental and behavioral health services under the Medicaid Act, the ADA, and Section 504 of the Rehabilitation Act. (Am. Compl; ECF Nos. 52–55.) As discussed the length, this case has involved significant pre-litigation investigation over the course of one and a half years as well as nearly two years of vigorous pre-trial litigation, which involved numerous discovery disputes, the commencement of class certification motion practice, and the marshalling of expert evidence.[3] According to the Joint Motion for Preliminary Approval, if the case were to continue, "the Parties would need to resume discovery and prepare for trial," which would require further extensive discovery because the significant volume of discovery regarding New York's mental and behavioral health system for children and youth already exchanged "is now stale." (Joint Mot. at 18.) The Parties agree that resuming litigation would require extensive additional discovery, including updated expert reports. (*Id.*)

---

[3] *See supra* Background § I for a review of the litigation history in this case.

Accordingly, the Parties agree that settling the case now serves their mutual interest in ensuring that the Relevant Services are delivered to all members of the Classes as expeditiously as possible, as opposed to continuing with protracted, lengthy, expensive, and uncertain litigation. The proposed Settlement Agreement provides immediate, substantial, and enforceable commitments by Defendants to develop an Implementation Plan informed by the expertise and input of the Independent Reviewer, Named Plaintiffs, and Class Counsel to timely deliver the Relevant Services to members of the Classes and thereby address the violations that led Named Plaintiffs to file this suit. The mental health service delivery systems that Defendants commit to systemically improving across New York State are complex. In agreeing to the proposed Settlement Agreement's requirements regarding the development of an Implementation Plan followed by a period for rolling out the Relevant Services and conducting consistent quality improvement plans and audits to identify areas for improvement and correction until specific exit criteria are met, the Parties convey their agreement that this course of action is best placed to ensure that the Relevant Services are provided as quickly as possible to children in the Classes. (*See* Joint. Mot. at 17–18.)

## (B) The Risks of Establishing Liability

A court considering the risks of establishing liability "need only assess the risks of litigation against the certainty of recovery under the proposed settlement." *In re Payment*, 330 F.R.D. at 36–7 (quotation marks omitted). Named Plaintiffs maintain that they have a strong case on the merits, but that proceeding to trial would delay needed relief to members of the Classes who lack access to the mental and behavioral health services they need. (Joint Mot. at 18.)

Without deciding the merits of the claims, the Court recognizes that a trial in this case would involve significant risks to Named Plaintiffs and members of the Classes because the

Medicaid Act, ADA, and Section 504 claims in this case are complex and require the evaluation of expert testimony and voluminous facts relating to the provision of mental health services to children across New York State. Named Plaintiffs have carefully weighed the risk of proceeding to trial as well as the resources and time required to litigate such complex claims in deciding to reach a settlement. Additionally, Class Counsel were fully informed about the facts and circumstances of this case when they entered settlement negotiations with Defendants on behalf of Named Plaintiffs and the Classes. (Gerard Decl. ¶ 16; Lewis Decl. ¶ 13; Tomlinson Decl. ¶ 19; Holinstat Decl. ¶ 9.) Indeed, were this case to continue, Named Plaintiffs would need to secure updated expert reports and the Parties would need to engage in additional fact and expert discovery and likely engage in additional motion practice.

Accordingly, the Court finds that there is sufficient risk of establishing liability and that this factor weighs in favor of granting preliminary approval.

### (C) The Risks of Maintaining the Class Through Trial

The risks of maintaining a class through trial, while "present in every class action . . . nevertheless weigh[] in favor of settlement where it is likely that defendants would oppose class certification if the case were to be litigated." *Payment Card*, 330 F.R.D. at 39–40 (quotation marks and brackets omitted).

Here, the Court has already certified two Classes under Rule 23(b)(2) following the Parties' stipulation to the class definitions. (*See* Cert. Order; Stip. & Proposed Order Class Cert; Joint Mot. Certify Class.) In light of the fact that Defendants ultimately joined Named Plaintiffs' Motion for Class Certification and stipulated to the class definitions, it is unlikely, although not impossible, that Defendants would move for decertification before any final judgment. *See* Fed. R. Civ. P. 23(c)(1)(C) (providing that, before final judgment, a court may alter or amend any

order granting or denying class certification). As a result, the Court finds that the *Grinnell* factor concerning the risks of maintaining the class through trial is either neutral or weighs in favor of granting preliminary approval. *See Payment Card*, 330 F.R.D. at 40 (finding that this factor likely weighs in favor of preliminary approval where defendants would likely move for decertification given that they had agreed to certification of a settlement class "for settlement purposes only"); *Warren v. Xerox Corp.*, No. 01-cv-2909, 2008 WL 4371367, at *5 (E.D.N.Y. Sept. 19, 2008).

### *(2) Effectiveness of Distributing Relief to the Class*

To assess whether the settlement of a putative class action affords adequate relief for the proposed class, courts must also examine "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e)(2)(C)(ii). Typically, this consideration involves evaluating the parties' proposed plan for distributing damages to class members. *See e.g.*, *Johnson*, 333 F.R.D. at 321 (indicating approval for a process by which checks would be mailed to each class member based on their proportion of the damages incurred by the entire class). In *In re Payment Card*, another judge of this Court found that the effectiveness of any proposed method of distributing relief to the class need not be considered in a class action seeking only equitable relief where "relief will be effectuated by the settlement terms alone." *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig*, No. 05-md-1720, 2024 WL 3236614, at *29 (E.D.N.Y. June 28, 2024) (relying on *Newkirk v. Pierre*, No. 19-cv-4283, 2022 WL 20358182, at *4–7 (E.D.N.Y. Oct. 25, 2022) (lacking any discussion of this factor when assessing settlement for equitable relief)).

Here, where Named Plaintiffs' claims on behalf of the Classes seek solely declaratory and injunctive relief, this factor is not considered. The terms of the proposed Settlement

Agreement will effect relief to members of the Classes in requiring Defendants to develop an Implementation Plan and roll out the Relevant Services to children in the Classes across New York State such that members of the Classes timely receive the Relevant Services "at the intensity (including frequency and duration) necessary to meet the individual needs of eligible children and their families." (Joint. Mot. at 6.) Like the agreement at issue in *In Re Payment Card*, because this relief is equitable in nature, "relief will be effectuated by the settlement terms alone" and the effectiveness of any proposed method of distributing relief to the class need not be considered as a separate issue. 2024 WL 3236614, at *29.

### (3) Attorneys' Fees

"[W]hen reviewing the substantive fairness of a proposed settlement, the district court is required to review both the terms of the settlement and any fee award encompassed in a settlement agreement in tandem." *Moses*, 79 F.4th at 244 (quotation marks omitted); *see also* Fed. R. Civ. P. 23(e)(2)(c)(iii). "This review provides a backstop that prevents unscrupulous counsel from quickly settling a class's claims to cut a check." *Moses*, 79 F.4th at 244 (quotation marks omitted). Indeed, "the relief actually delivered to the class can be a significant factor in determining the appropriate fee award." Fed. R. Civ. P. 23(e)(3) advisory committee's note to the 2018 amendment.

The proposed Settlement Agreement reserves the determination of attorneys' fees, costs, and expenses to the Court. (Settlement Agreement ¶ 124.) To avoid any conflict of interest, the Parties agreed to conduct any negotiations for attorneys' fees separate from the negotiations concerning the provisions of the proposed Settlement Agreement. (Joint Mot. at 17; Pls.' Oct. 2, 2024 Settlement Statement at 2; Gerard Decl. ¶ 17.) Named Plaintiffs anticipate that they will separately seek a reasonable award of attorneys' fees and costs only after the Court rules on the

Joint Motion for Preliminary Approval of the Settlement Agreement. (Gerard Decl. ¶ 17.) Moreover, this Court will "tak[e] into account . . . the terms of any proposed award of attorney's fees, including timing of payment" prior to approving the final settlement. Fed. R. Civ. P. 23(e)(2)(C)(iii).

Accordingly, the fact that attorney's fees are not awarded in the proposed Settlement Agreement but will instead be handled separately—and likely through motion practice—weighs in favor of preliminary approval.

### (4) Agreement under Rule 23(e)(3)

Rule 23 additionally requires the parties to "file a statement identifying any agreement made in connection with the proposal." Fed. R. Civ. P. 23(e)(3). A court must consider any such agreement in assessing whether "the relief provided for the class is adequate" under the proposed settlement agreement. Fed. R. Civ. P. 23(e)(2)(C). The Court need not address this factor, as the parties have not indicated that they made any separate agreement in connection with the proposed Settlement Agreement.

### (5) Release of Liability

It is "well-established . . . that class action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct." *Payment Card*, 330 F.R.D. at 42 (citing *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 107 (2d Cir. 2005)) (quotation marks omitted). Accordingly, "[c]ourts have denied preliminary approval where releases from liability are deemed to be overly broad." *Payment Card*, 330 F.R.D. at 42. For example, in *Karvaly v. eBay, Incorporated*, the court found that:

> a general release that purport[ed] to strip millions of individuals of their rights to sue the defendants upon a wide range of offenses that have nothing to do with the

> misconduct alleged in the present action, for no more consideration than [the defendant's] agreement to make certain superficial changes to its website, is an offense to the principle of due process so egregious as to render the proposed settlement untenable even at this preliminary stage.

245 F.R.D. 71, 88–89 (E.D.N.Y. 2007). Release of liability provisions in class action settlement agreements are further "limited by . . . [the] adequacy of representation doctrine[]." *Payment Card II*, 827 F.3d at 236–37 (citing *Wal-Mart Stores*, 396 F.3d at 106) (quotation marks omitted). Courts will not enforce releases where class plaintiffs were inadequately represented at the time the release was negotiated. *Cf. Payment Card II*, 827 F.3d. at 236 ("[M]embers of a class not present as parties to the litigation may be bound by the judgment where they are in fact adequately represented by parties who are present consistent with the requirements of due process and full faith and credit." (citing *Hansberry v. Lee*, 311 U.S. 32, 42–43 (1940)) (quotation marks omitted)); *see also Wal-Mart Stores, Inc.*, 396 F.3d at 109 ("Claims arising from a shared set of facts" that have been explicitly included in a settlement release of liability provision "will not be precluded [in a later action] where class plaintiffs have not adequately represented the interests of class members.").

Here, the proposed Settlement Agreement provides that "Nothing in this Settlement Agreement shall limit the ability of any individual Plaintiff or Class Member to pursue any legal or administrative remedies to which they would otherwise be entitled under state or federal law other than the claims for systemic injunctive and declaratory relief adjudicated by this action." (Settlement Agreement ¶ 142.) Neither this provision nor any other in the proposed Settlement Agreement accomplishes the type of overbroad, general release of liability in *Karvaly*, which "render[ed] the proposed settlement [in that action] untenable." 245 F.R.D. at 88–89. By contrast, paragraph 142 of the proposed Settlement Agreement only releases members of the Classes from bringing identical claims for *systemic changes* to the DOH and OMH's provision of

32

mental and behavioral health services to Medicaid-eligible children under 21 in New York State as those brought in this action.

Accordingly, this factor also weighs in favor of granting preliminary approval.

### d. *Equitable Treatment of Class Members*

Before approving a class settlement, "the court must take into account whether the 'proposal treats class members equitably relative to each other.'" *Moses*, 79 F.4th at 244 (quoting Fed. R. Civ. P. 23(e)(2)(D)). When analyzing this Rule 23(e)(2) factor, courts may consider "whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." *Payment Card*, 330 F.R.D. at 47 (quoting Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment).

The proposed Settlement Agreement satisfies Rule 23(e)(2)(D) because it secures a realistic if ambitious path to bring about the systemic relief sought by Named Plaintiffs in the Amended Complaint to ensure that Medicaid-eligible children under age 21 in New York State receive individualized intensive home and community-based mental and behavioral health services that are necessary and appropriate for their needs while remaining safely at home and in their communities. (Am. Compl. ¶¶ 1–6.) As discussed at length, the proposed Settlement Agreement requires the development of a detailed and comprehensive Implementation Plan to substantially overhaul the Relevant Services available to members of the Classes, who live across New York State. (Settlement Agreement § IV; Appendix B.) It also requires Defendants to improve care coordination through the development of Intensive Care Coordination services (Settlement Agreement ¶¶ 22–25), expand intensive home-based behavioral health services (*id.* ¶¶ 26–29); strengthen mobile crisis services (*id.* ¶¶ 30–31), standardize screening and assessment

processes (*id.* ¶¶ 37–38), address provider capacity challenges (*id.* ¶¶ 53–55), develop a public set of data reporting (*id.* ¶ 46), and implement a robust quality improvement and accountability framework to ensure timely access to the Relevant Services across the State (*id.* § V). Moreover, the proposed Settlement Agreement includes a specific timeline by which the interim steps required to develop the Implementation Plan must be completed and projects that this entire process, which will involve the Parties, numerous government agencies, the Independent Reviewer, stakeholders, and the Court will take eighteen months. (*Id*. ¶ 52; Appendix B.) Once approved by the Court, Defendants must roll out the Implementation Plan and, starting as early as the rollout period, conduct required quality improvement plans to assess Defendants' progress toward providing the Relevant Services. (*Id*. ¶¶ 62–65 (QIP), 85–87 (Rollout provisions.) Defendants must also conduct consistent audits to identify the need for any corrective action to ensure provision of the Relevant Services to members of the Classes. (*Id*. ¶¶ 81–84.) Finally, the proposed Settlement Agreement requires that the Independent Reviewer to oversee implementation of the Settlement Agreement and the development of exit criteria that Defendants must meet in order to exit from the Court's jurisdiction. (*id.* § VIII and ¶ 106.)

The proposed Settlement Agreement thus seeks to provide all members of the Classes relief by achieving widespread, systemic changes in how Defendants provide access to the Relevant Services, and thereby equitably treats all members of the EPSDT and ADA Classes. *See Moses*, 79 F.4th at 245 (noting that "Rule 23(e)(2)(D) requires that class members be treated *equitably*, not identically") (emphasis in original)); *Payment Card*, 2024 WL 3236614, at *36 (explaining that in a Rule 23(b)(2) class action, "different class members can benefit differently from an injunction – but no matter what, they *must* stand to benefit (it cannot be the case that some members receive no benefit while others receive some)") (emphasis in original; citation

omitted). Here, the Settlement does not grant preferential treatment to any member or subset of the EPDST or ADA Classes.

e.  *Reaction of the Class to the Settlement*

A fourth *Grinnell* factor not otherwise codified in Rule 23(e)(2) is the class's reaction to the proposed settlement. *See McReynolds*, 588 F.3d at 804 (citing *Grinnell*, 495 F.2d at 463). Courts have long considered this factor to be "perhaps the most significant factor to be weighted in considering [a class action settlement's] adequacy." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 343 F. Supp. 3d 394, 410 (S.D.N.Y. 2018), *aff'd sub nom. In re Facebook, Inc.*, 822 F. App'x 40 (2d Cir. 2020). Courts do not typically consider this factor at the preliminary approval stage because notice has not yet been provided to the class. *Mikhlin v. Oasmia Pharm. AB*, No. 19-cv-4349, 2021 WL 1259559, at *4 n.2 (E.D.N.Y. Jan. 6, 2021).

Accordingly, at this stage of the proceedings, this factor does not weigh in favor of, or against, preliminary approval of the proposed Settlement Agreement. *See Rodriguez v. CPI Aerostructures, Inc.*, No. 20-cv-982, 2023 WL 2184496, at *15 (E.D.N.Y. Feb. 16, 2023) ("The Court could not address the reaction of the Class to the settlement during the preliminary approval stage . . . .").

f.  *Proposed Settlement Agreement Meets the Requirements for Preliminary Approval*

For all of the aforementioned reasons, all of the Rule 23(e) and relevant *Grinnell* factors either weigh in favor of the determination that the proposed Settlement Agreement is fair, reasonable, and adequate, and merits preliminary approval, or are neutral at the preliminary approval stage. Named Plaintiffs and Class Counsel have adequately represented the interests of the Classes through extensive pre-litigation investigation, vigorous and skilled advocacy in the course of this litigation, and the devotion of thousands of hours to the development and

35

prosecution of this action. The resulting proposed Settlement Agreement would provide substantial benefits to the Classes while removing the delay, risk, and expense inherent in the trial of such a complex case. Under the terms of the proposed Settlement Agreement, Defendants commit to developing an implementation plan in the next 18 months and to rolling out that plan to ensure that Defendants provide Medicaid-eligible children in New York State with timely access to the intensive home and community-based mental and behavioral health services identified in the Amended Complaint. If approved by the Court, the proposed Settlement Agreement would resolve all claims in this lawsuit with Defendants' commitment to provide timely access to medically necessary services for Medicaid-eligible children under age 21 with mental and behavioral health conditions. The proposed Agreement thereby merits preliminary approval.

## II.    The Modified Notice and Notice Plan Are Sufficient

In preliminarily approving a class action settlement, the Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B). The notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Phillips*, 472 U.S. at 812 (internal citations omitted). "[T]he court has virtually complete discretion as to the manner of giving notice to class members." *Handschu v. Special Servs. Div.*, 787 F.2d 828, 833 (2d Cir. 1986); *see also Caballero v. Senior Health Partners, Inc.*, No. 16-cv-326 & 18-cv-2380, 2018 WL 4210136, at *13 (E.D.N.Y. Sept. 4, 2018); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 345 (E.D.N.Y. 2010). "Notice need not be perfect, but must be the best notice practicable under the circumstances, and each and every class member need not receive actual notice, so long

36

as class counsel acted reasonably in choosing the means likely to inform potential Class

Members." *Oladipo v. Cargo Airport Servs. USA, LLC*, No. 16-cv-6165, 2019 WL 2775785,

at *10 (E.D.N.Y. July 2, 2019).

The Proposed Notice adequately summarizes the litigation and describes the

Settlement Agreement. However, it uses compound sentences, block text, and legal and

technical terms that may be difficult for members of the Classes to understand.[4] The Court

has modified the Proposed Notice to better foster the provision of clear instructions on how

members of the Classes may obtain more information about the Settlement Agreement and

voice objections, while also using plain language and formatting that help make the

information more accessible to lay people and easier to understand. The modified Notice is

set forth below in Appendix I. With these modifications, the Notice meets the Rule 23

requirements. *See Oladipo*, 2019 WL 2775785, at *11 (approving notice that set forth options

available to class members, including if a member objected to the settlement). If the Parties

---

[4] For example, the Proposed Notice provides in block text:

> The Relevant Services include: (1) Intensive Care Coordination; (2) Intensive
> Home-Based Behavioral Health Services; (3) Mobile Crisis Services; and (4)
> Medicaid Home and Community-Based Waiver Services. These services are
> defined in more detail in the attached "Appendix A" from the Settlement
> Agreement, and are referred to as the Relevant Services. Under the Agreement,
> DOH and OMH have agreed to, among other things, (a) make changes to the
> standards and requirements in delivery of these services; (b) make changes to the
> eligibility criteria for access to these services; (c) increase the pathways available
> for accessing these services; (d) regularly review Medicaid reimbursement rates
> for these services; and (e) ensure that these Relevant Services are available
> throughout New York State and provided to class members of the Classes who
> need them.

(Proposed Notice at 4.) The information contained in this block of text is important, but may be
had for a layperson to digest because it includes compound sentences, dense and technical
language, and lists that are embedded in paragraph form rather than separated out to promote
easy reading and understanding. The Court's modified Notice seeks to address these issues.

object to any of the Court's modifications or seek to make any additional changes to the Notice, they will file a joint letter on ECF with a redlined revision of the Court's modified Notice by **August 20, 2025**.

Likewise, the Notice Plan is reasonable and adequately meets the due process requirements of Rule 23. The Notice Plan provides that both Parties will post copies of the Notice and the Settlement Agreement on their websites and in their offices. (*Id.*) The Notice Plan describes the manner in which the Parties will distribute the Notice, along with the proposed Settlement Agreement, to a list of specified individuals, agencies, and organizations likely to work with members of the Classes and their families, so that these entities may provide the Notice to potential members of the Classes. *Id.* These individuals and entities include, among others, managed care organizations, New York county mental hygiene directors and other county officials, community mental health providers, hospitals, institutional providers, legal organizations, and mental health advocacy organizations. *Id.* The Notice Plan also requires Named Plaintiffs to maintain dedicated lines of communication for members of both Classes to request further information or to ask questions or provide comments about the proposed Settlement Agreement. *Id.*

Here, individual notice to members of the Classes is not practicable because individual Class Members have not yet been referred for the Relevant Services and are therefore not yet easily identified. This is particularly true because the proposed Settlement Agreement requires Defendants to develop eligibility criteria for the Relevant Services. (Settlement Agreement ¶ 35–40.) Because there are presently millions of Medicaid-enrolled children under age 21 in New York State, providing individual notice to each of these children by mail would be extremely expensive. Where individual members of the Classes

cannot be easily identified, and "where individual notice would be burdensome or expensive," notice by publication is appropriate. *See MetLife*, 689 F. Supp. 2d at 345 (citations omitted).

### III.    Timeline

The Court adopts the following timeline for distribution of the Notice and scheduling of a final approval hearing:

| Event | Date |
|---|---|
| Completion of Notice Plan and Distribution of Notice | October 20, 2025 |
| Named Plaintiffs to submit to Court their application for fees and costs | November 10, 2024 |
| Objection Deadline | November 24, 2025 |
| Motion for Final Settlement Approval | December 19, 2025 |
| Named Plaintiffs to submit to Court, under seal, all submissions in support and objections to the settlement | December 19, 2025 |
| Final Approval Hearing | January 6, 2026 at 10:00 AM |

### CONCLUSION

For the reasons set forth above, the Court grants the Parties' Joint Motion for Preliminary Approval of Class Action Settlement Agreement and for Other Relief (ECF No. 77) in its entirety. The Parties' proposed Settlement Agreement is preliminarily approved.

The Court approves the form and content of the modified Notice set forth as Appendix I to this Opinion and Order. If the Parties object to any of the Court's modifications to the Proposed Notice or seek to make any additional changes to the modified

Notice, they will file a joint letter on ECF with a redlined revision of the Court's modified Notice by **August 20, 2025**.

The Court approves the proposed Notice Plan (ECF No. 77-4.) The Notice must be distributed by October 20, 2025.

Class Members and other interested parties shall submit any comments or objections to the proposed Settlement Agreement by November 21, 2025. Objections shall be submitted in accordance with the procedure set forth in the Notice.

The Parties may file a brief (a) in support of final approval of the Settlement Agreement, and (b) addressing any objections and comments by December 19, 2025. Named Plaintiffs will also submit to the Court under seal all submissions objecting or in support of the proposed Settlement Agreement by December 19, 2025.

The Final Approval Hearing concerning approval of the Settlement Agreement and Named Plaintiffs' request for attorney's fees and costs will be held on January 6, 2026 at 10:00 am in Courtroom 1040 of the Alfonse D'Amato Courthouse, 100 Federal Plaza, Central Islip, New York.


Dated: Central Islip, New York
        August 18, 2025


                                          _/s/ Nusrat J. Choudhury_____
                                          NUSRAT J. CHOUDHURY
                                          United States District Judge

**COURT APPENDIX I**

**<u>**PLEASE READ**</u>**

<u>IMPORTANT NOTICE THAT MAY AFFECT YOUR RIGHTS</u>

<u>PROPOSED CLASS ACTION SETTLEMENT</u>

**This Notice is about a proposed settlement of the class action lawsuit *C.K v. McDonald*.**

**PURPOSE OF THIS NOTICE**

This notice informs you about the proposed settlement of legal claims in a class action lawsuit against James V. McDonald, the Commissioner of the New York State Department of Health ("DOH") and Ann Marie T. Sullivan, the Commissioner of the New York State Office of Mental Health ("OMH").

DOH is the state agency responsible for administering the Medicaid program. OMH helps DOH administer Medicaid for people with serious mental illness, including children and teenagers with serious emotional disturbances and other mental or behavioral health conditions. OMH also has sole responsibility for licensing and overseeing the delivery of specialized services for these groups of people. DOH and OMH's collaboration to administer mental and behavioral health programs relevant to this lawsuit is referred to as "New York Medicaid."

This notice summarizes the Settlement Agreement ("Agreement") and tells you what you must do **if you <u>object</u> to the Agreement**. You are receiving this notice because you may be a member of the Classes or a person who may act in the interest of members of the Classes.

**BRIEF DESCRIPTION OF THE LAWSUIT**

This class action lawsuit is about New York Medicaid's provision of intensive home and community-based mental health services to Medicaid-eligible children in New York State under the age of 21 who have a mental or behavioral health condition. The lawsuit was filed on March 31, 2022 in federal court in the Eastern District of New York. It alleges that DOH and OMH fail to provide required services in violation of federal Medicaid laws, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act.

***The lawsuit does not seek to recover any money.***

The parties agreed to settle the lawsuit. They entered into this Agreement to improve the

provision of mental health services to children and youth in New York's Medicaid program. The lawsuit also requests that Defendants pay Plaintiffs' counsel reasonable attorney's fees and costs for their work on this case. This Agreement does not include those fees and costs for Plaintiffs' counsel. Any fees and costs for counsel will be negotiated separately from the Agreement.

## DESCRIPTION OF THE CLASSES

This case has been certified as a class action against DOH and OMH on behalf of two Classes of children and youth in New York State:

1. All current or future Medicaid-eligible children in New York State under the age of 21 (a) who have been diagnosed with a mental health or behavioral health condition, not attributable to an intellectual or developmental disability, and (b) for whom a licensed practitioner of the healing arts acting within the scope of practice under state law has recommended intensive home and community-based mental health services (as defined in Appendix A of this Settlement Agreement) to correct or ameliorate their conditions.

2. An ADA Class of all current or future Medicaid-eligible children in New York State under the age of 21 (a) who have been diagnosed with a mental health or behavioral health condition, not attributable to an intellectual or developmental disability, that substantially limits one or more major life activities, (b) for whom a licensed practitioner of the healing arts acting within the scope of practice under state law has recommended intensive home and community-based mental health services (as defined in Appendix A of this Settlement Agreement) to correct or ameliorate their conditions or who have been determined eligible for HCBS Waiver Services (as defined in Appendix A of this Settlement Agreement), and (c) who are segregated, institutionalized, or at serious risk of becoming institutionalized due to their mental health or behavioral health condition.

In other words, the Classes include children and youth with mental or behavioral health conditions who need intensive home and community-based services. They also include children and youth who might become institutionalized if they don't get these services. The Classes do not include people with addiction disorders or intellectual or developmental disabilities without a mental health diagnosis.

## SUMMARY OF THE SETTLEMENT AGREEMENT

The main objective of the Agreement is to ensure that New York Medicaid develops and delivers intensive home and community-based mental health services to children and youth in the Classes. These are referred to as the "Relevant Services."

The Relevant Services include:

(1) Intensive Care Coordination,
(2) Intensive Home-Based Behavioral Health Services,
(3) Mobile Crisis Services, and
(4) Medicaid Home and Community- Based Waiver Services.

The Relevant Services are defined in the attached "Appendix A" from the Settlement Agreement. Under the Agreement, DOH and OMH have agreed to, among other things:

(a) make changes to the standards and requirements for delivering these services;
(b) make changes to the eligibility criteria for access to these services;
(c) increase the pathways available for accessing these services;
(d) regularly review Medicaid reimbursement rates for these services; and
(e) ensure that these Relevant Services are available throughout New York State and provided to members of the Classes who need them.

As part of the Agreement, New York Medicaid has agreed to make additional changes to their mental and behavioral health services, including:

- Screening and assessing potential Class Members statewide for eligibility for the Relevant Services;

- Ensuring sufficient numbers of providers are available to deliver the Relevant Services in a timely manner;

- Providing public data related to those receiving the Relevant Services;

- Tracking and reviewing the quality of the Medicaid mental and behavioral health system to make sure that the children who need these services get them;

- Hiring an expert in children and family services to review New York Medicaid's progress in meeting the Agreement's requirements and reporting to the Court; and

- Developing a plan to inform potential referring providers and eligible children and their families/caregivers about the availability of the Relevant Services.

This lawsuit **does not seek money damages** for the Classes. The Agreement does ***not*** include any money for Class Members.

### PROCEDURES FOR OBJECTING TO THE SETTLEMENT

**If you agree with the Agreement between Plaintiffs and New York Medicaid, you DO NOT need to do anything.** You may attend the public hearing on the Agreement (called the

2

"Fairness Hearing") where the Judge will determine whether the Agreement is fair, reasonable, and adequate as to members of the Classes.

**If you have objections to the Proposed Agreement, please mail or email them by the November 21, 2025 deadline** to Plaintiffs' counsel at:

CHILDREN'S RIGHTS, INC.
Attn: Daniele Gerard
88 Pine Street, Suite 800
New York, NY 10005

OR

Email: NYMedicaid@childrensrights.org

Your objection should include your name and address. Please be specific about the basis for your objection. If you do not mail or email your objection by the **November 21, 2025 deadline**, the Court is not required to consider your objection and can stop you from speaking at the Fairness Hearing.

## HEARING ON THE FAIRNESS OF THE AGREEMENT

The Court will hold the Fairness Hearing to review the proposed Agreement and decide whether it is fair, reasonable, and adequate as to members of the Classes and should be approved.

If the Court approves the Agreement after the Fairness Hearing, the Agreement will be binding upon all members of the Classes.

The Fairness Hearing will be held on **January 6, 2026** at **10:00 am** in the Courtroom of the Honorable Nusrat J. Choudhury of the U.S. District Court for the Eastern District of New York. The Courtroom address is:

United States District Court
Eastern District of New York
Long Island Courthouse
100 Federal Plaza
Central Islip, NY 11722

*If you wish to speak at the Fairness Hearing to support or oppose the Agreement, you must mail or email a letter stating your name, mailing address, and desire to speak at the hearing by* ***November 21, 2025*** *to Plaintiffs' counsel Children's Rights at the mail and email addresses*

3

*provided above*. Plaintiffs' counsel will send your request to the Court.

The Court will either grant or deny your request. You will then receive notice of the Court's decision before the Fairness Hearing.

## OBTAINING ADDITIONAL INFORMATION

A copy of the Agreement is located at the following websites: www._____.com. If you would like to receive a printed copy in the mail, please email the lawyers for Plaintiffs at NYMedicaid@childrensrights.org. If you have questions about this notice or the Agreement, you may also contact the lawyers for Plaintiffs by (1) sending a letter to the address above or (2) sending an email to NYMedicaid@childrensrights.org.

## **PLEASE DO NOT CALL JUDGE CHOUDHURY
## OR THE CLERK OF THE COURT**

The Court will NOT be able to answer your questions about the class action lawsuit or the Agreement. If you have questions, you may contact the lawyers for Plaintiffs at the email provided above.

**COURT APPENDIX I**

**APPENDIX A**

**Intensive Home and Community-Based Mental and Behavioral Health Services, the "Relevant Services," for the Classes**

As described in the Amended Complaint and Plaintiffs' expert reports, children with serious mental and behavioral health conditions benefit from specific intensive mental and behavioral health services, provided in their homes and communities, to correct or ameliorate their conditions. These Medicaid-required services, collectively referred to as Intensive Home and Community-Based Services, include Intensive Care Coordination ("ICC"), Intensive In-Home Services, sometimes referred to as Intensive Home-Based Behavioral Health Services ("IHBBHS"), and Mobile Crisis Services.

**A. Intensive Home and Community-Based Services**

    1. <u>Intensive Care Coordination</u>

ICC is an assessment and service planning process conducted through a child and family team that coordinates services across multiple systems that serve the child and family, and manages the care and services they need. This includes assessment and service planning, assistance in accessing and arranging for mental or behavioral health services, coordinating multiple mental or behavioral health services, advocating for the child and the child's family, monitoring the child's progress, and transition planning.

- A single point of accountability for ensuring that medically necessary Medicaid services are accessed, coordinated, and delivered in a strength-based, individualized, family-driven, child-guided, culturally and linguistically relevant manner;

- Services and supports that are guided by the needs of the child;

- Facilitation of a collaborative relationship among a child, the family, and child-serving systems;

- Support for the family/caregiver in meeting the child's needs;

- A care planning process that ensures that a single, consistent care coordinator coordinates care across providers and child-serving systems to allow the child to be served in the home and community; and

- Facilitated development of an individual's child and family team, including individuals selected by the child and family who are committed to them through informal, formal, and community support and service relationships. ICC will facilitate cross-system involvement and a child and family team.

ICC service components consist of:

*Assessment:* The ICC performs or coordinates the performance of assessments and assessment-based care coordination activities, including, but not limited to:

1

- A strengths-based, needs-driven, comprehensive assessment that identifies the needs of the child for medical, school-related, social, or mental or behavioral health services, to organize and guide the development of a Person-Centered Plan and a risk management/safety plan;

- Planning and coordination of urgent needs before the comprehensive assessment is completed; and

- Further assessments as necessary within the scope of ICC.

*Planning and Development of a Family-Driven, Child-Guided, Person-Centered Plan ("PCP"):* ICC providers will maintain a family-driven, child-guided, person-centered planning process, which includes:

- Having the care coordinator use the information collected through an assessment, to convene and facilitate the child and family team meetings;

- Having the child and family team develop a child-guided and family-driven PCP that specifies the goals and actions to address the medical, school-related, social, mental or behavioral health, and other services needed by the child and family; and

- Ensuring that the care coordinator works directly with the child, the family, and others significant to the child to identify strengths, goals, and needs of the child and family, to inform the PCP.

*Crisis Planning:* The ICC provider will provide or coordinate crisis planning that, based on the child's history and needs, (a) anticipates the types of crises that may occur, (b) identifies potential precipitants and creates a crisis plan to reduce or eliminate them, and (c) establishes responsive strategies by family or caregivers and members of the child's team to minimize crises and ensure safety through the development of the risk management/safety plan.

*Referral, monitoring, and related activities:* The ICC provider must do the following:

- Work directly with the child and family team to implement elements of the PCP;

- Prepare, monitor, and modify the PCP in concert with the child and family team and determine whether services are being provided in accordance with the PCP and whether services in the PCP are adequate to meet the child's needs; and if not, or if there are changes in the needs or status of the child, adjust the PCP as necessary, in concert with the child and family team; and

- Actively assist the child and family to obtain available services, including medical, school-related, mental or behavioral health, social, therapeutic and other services, and monitor the provision of such services, including by ensuring receipt of available services in accordance with the PCP.

- Coordinate with local governmental units (the counties) to ensure that children receive available services.

*Transition:* The ICC provider will:

- Develop a transition plan with the child and family team, and implement such plan when the child has achieved the goals of the PCP; and

- Collaborate with the other service providers and agencies on behalf of the child and family in order to effectuate the transition plan.

*Settings:* ICC may be provided to children living and receiving services at home and in the community, including foster care placements, as well as to children who are currently in a hospital, group home, or other congregate or institutional placement as part of discharge or transition planning. Notwithstanding the foregoing, ICC will not be provided to children in juvenile detention centers.

*Providers:* ICC is provided by a qualified provider.

2. <u>Intensive Home-Based Behavioral Health Services</u>

IHBBHS are intensive behavioral health services and supports, including individualized therapeutic interventions, provided on a frequent and consistent basis and delivered to children and families in the child's home or appropriate community-based setting. Interventions help the child to build skills necessary for successful functioning in the home and community and improve the family's or caregiver's ability to help the child successfully function in the home and community.

IHBBHS are delivered according to a care plan developed by the child and family team. The IHBBHS treatment plan shall develop goals and objectives for all life domains in which the child's mental or behavioral health condition causes impaired functioning, including family life, community life, education, vocation, and independent living, and identifies the specific interventions that will be implemented to meet those goals and objectives.

Providers of IHBBHS should engage the child and other family members or caregivers in home and community activities where the child has an opportunity to work towards identified goals and objectives in the child's home or appropriate community-based setting.

IHBBHS may be provided by telehealth, as appropriate and where identified in the individual's IHBBHS treatment plan.

IHBBHS include, but are not limited to:

- Educating the child's family about, and training the family in addressing, the child's needs;

- Comprehensive mental health assessments;

- Behavioral supports, provided based on the PCP, which offer interventions, supports, and modeling for the child's family and others on how to implement strategies to guide and support a child's positive behaviors. These services provided by in-home

3

non-licensed practitioners, assist in implementing the goals of the treatment plan, monitor its effectiveness, and report the interventions' effectiveness to clinical professionals;

- Therapeutic services delivered in the child's home and community, including, but not limited to, therapeutic interventions such as individual and/or family therapy, including evidence-based practices. These services:

    o Improve wellness, including addressing behaviors and social skills deficits that limit the child's ability to function in the child's natural environment;

    o Improve self-management of symptoms, including teaching self-administration of medications, as developmentally appropriate;

    o Improve psychosocial functioning, including addressing social skills deficits, anger management, and emotional regulation skills, as developmentally appropriate;

    o Support the development and maintenance of social support networks and the use of community resources, as developmentally appropriate;

    o Support identifying and addressing behaviors that interfere with success in other settings, such as employment or school; and

    o Support independent living objectives by identifying and addressing behaviors that interfere with seeking and maintaining housing and living independently, as developmentally appropriate.

*Settings:* IHBBHS may be provided to children living and receiving services at home and in the community, including foster care placements.

*Providers*: IHBBHS are provided by a qualified provider.

3. Mobile Crisis Services

Mobile crisis services ("MCS") are mental or behavioral health services designed to interrupt and ameliorate a child or youth's crisis episode, wherever the crisis occurs outside of an institutional setting, through crisis intervention and/or resolution, de-escalation, and safety planning. Mobile crisis services work to stabilize the child by providing interventions to minimize or prevent the crisis in the future, with the intent of diverting emergency room visits or inpatient admissions, and/or avoiding other behavior-related disruptions. Prior approval by a managed care plan or any other entity shall not be required for a child to receive MCS.

Services include, but are not limited to:

- Responding to the immediate crisis and assessing child and family safety, and the resources available to address immediate problems;

4

- Stabilization of functioning by reducing or eliminating immediate stressors and providing counseling to assist the child, family, and caregivers in de-escalating behaviors and interactions;

- Referral and coordination with (a) other services and supports necessary to continue stabilization or prevent future crises from occurring, and (b) any current providers and team members, including, but not limited to, the care coordinator, therapists, family members, primary care practitioners, and school personnel; and

- Follow-up mobile crisis services, which include:

    o Therapeutic communication and interactions to maintain stabilization following a crisis episode and prevent escalation of mental and behavioral health symptoms;

    o Facilitation of engagement in mental and behavioral health services, care coordination, medical health, or basic needs related to the original crisis service; and

    o Confirmation with service providers to ensure crisis services are in place while the child/youth is awaiting initiation or resumption of other services.

*Settings:* During a crisis, MCS should be provided at the location where the crisis is occurring, including the home (biological, foster, relative, or adoptive) or any other setting where the child is naturally located, including schools, recreational settings, child-care centers, and other community settings.

*Availability:* MCS are available 24 hours a day, seven days a week, 365 days a year.

*Providers:* MCS are provided by a trained and experienced mobile crisis professional or team. MCS providers include both licensed and unlicensed staff.

## B. Waiver Services to Ensure Receipt of Services in the Least Restrictive Setting

These services are used in conjunction with covered EPSDT services to support children with serious emotional disturbances and to help maintain them in their homes and communities and avoid higher levels of care and out-of-home placements. These services are currently authorized through a waiver under Section 1915(c) of the Social Security Act and in conjunction with the Section 1115 Demonstration Waiver, allowing New York State to spend federal Medicaid dollars on these services.

These services improve a child's, family's, or caregiver's ability to help the child successfully function in the home and community. Such services include services or supports not required to be covered under Medicaid EPSDT provisions. The specific services provided by New York's Home and Community Based Services ("HCBS") Waiver will include services such as respite, caregiver support and training, in-home response, and additional intensive services that may be identified in connection with the development of the Implementation Plan.

Children receiving waiver services must have an individualized service plan developed collaboratively with the child and family team. This plan documents the agreed upon goals, objectives, and service activities. The individualized service plan must be reviewed and updated to meet the needs of the child and family. The child and family team consists of the child, the child's parents or legal guardians, care coordinator, mental health professionals, and any other persons that the child and family choose to include. The team meets to plan the supports a child and family need to safely maintain the child in the home and community.