# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| C.K. through his next friend P.K.; C.W. through her next friend P.W.; C.X. through her next friend P.X.; C.Y. through his next friend P.Y., for themselves and those similarly situated,<br><br>Plaintiffs,<br><br>-v-<br><br>James V. McDonald, in his official capacity as the Commissioner of the New York State Department of Health; Ann Marie T. Sullivan, in her official capacity as Commissioner of the New York State Office of Mental Health,<br><br>Defendants. | 2:22-cv-1791 (NJC) (JMW) |

## OPINION AND ORDER PROVIDING FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND FURTHER RELIEF

NUSRAT J. CHOUDHURY, District Judge:

This class action is brought by four minors—C.K., C.W., C.X., and C.Y (the "Named Plaintiffs")—each of whom proceed through their "Next Friend," on behalf of themselves and as representatives of two certified classes of Medicaid-eligible children with mental health conditions who have been determined by a licensed practitioner to require intensive home and community-based mental health services in order to correct or ameliorate their conditions while remaining safely at home and in their communities. In the Amended Complaint, the Named Plaintiffs seek declaratory and injunctive relief on behalf of themselves and the Classes against the Commissioners of the New York State Department of Health ("DOH") and the Office of Mental Health ("OMH") in their official capacities (together "Defendants"). (Am. Compl., ECF No. 34.)

The Amended Complaint alleges that Defendants are responsible for systemic violations of the Medicaid Act (specifically, the Early and Periodic Screening, Diagnostic, and Treatment Services ("EPSDT") and reasonable promptness provisions), Title II of the Americans with Disabilities Act (the "ADA"), and Section 504 of the Rehabilitation Act ("Section 504"). (Am. Compl. ¶¶ 4–5, 9–10, 212–37.) According to the Amended Complaint, Named Plaintiffs were not timely receiving the intensive home and community-based mental health services that they need. (*Id.* ¶¶ 18–82.) The Amended Complaint further alleges that each of the Named Plaintiffs was previously institutionalized or was at risk of institutionalization because of Defendants' failure to ensure that they timely received such services. (*Id.* ¶¶ 34, 50, 64, 81.)

After nearly two years of litigation and another one and a half years of extensive negotiations between the Parties on their own and with the assistance of this Court as mediator, the Parties entered into a proposed Settlement Agreement ("Settlement Agreement," ECF No. 77-2) to settle all claims brought by the Named Plaintiffs on behalf of two certified classes: the EPSDT Class and the ADA Class. The Parties filed a Joint Motion for Preliminary Approval and for Other Relief ("Preliminary Approval Motion," ECF No. 77), which the Court granted on August 19, 2025. ("Preliminary Approval Order," ECF No. 79, *C.K. through P.K. v. McDonald*, No. 22-cv-1791, 2025 WL 2406399 (E.D.N.Y. Aug. 19, 2025).)

Before the Court is the Parties' Joint Motion for Final Approval of Class Action Settlement Agreement and for Further Relief ("Final Approval Motion"). (ECF No. 83.) The Final Approval Motion requests that the Court: (1) grant final approval of the proposed Settlement Agreement under Rule 23(e) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."); (2) find that the Settlement Agreement resulted from extensive arm's-length, good-faith negotiations between the Parties through experienced counsel; (3) find that by agreeing to settle

2

this action, Defendants do not admit, and specifically deny, any and all liability; (4) incorporate the entirety of the express terms of the Settlement Agreement into the Court's final approval order; (5) approve as reasonable the provisions in the Parties' Supplemental Joint Stipulation of Settlement, General Release, and Order of Dismissal Regarding Attorneys' Fees and Costs ("Joint Fee Stipulation") (ECF No. 82), pursuant to Rule 23(h), Fed. R. Civ. P., and 42 U.S.C. § 1988(b); and (6) dismiss this case with prejudice while retaining jurisdiction to monitor compliance with and enforce the Settlement Agreement and Joint Fee Stipulation so that Plaintiffs are not be required to file an additional or separate action to enforce any part of either agreement in this or any other court. (ECF No. 83.)

For the reasons discussed below, the Court grants the Final Approval Motion in its entirety. The Settlement Agreement meets the requirements for final approval of a class action settlement under Rule 23(e), Fed. R. Civ. P., and governing authority from the Second Circuit in *Moses v. New York Times Company*, 79 F.4th 235, 242 (2d Cir. 2023), and subsequent cases. It sets forth a comprehensive, multi-year plan to substantially overhaul the provision of intensive home and community-based mental health services across New York State to Medicaid-eligible children. The Settlement Agreement requires Defendants to develop an Implementation Plan through collaboration with Class Counsel, acting on behalf of the Classes, and an Independent Reviewer in order to improve care coordination through the development of Intensive Care Coordination services, expand intensive home-based behavioral health services, strengthen mobile crisis services, standardize screening and assessment processes, address provider capacity challenges, develop a public set of data reporting, and implement a robust quality improvement and accountability framework to ensure timely access to the Relevant Services across the State, among other things.

Moreover, the Joint Fee Stipulation requires Defendants to compensate Class Counsel for attorneys' fees, costs, and expenses in the amount of $5.3 million for work completed to date and to permit Class Counsel to be compensated for annual fees and costs incurred in monitoring and validating Defendants' compliance with the Settlement Agreement, capped at $200,000, not including any contested motion practice. These fee terms do not cast doubt on the fairness of the Settlement Agreement, but rather reflect the complexity of this class action litigation, the extensive resources required to investigate, litigate, and settle it, as well as the skill and experience that Class Counsel have brought to bear. Class Counsel have performed exemplary work informed by deep experience in, and dedication to, advancing the rights of members of the Classes—Medicaid-eligible children with serious mental and behavioral health conditions—under the Medicaid Act, ADA, and Section 504 of the Rehabilitation Act. Class Counsel have contributed thousands of hours not only to litigating this action from its inception, but also to negotiating an impactful Settlement Agreement that affords significant relief to the Classes. Moreover, the amount the Parties have stipulated that Defendants will pay Class Counsel is nearly 40% less than what would be sought in a contested fee motion, based on an accounting of the actual work accomplished by Class Counsel since the commencement of this litigation more than three years ago. Without the contributions by Class Counsel, the path to systemic reform set forth by the Settlement Agreement simply would not have been achieved. Accordingly, the Parties' Joint Fee Stipulation does not raise any questions or concerns about the fairness, reasonableness or adequacy of the Settlement Agreement and meets all of the requirements of Rule 23(h).

This action is therefore dismissed with prejudice, and this Court retains jurisdiction to enforce any part of the Settlement Agreement and the Joint Fee Stipulation.

**BACKGROUND AND PROCEDURAL HISTORY**

**I.        Litigation and Settlement History**

On March 31, 2022, certain Named Plaintiffs filed a Complaint (ECF No. 1) against Mary T. Bassett, in her official capacity as the Commissioner of the New York State Department of Health, and Ann Marie T. Sullivan, in her official capacity as the Commissioner of the New York State Office of Mental Health. James V. McDonald, the current Commissioner of the New York State Department of Health, was automatically substituted for former Commissioner Basset pursuant to Rule 25(d), Fed. R. Civ. P. (Defendants Sullivan and McDonald, and former Defendant Bassett, are collectively referred to as the "Defendants."). On October 31, 2022, all of the Named Plaintiffs filed an Amended Complaint against Defendants, alleging that Defendants' policies and practices fail to ensure compliance with the Medicaid Act, ADA, and Section 504 requirements to timely provide, or arrange for, the provision of intensive home and community-based mental health services for children in New York State. (Am. Compl.)

The Parties engaged in substantial discovery and negotiated a Proposed Schedule (ECF No. 20), a Protective Order (ECF No. 25), an ESI Protocol (ECF No. 29), and five revised discovery schedules. (ECF No. 77-7, Decl. Daniele Gerard Supp. Joint Mot. Prelim. Approval Settlement Agreement ("First Gerard Decl.") ¶ 11.) The Parties produced hundreds of thousands of pages of documents through initial and supplemental disclosures and in response to requests for production, interrogatories, and rulings by Magistrate Judge James M. Wicks resolving several discovery disputes and motions. (*Id*.) Named Plaintiffs deposed nine fact witnesses and four additional witnesses designated by Defendants under Rule 30(b)(6). (*Id.*) In addition to producing documents, Defendants produced extensive data and deposed three witnesses. (*Id.*) On November 16, 2023, Named Plaintiffs filed a motion for class certification supported by a

memorandum of law, several declarations, hundreds of pages of exhibits, and five expert reports by national leaders in their fields. (ECF Nos. 52–55.) On January 11, 2024, on appeal from an order of Judge Wicks, this Court issued an Order granting Named Plaintiffs' motion to compel Defendants McDonald and Sullivan to be deposed. (ECF No. 67.)

On January 17, 2024, the Court held a status conference at which the Parties reported on their discussions to resolve Named Plaintiffs' class certification motion without a court ruling. (Min. Entry, Jan. 18, 2024.) The Parties reported on their efforts to reach a stipulation as to the definitions of Named Plaintiffs' proposed classes and a stay of discovery to allow the Parties to engage in settlement negotiations. (*Id.*) The Parties further reported their agreement that, if the Court were to oversee settlement negotiations, neither Party would ask for the Court to recuse from adjudicating a bench trial on the merits in the event that the Parties did not resolve this matter. (*Id.*)

On February 8, 2024, the Parties filed a joint motion to certify Named Plaintiffs' proposed classes, extend litigation deadlines, and stay litigation activity for three months to enable settlement discussions. (Joint Mot. Certify Class, ECF No. 71.) The Parties confirmed that they sought to explore settlement with the Court's assistance (*id.* at 1–2) and filed a stipulation concerning facts material to class certification. (Stip. & Proposed Order Class Cert., ECF No. 72.)

On February 22, 2024, the Court granted the joint motion and certified the case as a class action brought by the Named Plaintiffs on behalf of two classes (hereinafter "the Classes," and members thereof, the "Class Members"):

1. The **"EPSDT Class**[,]**"** . . . defined as consisting of all current or future Medicaid- eligible children in New York State under the age of 21 (a) who have been diagnosed with a mental health or behavioral health condition, not attributable to an intellectual or developmental disability, and (b) for whom a

licensed practitioner of the healing arts acting within the scope of practice under state law has recommended intensive home and community-based mental health services ("IHCB-EPSDT Services") to correct or ameliorate their conditions.

2. The **"ADA Class**[,]**"** . . . defined as consisting of all current or future Medicaid-eligible children in New York State under the age of 21 (a) who have been diagnosed with a mental health or behavioral health condition, not attributable to an intellectual or developmental disability, that substantially limits one or more major life activities, (b) for whom a licensed practitioner of the healing arts acting within the scope of practice under state law has recommended IHCB-EPSDT Services to correct or ameliorate their conditions or who have been determined eligible for HCBS Waiver Services (as defined in the Amended Complaint, ECF No. 34, ¶ 10), and (c) who are segregated, institutionalized, or at serious risk of becoming institutionalized due to their mental health or behavioral health condition.

(Mem. & Order Certifying Classes ("Cert. Order") at 3–4, ECF No. 73.) Following certification

of the Classes, the Court stayed the litigation to permit the Parties to explore a potential

settlement of the case. (*Id.* at 12–13.)

From late February 2024 to August 2025, the Parties engaged in frequent and intensive

settlement discussions on their own and with the Court's assistance as mediator on twelve

separate occasions. Based on its own observation of the Parties' good faith and the significant

progress made between and during each of the Court-mediated settlement discussions, the Court

granted the Parties' joint requests to extend the initial three-month litigation stay for additional

periods of time. (Cert. Order at 12–13; Min. Entry, Apr. 15, 2024; Elec. Order, Oct. 17, 2024;

Elec. Order, Dec. 13, 2024.) During this period of around eighteen months, the Parties held

meetings to discuss, draft, review, and negotiate the terms of the proposed Settlement

Agreement. (First Gerard Decl. ¶¶ 14–15.) Before each settlement conference with the Court, the

Parties submitted separate or joint settlement statements, updating the Court on the status of

negotiations and highlighting areas where the Court's input would be most helpful. (*Id*. ¶ 14.)

The Parties executed a final proposed Settlement Agreement on August 7, 2025. (*Id.*

¶ 15.) They filed the Preliminary Approval Motion the following day, on August 8, 2025. (ECF No. 77.)

On August 18, 2025, the Court granted the Parties' Preliminary Approval Motion. (ECF No. 78.) The following day, on August 19, 2025, the Court issued an Amended Opinion and Order preliminarily approving the Settlement Agreement in order to clarify procedures governing any request to seal information in any objections to the Settlement Agreement. (ECF No. 79.) As set forth in the Court's Amended Opinion and Order, the proposed Settlement Agreement was preliminarily approved as reasonable, fair and adequate pursuant to Rule 23(e) and governing caselaw. The Court also approved of the Parties' Proposed Class Action Notice Plan with Instructions for Posting and Distribution ("Notice Plan") (ECF No. 77-4.). In Appendix I to the Amended Opinion and Order, the Court modified the Parties' Proposed Class Action Settlement Notice ("Proposed Notice") (ECF No. 77-3) to make it easier for laypeople to understand, including members of the Classes, their parents and guardians, and service providers. ("Modified Notice," ECF No. 79 at 42–52.) The Court approved the Modified Notice and scheduled a Fairness Hearing to take place on January 6, 2026.

## II.      Final Approval Submissions

In support of the Final Approval Motion, the Parties filed:

- a supporting memorandum (ECF No. 83-1);

- the Declaration of Claire R. Glasspiegel (ECF No. 83-2, "Glasspiegel Decl.") along with three attached appendices containing letter submissions from various stakeholders in support of the Settlement Agreement:

  - Appendix 1 (ECF No. 83-3);

  - Appendix 2 (ECF No. 83-4); and

- o Appendix 3 (ECF No. 83-5);

- the Declaration of Daniele Gerard ("Second Gerard Decl.," ECF No. 83-6) along with attached appendices:

  - o Appendix A (ECF No. 83-7);

  - o Appendix B (ECF Nos. 83-8), which contains supporting documentation concerning prevailing market rates for Class Counsel; and

  - o Appendix C (ECF No. 83-9), which contains a summary of Class Counsel's billable hours and the hourly rates that would have been proposed in a contested fee motion; and

- a Proposed Order of Final Approval of Class Action Settlement and for Further Relief (ECF No. 83-10).

**III.      The Settlement Agreement**

Pursuant to the Settlement Agreement, the Parties agree to work together to develop and implement a multi-year plan to provide timely access to intensive home and community-based mental health services across New York State to children in the Classes in a manner consistent with the Parties' shared Goals and Objectives outlined in Section I of the Settlement Agreement. (Settlement Agreement § I.) The Settlement Agreement requires that Defendants, among other things, provide the following Medicaid-covered services to members of the Classes for whom such services are necessary to correct or ameliorate a behavioral or mental health condition: (1) Intensive Care Coordination, (2) Intensive Home-Based Behavioral Health Services, and (3) Mobile Crisis Services, which foster the decriminalization of mental health by resulting in decreased contacts between law enforcement and people with mental health conditions. (Settlement Agreement ¶ 12; ECF

9

No. 77-1, at 5.) The Settlement Agreement also requires Defendants to redesign the current Children and Family Treatment and Support Services ("CFTSS") program and the Home and Community-Based Services ("HCBS") Waiver Services program to meet the needs of members of the Classes who are eligible for the services. (*Id.*) These services are collectively referred to as the "Relevant Services" in the Settlement Agreement and they are each defined in Appendix A to the Settlement Agreement. (*Id.* ¶ 14; Appendix I, ECF No. 77-2 at 41–47.)

The Settlement Agreement requires that Defendants: (a) execute the commitments and processes in the Unified Implementation and Improvement Plan for the Relevant Services (the "Implementation Plan"), including how the Relevant Services will be developed and rolled out; (b) ensure that the Relevant Services are available in a timely manner statewide to all Medicaid-enrolled children eligible to receive them; (c) identify eligibility criteria for each of the Relevant Services and identify and implement a standardized assessment process or processes to determine eligibility for the Relevant Services; and (d) develop data reporting and quality assurance processes to ensure the Relevant Services are being provided on a timely basis in accordance with the terms of the Settlement Agreement. (Settlement Agreement ¶¶ 14, 16, 35–40, 44–46, 62–80.)

Pursuant to the terms of the Settlement Agreement, Defendants will engage Suzanne Fields, MSW, LICSW, a clinical social worker with decades of experience as a national behavioral health expert, as the "Independent Reviewer" who will work with the Parties to develop the Implementation Plan, monitor Defendants' progress, and mediate disputes concerning adherence to the terms of the Settlement Agreement. (*Id.* ¶ 11; First Gerard Decl. ¶ 15.) Ms. Fields has extensive experience implementing statewide changes to systems relating to Medicaid, managed care, mental health and substance use, child and adult

services, and child welfare. (First Gerard Decl. ¶ 15.)

### A. <u>Redesign of the Relevant Services</u>

Central to the Settlement Agreement is Defendants' commitment to substantially redesign their offering of mental and behavioral health services to more specifically and appropriately address the needs of children in the Classes. The redesign will draw from and adapt effective practices from Washington, Massachusetts, Ohio, and California, four states that have implemented intensive home and community-based services in response to litigation or other system reform efforts similar to this case, and will respond to Named Plaintiffs' concerns and experiences. (ECF No. 77-1 at 6.) In the Settlement Agreement, Defendants commit to ensuring provision of the Relevant Services in accordance with each child's needs in a timely manner and at the intensity (including frequency and duration) necessary to meet the individual needs of eligible children and their families. (Settlement Agreement ¶ 14.) Defendants also commit to ensuring that sufficient numbers of service providers are available to provide the Relevant Services to meet the needs of eligible children on a timely basis throughout New York State. (*Id*. ¶ 15.)

### B. <u>The Implementation Plan</u>

In the Settlement Agreement, the Parties agree to work closely and collaboratively to develop an Implementation Plan that will provide a roadmap for how Defendants will provide timely access to the Relevant Services to Medicaid-enrolled children in New York State. (*Id.* § IV.) Defendants will develop the Implementation Plan over the next eighteen months with the collaboration and assistance of Named Plaintiffs and the Independent Reviewer. (*Id.*; Appendix B, ECF No. 77-2 at 48.) The Implementation Plan will identify specific steps that Defendants will take to develop and deliver the Relevant Services to

11

eligible children statewide, and will include:

    a.  detailed standards and requirements and eligibility criteria for each of the Relevant Services;

    b.  proposed reimbursement rates to be set at amounts to ensure that payments to providers are sufficient to enlist enough providers to meet the needs of eligible children on a timely basis throughout New York State, at least to the extent that they are available to the general population in the geographic area, and network adequacy requirements;

    c.  an initial quality improvement plan ("QIP") that will establish a system of data-driven quality improvement that reviews, measures, and reports on a set of performance indicators related to the Relevant Services; and subsequent annual QIPs will report on these performance indicators;

    d.  the targeted strategies Defendants will undertake for providing all Class Members with medically necessary mental or behavioral health services in the least restrictive setting appropriate to their needs; and

    e.  a description of how Defendants will inform eligible children and their families/caregivers, and educate and involve the provider community and relevant state and local public child-serving agencies, regarding availability and delivery of the Relevant Services.

(*Id.* ¶¶ 20, 42, 47, 53–56, 62–63, 66–72.)

### C. <u>The Quality Improvement Plan</u>

The Settlement Agreement requires the consistent assessment of Defendants' progress toward providing the Relevant Services to members of the Classes in order to identify the need for any appropriate corrective action and promote continued improvement as necessary to ensure that the Relevant Services are timely provided. (*Id.* ¶¶ 59, 66–80.) It requires Defendants to conduct an initial Quality Improvement Plan ("QIP") and to issue, on an annual basis, an updated QIP developed in consultation with the Independent Reviewer, Named Plaintiffs, and relevant stakeholders and state agencies as set forth in the Settlement Agreement. (*Id.* ¶¶ 62–64.) The QIPs will include: (1) performance indicators measuring the provision, timeliness, sufficiency, and effectiveness of the Relevant Services; (2) benchmarks and interim utilization targets during

the rollout; and (3) quality improvement procedures. (*Id.* ¶¶ 62, 65–80.)

Under the terms of the Settlement Agreement, Defendants will also develop a publicly available and regularly updated data dashboard to provide transparency and track key statewide data related to the provision of the Relevant Services. (*Id.* ¶ 46.)

### D. The Audit & Exit Criteria

Under the Settlement Agreement, Defendants must conduct annual audits of the provision of the Relevant Services, during both the rollout period and afterwards, to evaluate whether Class Members are timely receiving the Relevant Services at the required intensity (including frequency and duration), and in the child's home or where the child is otherwise naturally located¸ and that recipients of the Relevant Services have received appropriate assessments related to such Services. (*See generally id.* § VI.) The purpose of the annual audits is also to allow the Independent Reviewer and the Parties to evaluate, among other things: (a) the performance indicators agreed upon in the QIP and to determine the extent to which Defendants have met any specified utilization targets; (b) whether providers are providing Relevant Services in accordance with the Standards and Requirements for the Services; (c) whether the members of the Classes receiving the Relevant Services are timely receiving them at the required intensity (including frequency and duration); and (d) whether corrective action is required under the quality improvement plan then in effect or otherwise under the Settlement Agreement. (*Id.* ¶ 81.)

Under the Settlement Agreement, the Parties will agree upon clear exit criteria consisting of objective measures to determine whether Defendants have achieved substantial compliance, which will then result in Defendants' exit from this Court's jurisdiction. (*Id.* ¶ 106.) The exit criteria will be established by the Parties in consultation with the Independent Reviewer based on, among other things, a post-rollout audit evaluating the provision of the Relevant Services.

(*Id.* ¶ 107.)

### E.  <u>Dispute Resolution and Enforcement</u>

Pursuant to the terms of the Settlement Agreement, six months following the period for rolling out the Relevant Services, the Independent Reviewer will provide the Court annual reports regarding the status of the Settlement Agreement and the Implementation Plan. (*Id.* ¶¶ 94, 114.)

The Settlement Agreement requires the Parties to mediate all disputes arising out of or in connection with the agreement or the Implementation Plan with the Independent Reviewer before seeking relief from the Court. (*Id.* ¶ 109.) If the Parties cannot achieve a resolution during the agreed-upon time period for mediating a dispute, the Independent Reviewer will prepare a recommendation as to how to resolve the dispute, and the Parties may respond to that recommendation within twenty days prior to submission of the recommendation to the Court. (*Id.* ¶¶ 112–13.) The Independent Reviewer will simultaneously submit any such recommendations and the Parties' responses to the Court. (*Id.*)

Under the Settlement Agreement, the Court retains all legal and equitable powers to enforce the terms of the agreement. (*Id.* ¶ 116.) Any party may seek relief from the Court regarding any recommendation of compliance, noncompliance, or remedy by the Independent Reviewer. (*Id.*) Upon a finding of Defendants' noncompliance with the Settlement Agreement, the Court may issue an Order setting forth its finding of noncompliance and adopting any remedy within the Court's discretion following receipt of the Independent Reviewer's recommendation as to a resolution of the dispute and the Parties' responses to that recommendation. (*Id.* ¶¶ 113, 116.) The Court shall retain jurisdiction to enforce its Order to remedy noncompliance through its power of contempt. (*Id.* ¶ 116(b).)

**LEGAL STANDARDS**

Where parties seek to settle claims brought by a plaintiff on behalf of a proposed class, the court must review the proposed class action settlement to ensure it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *Kurtz v. Kimberly-Clark Corp.*, 142 F.4th 112, 117 (2d Cir. 2025). Courts apply a three-step process of review. *See* Fed. R. Civ. P. 23(e)(1)–(2). The court first conducts a preliminary evaluation of the fairness of the proposed settlement agreement to determine whether to give notice of the proposal to all class members. Fed. R. Civ. P. 23(e)(1)(A). The second step consists of providing "notice of a hearing . . . to the class members" and holding a hearing to ensure that "class members and settling parties are provided the opportunity to be heard[.]" *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 27 (E.D.N.Y. 2019) (hereinafter "*Payment Card II*") (brackets and quotation marks omitted); *see also Whelan v. Diligent Corp.*, 349 F.R.D. 79, 84 (S.D.N.Y. 2025). Where a court has granted preliminary approval and afforded notice of the hearing and an opportunity to be heard to all class members, the court then proceeds to the third step—final approval. *See Payment Card II*, 330 F.R.D. at 27.

I.    **Final Approval Standard**

"[T]he Court's role in reviewing the proposed settlement 'is demanding because the adversariness of litigation is often lost after the agreement to settle.'" *Whelan*, 349 F.R.D. at 84 (quoting *Zink v. First Niagara Bank, N.A.*, 155 F. Supp. 3d 297, 308 (W.D.N.Y. 2016)). Under Rule 23(e), Fed. R. Civ. P., a proposed settlement agreement is considered fair, reasonable, and adequate where:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

15

(C) the relief provided for the class is adequate, taking into account:
     (i) the costs, risks, and delay of trial and appeal;
     (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
     (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
     (iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).[1] "The first two factors are procedural in nature and the latter two guide the substantive review of a proposed settlement." *Moses v. New York Times Co.*, 79 F.4th 235, 242 (2d Cir. 2023).

In *Moses v. New York Times Company*, the Second Circuit emphasized that district courts "must consider the four factors outlined in Rule 23(e)(2) holistically" in addition to the nine so-called *Grinnell* factors, which were used in this Circuit to analyze the reasonableness, fairness, and adequacy of proposed class action settlements prior to the 2018 amendment of Rule 23(e) to codify the four procedural and substantive factors currently set forth in that rule. *Moses*, 79 F.4th at 243 (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by, Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000)). As the Second Circuit explained:

> [T]he revised Rule 23(e)(2) does not displace our traditional *Grinnell* factors, which remain a useful framework for considering the substantive fairness of a settlement. But the rule now mandates courts to evaluate factors that may not have been highlighted in our prior case law, and its terms prevail over any prior analysis that are inconsistent with its requirements.

---

[1] Rule 23(e)(1)(B) requires a court considering approval of a class settlement to find that it "will likely be able to . . . certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B). This requirement is inapplicable here, where the Court has already certified two classes: the EPSDT Class and the ADA Class. (Cert. Order.)

*Moses*, 79 F.4th at 243.[2] The Second Circuit also held that courts may not presume a settlement

to be substantively fair where it arose from an arm's-length bargaining process. *Id.* at 243.

The nine *Grinnell* factors are:

(1) the complexity, expense and likely duration of the litigation;
(2) the reaction of the class to the settlement;
(3) the stage of the proceedings and the amount of discovery completed;
(4) the risks of establishing liability;
(5) the risks of establishing damages;
(6) the risks of maintaining the class action through the trial;
(7) the ability of the defendants to withstand a greater judgment;
(8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and]
(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*McReynolds v. Richards-Cantave*, 588 F.3d 790, 804 (2d Cir. 2009) (citing *Grinnell*, 495 F.2d at

463). Courts have found that Rule 23(e)(2) does not otherwise address the following *Grinnell*

factors:

- the reaction of the class to the settlement (second factor);
- the stage of the proceedings and the amount of discovery completed (third factor);
- the ability of the defendants to withstand a greater judgment (seventh factor);
- the range of reasonableness of the settlement fund in light of the best possible recovery (eighth factor); and
- the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation (ninth factor).

*See, e.g.*, *Flores v. Mamma Lombardi's of Holbrook, Inc.*, 104 F. Supp. 3d 290, 299–304

(E.D.N.Y. 2015) (discussing the second, third, seventh, eighth, and ninth *Grinnell* factors); *Hesse*

*v. Godiva Chocolatier, Inc.*, No. 19-cv-0972, 2022 WL 22895466, at *9–10 (S.D.N.Y. Apr. 20,

---

[2] *Moses* thus confirmed that courts must consider *both* the Rule 23(e) factors and the nine *Grinnell* factors—to the extent that they differ—in determining whether to approve the proposed settlement of class action claims, as district courts had done following the 2018 amendment of Rule 23(e). *See e.g.*, *Payment Card II*, 330 F.R.D. at 29; *LoCurto v. AT&T Mobility Servs. LLC*, No. 13-cv-4303, 2020 WL 13859604, at *4 (S.D.N.Y. June 22, 2020).

2022) (same).

Accordingly, courts continue to analyze the second, third, seventh, eighth, and ninth *Grinnell* factors in combination with the Rule 23(e)(2) factors in evaluating settlement agreements in class actions whether the actions are brought under Rule 23(b)(2) for declaratory and injunctive relief or under Rule 23(b)(3) for damages. *See, e.g.*, *Flores*, 104 F. Supp. 3d at 299–304 (considering *Grinnell* factors in the Rule 23(b)(3) context); *Hesse*, 2022 WL 22895466, at *9–10 (same); *Guoliang Ma v. Harmless Harvest, Inc.*, No. 16-cv-7102, 2018 WL 1702740, at *5–8 (E.D.N.Y. Mar. 31, 2018) (considering *Grinnell* factors in the Rule 23(b)(2) context). Courts differ, however, as to whether certain *Grinnell* factors relating to monetary damages— including the risks of establishing damages (fifth factor) and the amount of damages (seventh, eighth, and ninth factors)—are inapplicable or carry less weight in the context of class actions seeking only injunctive and declaratory relief. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-md-1720, 2024 WL 3236614, at *26 (E.D.N.Y. June 28, 2024) (hereinafter "*Payment Card III*") (collecting cases on both sides).

Named Plaintiffs brought this class action seeking injunctive and declaratory relief to ensure that Defendants comply with federal civil rights laws. The Settlement Agreement seeks to enact systemic changes in the provision of certain mental and behavioral health services across New York State so that members of the Classes receive tangible services to which they are legally entitled to correct or ameliorate their mental health conditions. Accordingly, the seventh, eighth, and ninth *Grinnell* factors, which concern monetary damages, need not be analyzed separately from the Rule 23(e)(2) factors and the other, relevant *Grinnell* factors. *See Payment Card III*, 2024 WL 3236614, at *26 ("In [civil rights] cases, the ability of the defendant to withstand a greater judgment is essentially a non-issue because the defendant need only stop

violating the law."); *Ingles v. Toro*, 438 F. Supp. 2d 203, 211 (S.D.N.Y. 2006) ("In cases where the plaintiffs seek declaratory and injunctive relief rather than money damages, there is no need to examine the last three *Grinnell* factors."); *United States v. New York*, Nos. 13-cv-4165 & 13-cv-4166, 2014 WL 1028982, at *8 (E.D.N.Y. Mar. 17, 2014) ("When, as here, the settlement offers the class members the most important, most tangible form of relief sought by plaintiffs, these [range of reasonableness] factors," the eighth and ninth *Grinnell* factors, "weigh in favor of approval of the settlement.").

## II.      Notice Standard

Under Rule 23(e)(1)(B), once a court has determined that it will likely approve a proposed class settlement and certify a class for the purposes of the settlement, the court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B); *see also* Fed. R. Civ. P. 23(c)(2)(A) (requiring that, "for any class certified under Rule 23(b)(1) or (b)(2), the court may direct appropriate notice to the class"). "The standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules [of Civil Procedure] is measured by reasonableness." *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 719–20 (2d Cir. 2023). "There are no rigid rules to determine whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements; the settlement notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Id.* Notice "is adequate if it may be understood by the average class member." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 114 (2d Cir. 2005), *superseded on other grounds by,* Fed. R. Civ. P. 23(e)(2). Moreover, "[c]ourts in this Circuit have explained that a Rule 23 Notice will satisfy due process when it describes the terms of the

settlement generally, informs the class about the allocation of attorneys' fees, and provides specific information regarding the date, time, and place of the final approval hearing." *Payment Card II*, 330 F.R.D. at 58–59 (collecting cases).[3]

Relatedly, Section 1715(b) of the Class Action Fairness Act of 2005 ("CAFA") imposes an additional notice requirement, obligating Defendants to serve the appropriate state and federal officials a notice of the proposed settlement "not later than 10 days" after the proposed settlement of a class action has been filed in court. 28 U.S.C. § 1715(b). The CAFA requirements apply to "any" class actions brought under Rule 23. *Perez v. Jupada Enters., Inc.*, No. 10-cv-3118, 2012 WL 3042928, at *2 (S.D.N.Y. July 25, 2012); *see also* 28 U.S.C. § 1711(2). CAFA further provides that the Court may not issue an order awarding final approval of a proposed settlement earlier than 90 days after the latest date on which the appropriate federal and state officials were served. *See* 28 U.S.C. § 1715(d).

## DISCUSSION

The Court grants final approval of the Settlement Agreement as a settlement of the Named Plaintiffs' claims on behalf of themselves and the EPSDT and ADA Classes. In granting preliminary approval, the Court found the Settlement Agreement to be procedurally and substantively fair, reasonable, and adequate in light of the Rule 23(e)(2) factors and the applicable *Grinnell* factors. The Settlement Agreement provides substantial, meaningful, and enforceable relief to the Classes to address the systemic issues that the Named Plaintiffs sought

---

[3] While *Fikes* concerned a Rule 23(b)(3) class action for damages, courts within this Circuit have applied the same standards to assess the adequacy of notice in the context of Rule 23(b)(2) class actions for declaratory and injunctive relief. *Compare Fikes Wholesale, Inc.*, 62 F.4th at 719–20 (requiring notice to be reasonable to satisfy due process and Rule 23(e) in the Rule 23(b)(3) context) *with Newkirk v. Pierre*, No. 19-cv-4283, 2022 WL 20358182, at *5 (E.D.N.Y. Oct. 25, 2022) (applying the same standard for assessing the adequacy of notice in a Rule 23(b)(2) class) and *Sykes v. Harris*, No. 9-cv-8486, 2016 WL 3030156, at *9 (S.D.N.Y. May 24, 2016) (same).

to remedy in bringing this resource-intensive litigation on behalf of themselves and the Classes.

Since preliminary approval, no new facts have emerged to alter this Court's conclusion that the Settlement Agreement is a critically important step to ensure the timely provision of intensive home and community-based mental health services to members of the Classes as needed to correct or ameliorate their mental health conditions and prevent unnecessary institutionalization, as Named Plaintiffs allege is required under the Medicaid Act, ADA, and Section 504. Moreover, following the provision of notice of the terms of the Settlement Agreement to members of the Classes, numerous stakeholders involved in advocating for, or providing health care and other services to, members of the Classes have submitted comments that are overwhelmingly supportive of the Settlement Agreement. Many stakeholders express a commitment to ensuring the timely delivery of mental and behavioral health services to members of the Classes, comment on the current barriers to providing such services, and have stated their desire to remain engaged in, and to contribute to, the development of the Implementation Plan through the advisory board contemplated by the Settlement Agreement. Additionally, the Parties' Joint Fee Stipulation raises no concerns about any imbalance in the significant and meaningful relief to the Classes and the proposed compensation for Class Counsel.

Accordingly, as was the case at the preliminary approval stage, all of the Rule 23(e) and relevant *Grinnell* factors weigh in favor of the determination that the Settlement Agreement is fair, reasonable, and adequate and merits final approval, or are neutral, as discussed in detail below. Because a detailed analysis already exists for many factors considered at the final approval stage and to avoid duplicative analysis, the Court incorporates by reference the reasoning set forth in the Preliminary Approval Order. (ECF No. 79, 2025 WL 2406399.)

21

**I.    Procedural and Substantive Fairness Under Rule 23(e)(2) and Grinnell**

      **A.  <u>Adequate Representation</u>**

To determine whether "the class representatives and class counsel have adequately represented the class" under Rule 23(e)(2)(A), courts consider "whether (1) plaintiff's interests are antagonistic to the interests of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Rosenfeld v. Lenich*, No. 18-cv-6720, 2021 WL 508339, at *3–4 (E.D.N.Y. Feb. 11, 2021) (citing *Cordes & Co. Fin. Servs. v. AG. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007)).

          *i.  Adequate Class Representatives*

In addition to the requirements of Rule 23(e)(2)(A), "[t]he Due Process Clause . . . requires that the named plaintiff at all times adequately represent the interests of the absent class members." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 231 (2d Cir. 2016) (hereinafter "*Payment Card I*") (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985)). The "named Class Representatives are teenage Medicaid recipients located throughout New York who have various mental and behavioral conditions requiring mental health care." (Cert. Order at 10 (citing Am. Compl. ¶¶ 18–82).) "The Next Friends are Named Plaintiffs' parents, family members, and guardians." (*Id.* (citing Am. Compl. ¶¶ 18, 36, 52, 66).) As noted in the Preliminary Approval Order:

> The members of the EPSDT and ADA Classes, along with Named Plaintiffs, who serve as class representatives, share an identical interest in attaining the requested injunctive and declaratory relief to ensure that Defendants are complying with their obligations under the Medicaid Act, the ADA, and Section 504 to timely provide, or arrange for, the provision of intensive home and community-based mental health services for children in New York.

(Preliminary Approval Order at 19 (citing Stip. & Prop. Order Class Cert. at 6).) "Additionally, the Next Friends are dedicated to representing the best interests of the four minor named Class

Representatives." (*Id.*)

As explained in the Preliminary Approval Order, the Named Plaintiffs and Next Friends have no conflict of interest with the members of the Classes and have adequately represented the Classes since this action has been pending, including since the Court certified the Classes in February 2024. (*Id.* (citing Cert. Order).) Moreover, the Next Friends' review of, and support for, the Settlement Agreement demonstrates their continued engagement and participation as required to ensure that the Named Plaintiffs, who are teenagers, adequately represent the Classes. (*Id.* (citing First Gerard Decl. ¶ 20).)

### ii. Adequate Class Counsel

"A court reviewing a proposed settlement must pay close attention to the negotiating process, to ensure that . . . plaintiffs' counsel have possessed the experience and ability, and have engaged in the discovery[] necessary to effective representation of the class's interests." *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (citation and quotation marks omitted); *see also* Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment ("[T]he nature and amount of discovery in this or other cases, or the actual outcomes of other cases, may indicate whether counsel negotiating on behalf of the class had an adequate information base."). A court may determine that class counsel is adequate based on findings concerning counsel's experience, involvement in other similar litigation, and knowledge in the area of complex class actions. *See D'Amato*, 236 F.3d at 85–86 (upholding district court's adequacy of class counsel finding based on these factors).

As addressed at length in the Preliminary Approval Order, Class Counsel have provided exemplary representation to the Named Plaintiffs and the Classes in investigating and bringing this class action and throughout the more than three and a half years that this litigation has been

pending. (Preliminary Approval Order at 20–23.) Class Counsel at Children's Rights, Disability Rights New York, the National Health Law Program, and Proskauer Rose LLP have extraordinary collective experience litigating class actions involving Medicaid, disability rights, and children's rights. (*Id*. at 20–21.) Class Counsel at Children's Rights and Disability Rights New York engaged in a lengthy and resource-intensive investigation and analysis of the potential claims at issue in this case, which commenced more than one and a half years before suit was filed. (*Id*. at 21.) The collective expertise of Class Counsel in investigating, litigating, and negotiating the resolution of the claims in this class action has been apparent in the high quality oral and written advocacy, successful motion practice, and deft approach to settlement conducted by Class Counsel as detailed at length in the Preliminary Approval Order. (*See id*. at 21–22.) Finally, no member of the Classes has objected to final approval on the basis of inadequate representation. Accordingly, Class Counsel continue to "exceed the requirements of Rule 23(e)(2)(A) to adequately represent the Classes based on their deep experience, involvement in similar, complex litigation concerning the rights of children under the relevant federal statutes, and investment of thousands of hours to effectively investigate and litigate this case." (*Id*. at 23.)

### B. Arm's-Length Negotiations

A court must consider whether "the proposal was negotiated at arm's length" in assessing the fairness of a proposed class action settlement. Fed. R. Civ. P. 23(e)(2)(B). It is legal error, however, for a district court to "*presume*[] that [a] proposed settlement [is] fair, reasonable, and adequate because it was reached in an arms-length negotiation," even where "the arms-length quality of the negotiations remain[s] a factor in favor of approving the settlement." *Moses*, 79 F.4th at 243.

As detailed in the Preliminary Approval Order, the Parties engaged in nearly two years of

24

active, adversarial litigation, which included written fact and expert discovery, depositions, and class certification motion practice, and thereafter engaged in nearly eighteen months of extensive, arm's-length negotiations on their own and with this Court's assistance as mediator before reaching the proposed Settlement Agreement in August 2025. (Preliminary Approval Order at 23–24; First Gerard Decl. ¶¶ 11, 14.[4]) The Court directly observed the Parties engage in vigorous advocacy during the settlement negotiation process and did not observe any bad faith or collusion between the Parties. Since this Court's grant of preliminary approval, no facts have emerged to suggest any bad faith or collusion, such as a Class member objection to final approval for lack of arm's-length negotiations. Accordingly, this factor weighs in favor of final approval of the Settlement Agreement.

### C. **Adequate Relief for the Class**

A court must also consider whether relief for the class is adequate under Rule 23(e)(2), taking into account:

> (i) the costs, risks, and delay of trial and appeal;
> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
> (iv) any agreement required to be identified under Rule 23(e)(3).

Fed. R. Civ. P. 23(e)(2)(C). Because a proposed settlement agreement's provision setting forth a release of liability "affects the determination of the fairness, reasonableness, and adequacy of class relief," the Court also considers the proposed release of liability in the analysis of whether the Settlement Agreement provides adequate relief for the Classes. *Payment Card II*, 330 F.R.D.

---

[4] *See* Min. Entry, Apr. 15, 2024; Min. Entry, May 30, 2024; Min. Entry, July 10, 2024; Min. Entry, Aug. 15, 2024; Min. Entry, Oct. 17, 2024; Min. Entry, Dec. 13, 2024; Min. Entry, Mar. 10, 2025, Min. Entry, Apr. 11, 2025; Min. Entry, May 9, 2025; Min. Entry, June 18, 2025; Scheduling Order, June 21, 2025; Min. Entry, Aug. 21, 2025.

at 36; *see also Zaslavskiy v. Weltman, Weinberg & Reis Co., LPA*, No. 18-cv-4747, 2020 WL 9814083, at *9–10 (E.D.N.Y. Oct. 19, 2020), *report and recommendation adopted*, Elec. Order, Dec. 1, 2020.

### i.    Costs, Risks, and Delay of Trial and Appeal

In assessing the costs, risks, and delay of trial and appeal, "courts may need to forecast the likely range of possible classwide recoveries and the likelihood of success in obtaining such results." *Payment Card II*, 330 F.R.D. at 36 (citing Fed. R. Civ. P. advisory committee's note to 2018 amendment). "This assessment implicates several *Grinnell* factors, including: (i) the complexity, expense and likely duration of the litigation; (ii) the risks of establishing liability . . . and (iv) the risks of maintaining the class through the trial." *Id.* (citing *Grinnell*, 495 F.2d at 463); *see also Cymbalista v. JPMorgan Chase Bank, N.A.*, No. 20-cv-456, 2021 WL 7906584, at *6 (E.D.N.Y. May 25, 2021). Accordingly, courts "use . . . these *Grinnell* factors to guide [the] assessment" of costs, risks, and delay under Rule 23(e)(2)(C). *Payment Card II*, 330 F.R.D. at 36.

### 1.    Complexity, Expense, and Likely Duration of the Litigation

"Courts favor settlement when litigation is likely to be complex, expensive, or drawn out." *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 693 (S.D.N.Y. 2019). The Preliminary Approval Order explained that this case involves complex issues of substantive and procedural law relating to children's rights to mental and behavioral health services under the Medicaid Act, the ADA, and Section 504 of the Rehabilitation Act, and that further litigation would be expensive—requiring additional fact and expert discovery—complex, and take years, further delaying reforms to ensure that members of the Classes receive needed intensive home and community-based mental health services. (*See* Preliminary Approval Order at 26–27.) No

member of the Classes has objected to final approval of the Settlement Agreement on the ground that the costs, risks, and delay of trial and appeal are sufficiently low to warrant continuing with litigation. By contrast, stakeholders and advocates have submitted comments that underscore the urgent need for reforms to address barriers to ensure that members of the Classes—all of whom are children with mental health or behavioral health conditions—receive intensive home and community-based mental health services. (*See* Discussion Section I.E. *infra*). Accordingly, the expense, complexity, and length of additional litigation between the Parties weighs heavily in favor of final approval.

### 2. The Risks of Establishing Liability

A court considering the risks of establishing liability "need only assess the risks of litigation against the certainty of recovery under the proposed settlement." *Payment Card II*, 330 F.R.D. at 36–7 (quotation marks omitted). As detailed in the Preliminary Approval Order, a trial in this case would involve significant risks to Named Plaintiffs and members of the Classes because the Medicaid Act, ADA, and Section 504 claims are complex and require the evaluation of expert testimony and voluminous facts relating to the provision of mental health services to children across New York State. (Preliminary Approval Order at 27–28.) Additional litigation would further delay reforms to ensure that members of the Classes receive needed intensive home and community-based mental health services as soon as possible. Moreover, no member of the Classes has objected to final approval on the basis that there is a low risk of establishing liability with continued litigation.

Accordingly, the Court continues to find that there is sufficient risk of establishing liability and that this factor weighs strongly in favor of granting final approval.

27

### 3. The Risks of Maintaining the Class Through Trial

The risks of maintaining a class through trial, while "present in every class action . . . nevertheless weigh . . . in favor of settlement where it is likely that defendants would oppose class certification if the case were to be litigated." *Payment Card II*, 330 F.R.D. at 39–40 (quotation marks and brackets omitted). This *Grinnell* factor is either neutral or weighs in favor of granting final approval for the reasons explained in the Preliminary Approval Order. Certification of the Classes under Rule 23(b)(2) followed the Parties' stipulation to the class definitions, and it is unlikely, although not impossible, that Defendants would move for decertification before any final judgment under Rule 23(c)(1)(C), Fed. R. Civ. P. (Preliminary Approval Order at 28–29 (citing Cert. Order; Stip. & Proposed Order Class Cert; Joint Mot. Certify Class).)

### ii. Effectiveness of Distributing Relief to the Class

To assess whether the settlement of a putative class action affords adequate relief for the class, courts must also examine "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e)(2)(C)(ii). Typically, this consideration involves evaluating the parties' proposed plan for distributing damages to class members. *See e.g.*, *Johnson v. Rausch, Sturm, Israel, Enerson & Hornik, LLP*, 333 F.R.D. 314, 321 (S.D.N.Y. 2019) (indicating approval for a process by which checks would be mailed to each class member based on their proportion of the damages incurred by the entire class). In *Payment Card III*, another judge of this Court found that the effectiveness of any proposed method of distributing relief to the class need not be considered in a class action seeking only equitable relief where "relief will be effectuated by the settlement terms alone." *See Payment Card III*, 2024 WL 3236614, at *29 (relying on *Newkirk v. Pierre*, No. 19-cv-4283,

2022 WL 20358182, at *4–7 (E.D.N.Y. Oct. 25, 2022) (lacking any discussion of this factor when assessing settlement for equitable relief)).

Here, Named Plaintiffs' claims on behalf of the Classes seek solely declaratory and injunctive relief. Because the relief provided by the Settlement Agreement is equitable in nature and "will be effectuated by the settlement terms alone," the effectiveness of any proposed method of distributing relief to the class need not be considered as a separate issue. (Preliminary Approval Order at 29.)

### iii.  Attorneys' Fees, Costs, and Expenses

Congress's 2018 amendments to Rule 23(e) include the requirement to examine the adequacy of class relief by "taking into account . . . the terms of any proposed award of attorney's fees, including timing of payment." Fed. R. Civ. P. 23(e)(2)(c)(iii). The traditional *Grinnell* factors had not previously included such a requirement. *Kurtz*, 142 F.4th at 118. "[W]hen reviewing the substantive fairness of a proposed settlement, the district court is required to review both the terms of the settlement and any fee award encompassed in a settlement agreement in tandem." *Moses*, 79 F.4th at 244 (quotation marks omitted). The purpose of this analysis is to "provide . . . a backstop that prevents unscrupulous counsel from quickly settling a class's claims to cut a check." *Id.* (quoting *Fresno County Employees' Ret. Ass'n v. Isaacson/Weaver Fam. Tr.*, 925 F.3d 63, 72 (2d Cir. 2019)); *see also Kurtz*, 142 F.4th at 118 ("One of the major risks of class action settlements is that class counsel may undervalue the class's claims in exchange for a higher attorney's fee, or in order to collect a fee more quickly.").

In its 2025 decision in *Kurtz v. Kimberly-Clark Corporation*, the Second Circuit held that "this tandem analysis of class relief and attorney's fees requires courts to *compare the proportion of total recovery allocated to the class to the proportion of total recovery allocated to class*

*counsel.*" 142 F.4th at 115 (emphasis added). It explained, as follows, that the Rule 23(e) inquiry serves a different purpose than the Rule 23(h) requirement to assess the reasonableness of requested attorneys' fees for class counsel:

> Certainly, both rules ask courts to weigh class recovery against attorney's fees. But the focus of each inquiry is different. Whereas Rule 23(h) asks whether fees are reasonably calculated and genuinely earned—using class recovery as a measuring stick for *attorney success*—Rule 23(e) safeguards the fairness of a settlement for the class by posing a comparative inquiry: does the proportion of the total recovery allocated to attorney's fees compared to the proportion of the total recovery allocated to the class raise any questions about the *adequacy of class relief*? The two examinations may overlap, but Rule 23(e) requires its own separate analysis of fees in relation to class relief, regardless of how the court conducts its Rule 23(h) inquiry.
>
> Because the district court did not consider the allocation of recovery between class counsel and the class in assessing settlement fairness, as required by Rule 23(e), we vacate and remand for the district court to conduct this analysis in the first instance.

*Kurtz*, 142 F.4th at 121 (emphasis in original). To satisfy Rule 23(e), the district court must therefore "compare the proportion of the total recovery going to attorney's fees with the proportion going to the class, and . . . consider whether that comparison reveals *a sufficient imbalance* as to cast doubt on the settlement's fairness." *Id*. at 119 (emphasis added). Moreover, the Second Circuit clarified in *Kurtz* that "class recovery and the agreement on attorneys' fees should be viewed as a package deal *even when the two are structurally segregated*." *Id*. at 120 (emphasis added). "Although a defendant's separate funds for attorney's fees and class recovery may be a relevant consideration in assessing a settlement's fairness, it is not a replacement for the proportionality analysis required by Rule 23(e)(2)(C)(iii)." *Id*.

In analyzing whether a comparison of the proportion of the total recovery going to the class as opposed to class counsel calls into question the fairness of a proposed class settlement, the district court may need to determine the "appropriate benchmark" for the proportionality analysis. The Second Circuit has found that this is a "fact-bound question that is best left to the

district court's discretion." *Id*. at 119. It further explained:

> Different settlement structures, different rates of actual recovery by the class, and different treatments of unclaimed funds all might lead a district court to conclude that comparison to the actual, to the hypothetical, or to some predicted class recovery is most suitable. For example, at one extreme, unduly complicated claim procedures combined with abysmal claim rates would weigh in favor of using actual class recovery as the comparator. On the other hand, if a settlement is structured so that unclaimed funds did not revert to the defendant, then it might make more sense to compare fees to the hypothetical maximum class recovery, even if class members do not in fact recover much of the money. So long as the proportion of the total recovery that goes to attorney's fees is compared to the proportion of relief provided for the class, whether that be the actual, hypothetical, or predicted class recovery, Rule 23(e)(2)(C)(iii) is satisfied.

*Id*.[5]

Since the Second Circuit decided *Kurtz* around six months ago, it has not provided additional guidance regarding the permissible allocation of recovery between the class and class counsel under Rule 23(e). *See, e.g.*, *Hasemann v. Gerber Products Co.*, No. 15-cv-2995, 2025 WL 2773748, at *4 (E.D.N.Y. Sept. 29, 2025). Nor has it considered how the proportionality analysis is conducted in the context of a Rule 23(b)(2) class action for declaratory and injunctive relief where the class claims do not seek monetary relief at all, but rather seek systemic reform of large-scale policies and procedures that impact the ability of class members to secure services that they argue are required under the law.

Here, the Settlement Agreement reserves the determination of "reasonable attorneys' fees and costs" to the Court. (Settlement Agreement ¶ 124.) To avoid any conflict of interest between members of the Classes and Class Counsel, the Parties conducted negotiations for attorneys'

---

[5] *Kurtz* concerned a claims-based settlement, in which there was a significant gap between "the hypothetical maximum recovery to the class (the upper-limit amount a defendant agrees to pay to class members)," which was $20 million, and "the actual class recovery (the amount ultimately paid out to class members," which was a little under $1 million. 142 F. 4th at 119. The Second Circuit also observed that in certain class actions, the "predicted class recovery" may be the appropriate benchmark, particularly when the question of preliminary approval of a class settlement takes place "before class members have finished filing claims." *Id*.

fees, costs, and expenses separately from the negotiations concerning the substantive provisions of the Settlement Agreement, which concern a process for developing systemic reforms to address the declaratory and injunctive relief claims brought by Named Plaintiffs on behalf of themselves and the Classes. (Second Gerard Decl. ¶¶ 4, 11.) After submitting their Preliminary Approval Motion, the Parties continued negotiations to determine whether they could resolve the Named Plaintiffs' claims for attorneys' fees and expenses, including but not limited to, any claim under 42 U.S.C. § 1988, or whether Class Counsel would file a motion. The Parties ultimately reached two stipulations: (1) that Defendants would pay Class Counsel $5.3 million for all attorneys' fees, costs, and expenses incurred up to and including the Court's final approval of the Settlement Agreement; and (2) that following final approval of the Settlement Agreement, Defendants will pay reasonable attorneys' fees and costs incurred in monitoring and validating Defendants' compliance with the Settlement Agreement in an amount not to exceed $200,000 per year until the Settlement Agreement is terminated, excluding any contested motion practice. (*See* Joint Fee Stipulation; Second Gerard Decl. ¶¶ 4, 23–24.)

The Court first considers whether the Parties' agreement to resolve the Named Plaintiffs' claims for attorneys' fees, costs, and expenses incurred up through final approval of the Settlement Agreement for $5.3 million casts any doubt on the fairness, adequacy or reasonableness of the settlement for the Classes under Rule 23(e)(2)(C)(iii). It does not, for two overarching reasons.

First, a comparison of the proportion of the total recovery allocated to the Classes to the proportion of the total recovery allocated to Class Counsel weighs strongly in favor of a determination that the class settlement is fair, reasonable, and adequate. Although the Joint Fee Stipulation seeks an award of $5.3 million for Class Counsel—a significant sum—to compensate

them for investigating and litigating this action and negotiating the Settlement Agreement, that amount does not rival the much greater relief that the Settlement Agreement affords the Classes.

As detailed in the Preliminary Approval Order and above, the Settlement Agreement requires Defendants to develop a detailed and comprehensive Implementation Plan to substantially overhaul the Relevant Services available to members of the Classes, who live across New York State. (Settlement Agreement § IV; Appendix B.) It also requires Defendants to improve care coordination through the development of Intensive Care Coordination services (Settlement Agreement ¶¶ 22–25), expand intensive home-based behavioral health services (*id.* ¶¶ 26–29), strengthen mobile crisis services (*id.* ¶¶ 30–31), standardize screening and assessment processes (*id.* ¶¶ 37–38), address provider capacity challenges (*id.* ¶¶ 53–55), develop a public set of data reporting (*id.* ¶ 46), and implement a robust quality improvement and accountability framework to ensure timely access to the Relevant Services across the State (*id.* § V). Additionally, the Settlement Agreement includes a specific timeline for developing the Implementation Plan and projects that this entire process, which will involve the Parties, numerous government agencies, the Independent Reviewer, stakeholders, and the Court, will take eighteen months. (*Id*. ¶ 52; Appendix B.) Defendants must roll out the Implementation Plan once it is approved by the Court and, starting as early as the rollout period, conduct required quality improvement plans to assess Defendants' progress toward providing the Relevant Services. (*Id*. ¶¶ 62–65 (QIP), 85–87 (Rollout provisions.)) Defendants must also conduct consistent audits to identify the need for any corrective action to ensure provision of the Relevant Services to members of the Classes. (*Id*. ¶¶ 81–84.) Finally, the Settlement Agreement requires that the Independent Reviewer oversee implementation of the Settlement Agreement and the development of exit criteria that Defendants must meet in order to exit from the Court's

jurisdiction. (*Id.* § VIII and ¶ 106.) As a result, the Settlement Agreement affords members of the Classes significant, immediate relief: a process for developing and implementing lasting and sustainable improvements to the provision of Medicaid-covered mental health services for more than 100,000 children across New York State, regardless of where they reside in the state.

The Parties agree, and the Court concurs, that the process for systemic reform required by the Settlement Agreement is a significant, necessary first step forward to ensure that members of the Classes—all minors under the age of 21—receive needed mental and behavioral health care in their homes and communities. As mediator, the Court has direct knowledge of the truly significant hurdles—financial, institutional, cultural, and political—to achieving the Parties' agreement to systemically reform the delivery of Medicaid-covered mental health services for children across New York State. The achievement of the process laid out in the Settlement Agreement for developing, sustainably implementing, and measuring systemic reform in the provision of Relevant Services to members of the Classes is the best possible outcome for the Classes. As the Second Circuit recognized in *Kurtz*, the district court is best situated to determine the proper benchmark for assessing the proportion of class settlement relief provided to the Classes, whether that be the actual, hypothetical, or predicted class recovery. *Kurtz*, 142 F.4th at 119. Because the class relief is not monetary, but injunctive, there is no "predicted" class recovery or meaningful "hypothetical" recovery that can serve as a benchmark. Rather, the actual relief secured for the Classes is the appropriate benchmark for assessing the portion of class settlement relief that flows to the Classes. Because the Settlement Agreement is the best possible outcome for the Classes, a comparison of the proportion of class settlement relief provided to the Classes to the proportion of relief for Class Counsel does not reveal any "imbalance as to cast doubt on the settlement's fairness." *Id*.

Second, for the reasons already explained, the Settlement Agreement and Joint Fee Stipulation are not the result of unscrupulous counsel seeking "to quickly settl[e] a class's claims to cut a check," *Moses*, 79 F.4th at 244, but the result of hard work by Class Counsel to secure significant, meaningful, and immediate relief for the Classes in the form of a path for systemic improvements to ensure that members of the Classes receive intensive home and community-based mental health services. This Court served as mediator for the Parties' negotiation of the Settlement Agreement from February 2024 through August 2025, as well as negotiation of the Joint Fee Stipulation through November 2025, and oversaw at least thirteen separate sessions, reviewing numerous submissions by the Parties related to those discussions. Throughout this process, Class Counsel ensured that settlement negotiations concerning the substantive provisions of the Settlement Agreement were separate from negotiations concerning the resolution of Named Plaintiffs' request for attorneys' fees, costs, and expenses. Moreover, Class Counsel maximized relief for the Classes by focusing first and foremost on vigorous negotiations to secure a Settlement Agreement that will provide substantial, meaningful, and enforceable relief to the Classes. Accordingly, the Settlement Agreement and Joint Fee Stipulation do not cast doubt on the fairness of the settlement for the Classes.

I also conclude that the Parties' agreement that Defendants will pay Class Counsel reasonable attorneys' fees and costs incurred in monitoring and validating Defendants' compliance with the Settlement Agreement, excluding any contested motion practice, capped at $200,000 a year until the Settlement Agreement is terminated, does not cast any doubt on the fairness, reasonableness, or adequacy of the settlement for the Classes under Rule 23(e)(2)(C)(iii). Class Counsel are taking on significant responsibilities in enforcing the Settlement Agreement. Class Counsel must work, on behalf of the Classes, collaboratively with

Defendants and the Independent Reviewer to develop an Implementation Plan that will provide a roadmap for how Defendants will provide timely access to the Relevant Services to Medicaid-enrolled children in New York State. (Settlement Agreement § IV.) They must also carry out responsibilities related to the development of the Quality Improvement Plan and publicly available data dashboard (*id*. ¶¶ 46, 59, 62, 64, 66–80) and the development of clear exit criteria for determining whether Defendants have achieved substantial compliance (*id*. ¶ 106), and are required to mediate disputes arising out of the Settlement Agreement and Implementation Plan (*id*. ¶ 109). To be clear, Class Counsel must document any attorney hours worked and expenditures for which they may claim compensation for monitoring and validating the Settlement Agreement. (*See* Joint Fee Stipulation ¶ 7.) Thus, the Settlement Agreement does not guarantee Class Counsel annual compensation. It permits Class Counsel to request compensation from Defendants for work to enforce the Settlement Agreement, properly supported with documentation of attorney hours and expenditures, and caps the amount they can receive at $200,000 per year, not including fees for any contested motion practice. Any disputes concerning the amount requested will be resolved by the Court after the Parties make best efforts to resolve the dispute. (*Id*.)

Accordingly, the requested amount of attorneys' fees, costs, and expenses for Class Counsel is substantively fair and raises no concerns about any imbalance between the gains for the Classes from the Settlement Agreement and the gains to Class Counsel from the Joint Fee Stipulation. *Kurtz*, 142 F.4th at 119. Class Counsel contributed their extensive expertise and thousands of hours of work to achieve an urgently needed path for developing systemic reforms to improve the delivery of intensive home and community-based mental health services to members of the Classes. Class Counsel pursued this relief for the Classes prior to negotiating the

Joint Fee Stipulation, thereby prioritizing and maximizing relief for the Classes. In addition, the attorneys' fees, costs, and expenses requested for Class Counsel will be paid directly by Defendants from funds entirely separate from any funds required to deliver the promised injunctive relief to the Classes. Accordingly, the amount of attorneys' fees, costs, and expenses requested for Class Counsel weighs in favor of finding that the Settlement Agreement and Joint Fee Stipulation are reasonable, fair, and provide adequate relief to the Classes.

### iv. *Agreement under Rule 23(e)(3)*

Rule 23 additionally requires the parties to "file a statement identifying any agreement made in connection with the proposal." Fed. R. Civ. P. 23(e)(3). A court must consider any such agreement in assessing whether "the relief provided for the class is adequate" under the proposed settlement agreement. Fed. R. Civ. P. 23(e)(2)(C). The Court need not address this factor, as the Parties have not indicated that they made any separate agreement in connection with the Settlement Agreement.

### v. *Release of Liability*

It is "well-established . . . that class action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct." *Payment Card II*, 330 F.R.D. at 42 (citing *Wal-Mart Stores, Inc.*, 396 F.3d at 107 (quotation marks omitted). Accordingly, "[c]ourts have denied preliminary approval where releases from liability are deemed to be overly broad." *Payment Card II*, 330 F.R.D. at 42. For example, in *Karvaly v. eBay, Incorporated*, the court found that:

> a general release that purport[ed] to strip millions of individuals of their rights to sue the defendants upon a wide range of offenses that have nothing to do with the misconduct alleged in the present action, for no more consideration than [the defendant's] agreement to make certain superficial changes to its website, is an

offense to the principle of due process so egregious as to render the proposed settlement untenable even at this preliminary stage.

245 F.R.D. 71, 88–89 (E.D.N.Y. 2007). Release of liability provisions in class action settlement agreements are further "limited by . . . [the] adequacy of representation doctrine . . . ." *Payment Card I*, 827 F.3d at 236–37 (citing *Wal-Mart Stores*, *Inc.*, 396 F.3d at 106) (quotation marks omitted). Courts will not enforce releases where class plaintiffs were inadequately represented at the time the release was negotiated. *Cf. Payment Card I*, 827 F.3d. at 236 ("[M]embers of a class not present as parties to the litigation may be bound by the judgment where they are in fact adequately represented by parties who are present consistent with the requirements of due process and full faith and credit.") (citing *Hansberry v. Lee*, 311 U.S. 32, 42–43 (1940)) (quotation marks omitted); *see also Wal-Mart Stores, Inc.*, 396 F.3d at 109 ("Claims arising from a shared set of facts" that have been explicitly included in a settlement release of liability provision "will not be precluded [in a later action] where class plaintiffs have not adequately represented the interests of class members.").

Here, the Settlement Agreement provides that "[n]othing in this Settlement Agreement shall limit the ability of any individual Plaintiff or Class Member to pursue any legal or administrative remedies to which they would otherwise be entitled under state or federal law other than the claims for systemic injunctive and declaratory relief adjudicated by this action." (Settlement Agreement ¶ 142.) As addressed in the Preliminary Approval Order, neither the release set forth in paragraph 142 nor any other provision in the Settlement Agreement accomplishes the type of overbroad, general release of liability in *Karvaly*, which "render[ed] the proposed settlement [in that action] untenable." (Preliminary Approval Order at 31–33 (citing *Karvaly*, 245 F.R.D. at 88–89).) Additionally, no member of the Classes has objected to final approval on the basis of the release. Accordingly, this factor also weighs in favor of granting

final approval.

### D. Equitable Treatment of Class Members

Before approving a class settlement, "the court must take into account whether the 'proposal treats class members equitably relative to each other.'" *Moses*, 79 F.4th at 244 (quoting Fed. R. Civ. P. 23(e)(2)(D)). When analyzing this Rule 23(e)(2) factor, courts may consider "whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." *Payment Card II*, 330 F.R.D. at 47 (quoting Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment).

The Settlement Agreement satisfies Rule 23(e)(2)(D) because it secures a path to bring about systemic relief to ensure that Medicaid-eligible children under age 21 in New York State receive individualized intensive home and community-based mental and behavioral health services that are necessary and appropriate for their needs while remaining safely at home and in their communities. (*See* Preliminary Approval Order at 33–34.) As detailed in the Preliminary Approval Order, the Settlement Agreement seeks to provide *all* members of the Classes relief by achieving widespread, systemic changes in how Defendants provide access to the Relevant Services and thereby equitably treats all members of the EPSDT and ADA Classes. *See id.;* *Moses*, 79 F.4th at 245 (noting that "Rule 23(e)(2)(D) requires that class members be treated *equitably*, not identically") (emphasis in original); *Payment Card III*, 2024 WL 3236614, at *36 (explaining that in a Rule 23(b)(2) class action, "different class members can benefit differently from an injunction – but no matter what, they *must* stand to benefit (it cannot be the case that some members receive no benefit while others receive some)") (emphasis in original, citation omitted).

The Settlement Agreement does not grant preferential treatment to any member or subset of the EPSDT or ADA Classes, and there have been no objections from members of the Classes or outside stakeholders raising any such concerns. Accordingly, this factor weighs in favor of final approval.

### E. <u>Reaction of the Class to the Settlement</u>

A fourth *Grinnell* factor not otherwise codified in Rule 23(e)(2) is the class's reaction to the proposed settlement. *See McReynolds*, 588 F.3d at 804 (citing *Grinnell,* 495 F.2d at 463). Courts have long considered this factor to be "perhaps the most significant factor to be weighted in considering [a class action settlement's] adequacy." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 343 F. Supp. 3d 394, 410 (S.D.N.Y. 2018), *aff'd sub nom. In re Facebook, Inc.*, 822 F. App'x 40 (2d Cir. 2020). "A favorable reception by the class constitutes 'strong evidence' that a proposed settlement is fair." *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 382 (S.D.N.Y. 2013) (quoting *Grinnell*, 495 F.2d at 462). For example, "[i]f only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement." *Wal-Mart Stores, Inc.*, 396 F.3d at 118.

Here, no members of the Classes have provided any comments on the Settlement Agreement, whether positive or negative. However, numerous stakeholders, including organizations and professionals who provide intensive home and community-based mental health services to children in New York State, provided 40 written comments.[6] The vast majority of the

---

[6] The Court notes for the record that the Court received only written comments addressing the Settlement Agreement, all of which are appended to the Glasspiegel Declaration. (*See* ECF Nos. 83-3 through 83-5.) While Class Counsel noted that three individuals requested to speak at the Fairness Hearing in support of the Settlement Agreement, all of whom also provided written comments, these individuals were ultimately unavailable on the hearing date. (*See* Glasspiegel Decl. ¶ 3.)

comments express strong support for Settlement Agreement and underscore the dire need for systemic changes to enable providers to deliver the Relevant Services to children throughout New York State. (Glasspiegel Decl. ¶ 40.) Based on all of these comments, the reaction of the Classes to the Settlement Agreement weighs strongly in favor of final approval.

Many organizations and individuals who provide intensive home and community-based mental health services to children in New York State submitted comments strongly supporting the Settlement Agreement, including the following:

- the New York State Coalition for Children's Behavioral Health,

- Child and Family Services,

- Citizens' Committee for Children of New York,

- NYS Council for Community Behavioral Healthcare,

- the Children's Aid Society,

- JCCA,

- The Jewish Board of Family & Children's Services,

- Greater Mental Health of New York,

- Council of Family and Child Caring Agencies,

- Families Together in New York State, Inc., and

- AspireHope NY Inc.

(Glasspiegel Decl. ¶ 15.)

The Court has reviewed all 40 comments and finds that they contain several important themes that weigh in favor of finding that the Settlement Agreement is fair, reasonable, and adequate.

### i. Barriers to the Provision of Intensive Home and Community-Based Mental and Behavioral Health Services to Members of the Classes

A number of comments from providers powerfully describe the significant challenges they have faced when seeking to provide intensive home and community-based mental health services to children in New York State, and how the Settlement Agreement, if approved, would create a path to address those barriers.

For example, Ann Marie Scalia, the CEO of JCCA, a provider of child welfare and behavioral health services, described the challenges which led JCCA to stop providing certain Relevant Services to New York children as follows:

> As a service provider, we have struggled to provide [Children and Family Treatment and Support Services] and [Home and Community-Based Services] to meet the needs of the children and their families who seek our help. JCCA worked hard in recent years to make HCBS work, but we experienced significant and persistent financial losses despite trying different staffing approaches. As a result, this past summer we were forced to de-designate from providing HCBS services. . . . We are encouraged that the settlement requires New York State to strengthen provider capacity, expand service eligibility pathways, raise Medicaid reimbursement rates, and ensure access to critical services including mobile crisis support, intensive care coordination, and intensive in-home supports that enable young people to reside safely and improve their wellbeing in their homes and communities.

(ECF No. 83-3 at 13.)

Similarly, Deirdre Sferrazza, Senior Vice President of Children's Services, Greater Mental Health of New York, poignantly describes the challenges facing her organization in providing Mobile Crisis Services to children:

> Our mobile teams face extremely challenging situations, often working late into the evening and sacrificing time with their own families. In today's job market, these roles are primarily filled by recent graduates—dedicated but inexperienced professionals who require intensive supervision, training and oversight that most programs simply cannot afford. Obtaining limited permits and licenses can sometimes take months, leading to delays in service provision and cost to the programs. These staff often move on after receiving their licensure. . . .
>
> Current rate structures leave programs struggling to cover essential costs . . .

> Without these resources, we cannot deliver the level of care children need. Care coordination by qualified care managers is not optional—it is essential for achieving the best outcomes.

(ECF No. 83-3 at 20.)

Several comments specifically express support for the provisions of the Settlement Agreement that promise to tackle barriers to the provision of intensive home and community-based mental health services by improving Medicaid reimbursement rates for service providers. These comments underscore that current reimbursement rates either do not cover or inadequately cover functions needed to ensure that such services are actually delivered. (*See, e.g.*, ECF No. 83-3 at 5, 8–9, 13–14, 17, 20–21, 24, 46, 49.) They also note that reimbursement rates do not adequately compensate for various types of work needed to ensure the provision of intensive home and community-based mental health services to children across New York State, including: (1) work outside of traditional working hours; (2) back-office support, including non-billable care coordination; (3) leadership and management performed by people serving in full-time director roles; (4) quality assurance measures; (5) billing and insurance monitoring; (6) bilingual sessions; (7) peer services; and (8) travel. (*See, e.g.*, ECF No. 83-3 at 13, 20, 49; *see also* Glasspiegel Decl. ¶ 18.)

Jeannine Struble, Executive Director of AspireHope NY, explains how inadequate reimbursement rates have directly impaired her organization from providing intensive home and community-based mental health services for New York children:

> As a community-based peer services provider, we are committed but have struggled to successfully provide this much needed service due to barriers including sub-standard reimbursement rates directly affecting hiring and retention of staff. Direct service provision is demanding and stressful, resulting in a high rate of burn out and lack of interest and engagement in the field. . . .
>
> The sub-standard reimbursement rate does not promote a self-sustaining program and

does not support a necessary administrative structure. Many peers are being supervised by unqualified and overworked clinicians that do not understand the work that needs to be done.

(ECF No. 83-3 at 49.)

Similarly, Melissa Seale, a psychiatric nurse practitioner and owner of Well Child Psychiatric NP, PLLC, an outpatient provider of mental and behavioral health services, writes:

Our children are suffering. . . . At Well Child, we are doing all we can to educate, treat, support other agencies. We are one of the few providers that take all managed Medicaid programs, because those are the children that need us the most. However, we are barely able to stay open as a business due to such poor reimbursement rates. To top it off, we have to fight for every bill we send out, justify our sessions, rationale and there are times we get insurance companies asking us to pay them back if they feel the session was not warranted! We are treading quicksand in a system that sets our children and providers up to fail.

(ECF No. 83-5 at 4.)

Therefore, the Court finds that stakeholder comments underscore that providers of intensive home and community-based mental health services for children face significant barriers to providing such services, and that the Settlement Agreement is needed to provide a mechanism for ameliorating these barriers.

### ii. Urgent Need to Address Existing Challenges

Relatedly, many comments underscore the pressing urgency of remedying the barriers confronting service providers and thereby ensuring that children across New York State secure intensive home and community-based mental and behavioral health services. For example, Alice Bufkin from Citizens' Committee for Children of New York writes of the "widespread access to care crisis," noting that "providers across the state overwhelmingly report[] significant waitlists, resulting in families waiting for months to get an initial appointment," and that, "[a]s a result of this waitlist crisis, families across the state are experiencing hospitalizations, police involvement, lost education, job loss, family anxiety, and numerous other harms caused by access barriers."

44

(ECF No. 83-3 at 5.)

Similarly, Elizabeth McPartland at Child and Family Services writes:

Gaps in Medicaid's system of care lead children to experience unnecessary hospitalizations and other out-of-home placements when intensive home and community-based services were not available. Our agency has placed hundreds of children on waiting lists for our services, because we simply cannot hire enough qualified staff to provide the intervention needed.

(Id. at 3.) Finally, Kathleen Brady-Stepien, President and CEO of the Council of Family and Child Caring Agencies, writes: "[a]s the State is considering solutions to meet the requirements of the settlement, we urge the State to act with haste to fund and implement these proposed reforms. (*Id*. at 24.)

The Court finds that these comments convey a meaningful sense of urgency in ensuring that the Settlement Agreement is implemented.

### iii.   High Interest in Stakeholder Engagement Process

Many who submitted comments also express a strong interest in participating in the stakeholder engagement process by joining the Implementation Advisory Committee or by other means. (*See, e.g.*, ECF No. 83-3 at 3, 14–15, 21, 49–50.) The Court finds that these comments underscore another strength of the Settlement Agreement: its establishment of a mechanism for incorporating the expertise and feedback of knowledgeable stakeholders to help ensure that the Implementation Plan enacts meaningful and sustainable reforms.

For example, Lisa Freeman, Attorney-in-Charge, Special Litigation and Law Reform Unit, Legal Aid Society Juvenile Rights Practice, writes that the Settlement Agreement "reflects a potentially big step forward to address the mental health needs of children in New York State" and makes a series of suggestions for inclusion in the Implementation Plan. (ECF No. 83-5 at 39–42.) Named Plaintiffs have addressed the specific ways that these suggestions can be

considered in developing the Implementation Plan. (*See* Glasspiegel Decl. ¶ 37.) ("For example, the Parties can discuss [Freeman's] suggestions regarding procedures related to any adverse determinations or denial of services that may occur following the 60-day period when services are initially delivered.")

#### iv.   The Health Homes Model

A subset of comments, from CCF Health Home and affiliated care management agencies, similarly express strong support for the Settlement Agreement while voicing a cautionary concern "that the care coordination structure will result in fragmentation of care, duplication of efforts, and additional financial strain to the State." (Glasspiegel Decl. ¶ 22.) For example, Hersh Moskovits, CEO of Yeled v'Yalda, a care management agency, comments:

> Creating a new care coordination structure inevitably creates financial strains, duplicates required outreach, and delays service delivery when established implementation infrastructure is bypassed. We must prioritize strengthening existing, proven care management systems, like Health Homes, to avoid further administrative failure. Families deserve coordination, not more coordinators.

(ECF No. 83-4 at 11.) As Named Plaintiffs explain, the Settlement Agreement's Intensive Care Coordination requirement has been designed to address precisely these concerns:

> [T]he Parties have attempted to ensure that care coordination as defined in the Settlement Agreement is centralized at a single point, intentional, and efficient, squarely addressing these concerns. . . . The Settlement Agreement requires that Defendants provide Intensive Care Coordination ("ICC") to eligible children through High Fidelity Wraparound (as suggested by these submissions) and through the establishment of a Second Tier ICC. . . .
>
> The Settlement Agreement specifies that "ICC will facilitate cross-system involvement and a child and family team." . . .
>
> Also consistent with the commenters' recommendations, the Settlement Agreement emphasizes improved provider capacity, adequate reimbursement rates, and other supports for the provider workforce, such as additional education and training.

(Glasspiegel Decl. ¶¶ 23–25) (citations omitted). Moreover, at the Fairness Hearing, Class Counsel noted that these concerns about care coordination and the role of Health Homes will be

46

a focus of the Implementation Plan. Class Counsel also noted that the Parties will be able to further consider and incorporate perspectives and recommendations from CCF Health Homes through the stakeholder engagement process, which includes the participation of the Implementation Advisory Committee.

Notwithstanding the cautionary concerns from CCF Health Home and affiliated care management agencies, the comments from this subset convey clear support for the Settlement Agreement. The Court has reviewed all 40 comments submitted in response to the Settlement Agreement and find that they demonstrate an overwhelmingly "favorable reception" constituting "'strong evidence' that a proposed settlement is fair." *Citigroup*, 965 F. Supp. 2d at 382.

## II. Reasonable Notice was Provided to Members of the Classes

In preliminarily approving a class action settlement, the Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B). The notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Phillips*, 472 U.S. at 812 (internal citations omitted). "[T]he . . . court has virtually complete discretion as to the manner of giving notice to class members." *Handschu v. Special Servs. Div.*, 787 F.2d 828, 833 (2d Cir. 1986); *see also Caballero v. Senior Health Partners, Inc.*, No. 16-cv-326 & 18-cv-2380, 2018 WL 4210136, at *13 (E.D.N.Y. Sept. 4, 2018); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 345 (E.D.N.Y. 2010). "Notice need not be perfect, but must be the best notice practicable under the circumstances, and each and every class member need not receive actual notice, so long as class counsel acted reasonably in choosing the means likely to inform potential Class Members." *Oladipo v. Cargo Airport Servs. USA, LLC*, No. 16-cv-6165, 2019 WL 2775785, at *10 (E.D.N.Y. July 2, 2019).

The Modified Notice provided adequate notice to members of the Classes by summarizing the litigation, describing the Settlement Agreement, and providing clear instructions on how members of the Classes may obtain more information about the Settlement Agreement and voice objections. The Modified Notice also describes the procedures for people who wish to be heard in favor of, or in objection to, the Settlement Agreement, and specifies the date, time, place, and manner of attendance at the January 6, 2026 Fairness Hearing set by the Court. The Modified Notice includes all of the substantive information in the Parties' Proposed Notice, and reflects the Court's revisions, which use plain language and formatting to help make the information accessible to lay people and easier to understand. (*See* Preliminary Approval Order at 36–39.) No Party objected to the Court's modifications to the Parties' Proposed Notice. As addressed in the Preliminary Approval Order, the Modified Notice meets the Rule 23 requirements. *See id*. at 36–39; *see also Oladipo*, 2019 WL 2775785, at *11 (approving notice that set forth options available to class members, including if a member objected to the settlement).

At the preliminary approval stage, the Court also found that the Parties' jointly proposed Notice Plan was reasonable and satisfied the due process requirements of Rule 23. The Parties' submissions in support of final approval demonstrate that the Notice Plan was properly carried out. The Parties posted copies of the Modified Notice and the Settlement Agreement on their websites and in their offices. (ECF No. 83-1 at 14.) The Parties distributed the Modified Notice, along with the Settlement Agreement, to a list of specified individuals, agencies, and organizations likely to work with members of the Classes and their families, so that these entities may provide the Modified Notice to potential members of the Classes. (Preliminary Approval Order at 38). These individuals and entities include, among others, managed care organizations,

New York county mental hygiene directors and other county officials, community mental health providers, hospitals, institutional providers, legal organizations, and mental health advocacy organizations. (*Id*.) Class Counsel maintained dedicated lines of communication for members of both Classes to request further information and to ask questions or provide comments about the Settlement Agreement, including a mailing address and an email address. (*Id*.) At the Court's direction, the Parties subsequently distributed the Joint Fee Stipulation as an addendum to the Notice. (Glasspiegel Decl. ¶ 2; *see also* Joint Fee Stipulation.)

As addressed in the Preliminary Approval Order, here, individual notice to members of the Classes is not practicable because individual Class Members have not yet been referred for the Relevant Services and are therefore not yet easily identified. (*See* Preliminary Approval Order at 38–39.) Where individual members of the Classes cannot be easily identified, and "where individual notice would be burdensome or expensive," notice by publication is appropriate. *See MetLife*, 689 F. Supp. 2d at 345 (citations omitted).

## III.     The Settlement Agreement Meets the Requirements for Final Approval

For all of the aforementioned reasons, all of the Rule 23(e) and relevant *Grinnell* factors either weigh in favor of the determination that the Settlement Agreement is fair, reasonable, and adequate, and merits final approval, or are neutral. Named Plaintiffs and Class Counsel have adequately represented the interests of the Classes through extensive pre-litigation investigation, vigorous and skilled advocacy in the course of this litigation, and the devotion of thousands of hours to the development and prosecution of this action. The resulting Settlement Agreement promises to provide substantial benefits to the Classes while removing the delay, risk, and expense inherent in the trial of such a complex case. Under the terms of the Settlement Agreement, Defendants commit to developing an Implementation Plan in the next eighteen

months and to rolling out that plan to ensure that Defendants provide Medicaid-eligible children in New York State with timely access to the intensive home and community-based mental and behavioral health services identified in the Amended Complaint. If approved by the Court, the Settlement Agreement would resolve all claims in this lawsuit with Defendants' commitment to provide timely access to medically necessary services for Medicaid-eligible children under age 21 with mental and behavioral health conditions.

Additionally, the award of attorneys' fees, costs, and expenses for Class Counsel raises no concerns about whether the Settlement Agreement and Joint Fee Stipulation are fair, reasonable, and adequate. There is no imbalance in the proportion of the recovery for the Classes and the proportion flowing to Class Counsel. Moreover, no members of the Classes have objected to the Settlement Agreement or Joint Fee Stipulation. Comments by stakeholders overwhelmingly underscore the urgent need for reforms of precisely the type contemplated by the Settlement Agreement and express strong support for the agreement. Finally, adequate Notice was provided to members of the Classes in compliance with Rule 23(e)(1)(B) of the Federal Rules of Civil Procedure.

For all of these reasons, the Settlement Agreement merits final approval.

## IV.        Approval of Class Counsel's Requested Attorneys' Fees and Costs

Pursuant to Rule 23(h), Fed. R. Civ. P., "[i]n a certified class action, the court may award reasonable attorneys' fees and nontaxable costs that are authorized by law or by the parties' agreement" when they are "made by motion under Rule 54(d)(2)." "[T]he relief actually delivered to the class can be a significant factor in determining the appropriate fee award." Fed. R. Civ. P. 23(e)(2) advisory committee's note to the 2018 amendment. As explained above, the Parties stipulate that Class Counsel should be awarded attorneys' fees, costs, and expenses as set

forth in the Joint Fee Stipulation as follows: $5.3 million for all attorneys' fees and costs incurred up to and including the Court's final approval of the Settlement Agreement; as well as reasonable attorneys' fees and costs incurred in monitoring and validating Defendants' compliance with the Settlement Agreement, capped at $200,000 a year until the Settlement Agreement is terminated, excluding any contested motion practice. (Joint Fee Stipulation; Second Gerard Decl. ¶¶ 4, 23.)

Under Rule 23(h), district courts have discretion to choose between the "lodestar" and the "percentage of the fund method" for assessing the reasonableness of attorneys' fees, although the trend in the Second Circuit is towards the latter method. *McDaniel v. Cnty. of Schenectady*, 595 F.3d 411, 417 (2d Cir. 2010); *Fresno Cnty. Employees' Ret. Ass'n*, 925 F.3d at 72. Under a lodestar analysis, courts "calculate[] a given attorney's fee by multiplying an attorney's reasonable hourly rate by the number of hours that the attorney spent on the case." *Fresno Cnty. Employees' Ret. Ass'n*, 925 F.3d at 67 n.2. Under the percentage of the fund approach, courts consider the requested fees as a percentage of the settlement funds and will routinely approve "fees as high as 33.5% from comparable class settlement funds" under Rule 23(h). *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d at 695; *Robertson v. Trinity Packaging Corp.*, No. 19-cv-659, 2025 WL 2224586, at *13 (W.D.N.Y. Aug. 5, 2025). However, even when a court employs the percentage of the fund approach, the Second Circuit encourages district courts to "use the lodestar as a 'baseline' against which to cross-check a percentage fee" before finding the percentage fee reasonable. *Fresno Cnty. Employees' Ret. Ass'n*, 925 F.3d at 72 ("Fee requests that deviate wildly from the unenhanced lodestar fee are unlikely to pass this cross-check, and district courts are at liberty to reduce the requested fee within their discretion."). Similarly, courts have relied on the lodestar approach as a point of comparison where, as here, the parties

have stipulated to a fee award. *See, e.g.*, *Campos v. Kijakazi*, No. 21-cv-5143, 2023 WL 8096923 (E.D.N.Y. Nov. 20, 2023).

Regardless of the method applied, when determining a reasonable fee, courts in the Second Circuit are guided by the traditional criteria: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Goldberger*, 209 F.3d at 50; *see, e.g., Sakiko Fujiwara v. Sushi Yasuda Ltd.*, 58 F. Supp. 3d 424, 439 (S.D.N.Y. 2014) (conducting a lodestar analysis cross-check and applying the *Goldberger* factors in approving of an award of fees pursuant to a class settlement).

The Second Circuit has not indicated whether district courts are to use the lodestar or percentage of the fund approach to assess the reasonableness of attorneys' fees in the settlement of a Rule 23(b)(2) class action seeking only injunctive and declaratory relief. Here, where the settlement provides solely non-monetary relief for the Classes, it is difficult to ascertain a precise dollar value for the class relief that would permit a percentage of the fund approach. Thus, numerous courts evaluating a request for attorneys' fees under Rule 23(h) in the context of Rule 23(b)(2) classes have used the lodestar approach. *See Selby v. Principal Mut. Life Ins. Co.*, No. 98-cv-5283, 2003 WL 22772330, at *2, 5 & n.16 (S.D.N.Y. Nov. 21, 2003) (approving fees "represent[ing] a 58.22% discount from the current lodestar value of counsel's time" in Rule 23(b)(2) class action settlement); *see also In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Inj. Litig.*, 332 F.R.D. 202, 221 (N.D. Ill. 2019) (applying lodestar method to Rule 23(b)(2) class action settlement); *Lilly v. Jamba Juice Co.*, No. 13-cv-02998, 2015 WL 2062858, at *5 (N.D. Cal. May 4, 2015) (same and noting that "in injunctive relief class actions, courts often use a lodestar calculation because there is no way to gauge the net value of the settlement

or any percentage thereof"); *In re Budeprion XL Mktg. & Sales Litig.*, No. 09-md-2107, 2012 WL 2527021, at *21 (E.D. Pa. July 2, 2012) (same and noting that "in cases such as this one, in which the settlement's terms evade precise evaluation, the lodestar method is preferred").

Applying the lodestar approach, Class Counsel's requested attorneys' fees and costs are reasonable under Rule 23(h) for the following reasons.

### A. Calculation of Class Counsel's Proposed Lodestar

Had the Parties not stipulated to a fee award of $5.3 million, Class Counsel would have sought a lodestar of approximately $8.7 million in attorneys' fees, representing approximately 13,500 hours of work from April 2021 through August 2025 by 27 attorneys and support staff across four different organizations. (Second Gerard Decl. ¶ 20; *see also* ECF No. 83-9.) As discussed below, these hours include only twelve of the eighteen months that were expended investigating this action, and do not include much of the significant work done in the course of the litigation, including filing the Final Approval Motion and negotiating the Joint Fee Stipulation. (Second Gerard Decl. ¶ 13.) The lodestar also reflects hourly rates ranging from $840 to $950 for attorneys with 30 years or more of experience, $550 to $790 for attorneys with more than 10 but less than 30 years of experience, $400 for attorneys with less than 10 years of experience, and $150 to $200 for legal support staff. (*See* ECF No. 83-9 at 2-3.)

For the reasons explained below, the Court finds that both the number of hours and hourly rates that Class Counsel would have advanced in a contested fee petition are reasonable. Nevertheless, even were this not the case, the stipulated fees constitute a 39% reduction from the lodestar and are therefore eminently reasonable as addressed in detail below.

### i. Class Counsel's Hours Expended

The Court first considers whether the hours claimed by Class Counsel were "reasonably expended." *Holick v. Cellular Sales of New York, LLC*, 48 F.4th 101, 106 (2d Cir. 2022). Courts expect counsel to exclude hours that are "excessive, redundant, or otherwise unnecessary" or that result from a case being "overstaffed." *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983); *see also Chaparro v. John Varvatos Enters., Inc.*, No. 21-446-cv, 2021 WL 5121140, at *2 (2d Cir. Nov. 4, 2021) (summary order) (same). Accordingly, courts have concluded that "it [is] not appropriate to bill every menial task in the litigation at a partner rate" where work "billed to the lead partner . . . could have been performed by junior associates." *Surdu v. Madison Glob., LLC*, No. 15-cv-6567, 2018 WL 1474379, at *10 (S.D.N.Y. Mar. 23, 2018).

The requested fee award was calculated after "significant discretionary write-offs and billing judgment" by Class Counsel, including a write-off of more than 2,400 hours of time. (Second Gerard Decl. ¶ 13.) Class Counsel did not bill for any time spent on administrative tasks and did not bill for every attorney present when more than two attorneys attended a meeting. (*Id.* ¶ 14.) Class Counsel not only ensured that "efforts were coordinated and that duplication of effort could be avoided," they also "made highly effective use of paralegals to efficiently allocate time and resources and reduce the time attorneys otherwise would have had to devote to this matter." (*Id.* ¶¶ 16–17.) Accordingly, this Court finds that Class Counsel have already excluded any hours that are "excessive, redundant, or otherwise unnecessary" and that Class Counsel have not "bill[ed] every menial task in the litigation at a partner rate." *Hensley*, 461 U.S. at 434; *Surdu*, 2018 WL 1474379, at *10.

After all write-offs have been accounted for, Class Counsel seek compensation for approximately 13,500 hours of work from 27 attorneys and support staff across four different

organizations. These hours represent a reasonable amount of time to file and conduct the litigation and to resolve the Classes' claims when considering: (1) the complexity of the class claims for statewide relief under the Medicaid Act, ADA, and Section 504 of the Rehabilitation Act; (2) the fact that this action seeks statewide systemic reforms; (3) the fact that active litigation from March 2022 through February 2024 involved extensive discovery and a robust motion in support of class certification; and (4) that this action was then in active settlement negotiation from February 2024 through November 2025. Accordingly, the Court finds that Class Counsel have provided a reasonable estimate of the hours expended on this litigation for purposes of a lodestar calculation.

### ii. Class Counsel's Hourly Rate

The hourly rates used in making a fee award should be "what a reasonable, paying client would be willing to pay." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 522 F.3d 182, 184 (2d Cir. 2007). This rate should be "in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984); *accord Reiter v. MTA N.Y.C. Transit Auth.*, 457 F.3d 224, 232 (2d Cir. 2006). Under a rebuttable presumption known as the "forum rule," courts within the Second Circuit "generally use the hourly rates employed in the district in which the reviewing court sits." *Simmons v. New York City Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) (quoting *Arbor Hill*, 493 F.3d at 119); *see also Kyros L. P.C. v. World Wrestling Ent., Inc.*, 78 F.4th 532, 547 (2d Cir. 2023) (applying *Simmons*). When assessing attorneys' fees, district courts may "consider the complexity of a matter because a reasonable paying client would consider the complexity of his or her case when deciding whether an

55

attorney's proposed hourly rate is fair, reasonable, and commensurate with the proposed action." *Lilly v. City of New York*, 934 F.3d 222, 231–32 (2d Cir. 2019).

After district courts began to develop various exceptions to the forum rule, the Second Circuit clarified that, "when faced with a request for an award of higher out-of-district rates, a district court must first apply a presumption in favor of application of the forum rule." *Simmons*, 575 F.3d at 175. To successfully rebut the presumption of the forum rule, "a litigant must persuasively establish that a reasonable client would have selected out-of-district counsel because doing so would likely (not just possibly) produce a substantially better net result." *Id*. "In determining whether a litigant has established such a likelihood, the district court must consider experience-based, objective factors." *Id*. Such factors may include "counsel's special expertise in litigating the particular type of case, if the case is of such nature as to benefit from special expertise." *Id*. at 176. "The party seeking the award must make a particularized showing, not only that the selection of out-of-district counsel was predicated on experience-based, objective factors, but also of the likelihood that use of in-district counsel would produce a substantially inferior result." *Id*.

### 1. Rates in the Eastern District of New York

The Court's evaluation of the reasonableness of Class Counsel's proposed hourly rates begins with a consideration of hourly rates for attorneys of comparable skill and experience in the Eastern District of New York, which is the relevant market. *Simmons*, 575 F.3d at 174. This involves first identifying hourly rates awarded in cases brought in this District that are comparable to this action—a complex Rule 23(b)(2) class action involving claims under the ADA, the Medicaid Act, and the Rehabilitation Act brought by named plaintiffs on behalf of statewide classes seeking injunctive and declaratory relief in the form of systemic reform.

56

The Court has identified only one relatively recent decision in this District addressing attorneys' fees in the context of a Rule 23 class action seeking injunctive relief, specifically systemic reform, on behalf of people with disabilities, including children, against state officials: *New York Association for Retarded Child. v. Cuomo*, No. 72-cv-356, 2019 WL 3288898 (E.D.N.Y. July 22, 2019) ("*Willowbrook*"). That class action challenges the "deprivation of basic rights, including unclean and unsafe living conditions, of individuals with intellectual and developmental disabilities housed at the Willowbrook State Developmental Center in Staten Island, New York" and resulted in a 1975 Consent Judgment, which was later replaced by a Permanent Injunction in 1993 requiring, among other things, payment of attorneys' fees and costs related to monitoring and enforcement. *Id*. at \*1. In a 2019 decision addressing a motion for attorneys' fees concerning monitoring and enforcement work by class counsel, Judge Raymond Dearie of this District approved hourly rates of $425 to $500 for counsel with approximately 30 years of experience and an hourly rate of $100 for legal support. *Id*. at \*5.

The 2019 attorneys' fee ruling in *Willowbrook* is a starting point for determining reasonable hourly rates for Class Counsel, but is not dispositive. At first glance, the hourly rates approved in *Willowbrook* are significantly lower than the hourly rates requested in Class Counsel's lodestar calculation in this action—e.g., $425 to $500 for counsel with approximately 30 years of experience as opposed to the $840 to $950 for attorneys with 30 years or more of experience sought by Class Counsel in this action. However, hourly rates in the New York market have meaningfully increased in the seven years since the 2019 *Willowbrook* decision. For example, the Wolters Kluwer report demonstrates that the mean hourly rate for litigation partners in New York has increased by $100 in just two years. *See* ECF No. 83-7 at 8; *see also* Discussion Section IV.A.ii.2 *infra*.

The Court next considers caselaw awarding fees in smaller cases involving claims under the Medicaid Act, ADA, Rehabilitation Act, and civil rights laws. In recent years, judges in this District found reasonable hourly rates of $450 to $650 for partners, $300 to $450 for senior associates, $150 to $300 for junior associates, and $100 to $150 for legal support in such cases. *See Moreno v. Cap. Concrete NY Inc.*, No. 24-cv-3120, 2025 WL 2555609, at *13–14 (E.D.N.Y. Sept. 5, 2025) (approving an hourly rate of $450 to $650 for partners, $300 to $450 for senior associates, $150 to $300 for junior associates, and $100 to $150 for paralegals in an ADA suit); *Asseng v. Beisel*, No. 14-cv-5275, 2024 WL 669871 (E.D.N.Y. Feb. 19, 2024), *aff'd*, No. 24-700, 2025 WL 728405 (2d Cir. Mar. 3, 2025) (approving an hourly rate of $450 for partners, $350 to $400 for mid-level to senior associates, and $100 for paralegals under 42 U.S.C. § 1988). In 2019, the Second Circuit approved a $450 hourly rate as reasonable for an experienced attorney in a civil rights action. *Lilly*, 934 F.3d at 232–33.

While the rates in these cases are lower than those requested in Class Counsel's lodestar calculation, these cases are distinguishable because almost all of them involve only one plaintiff and are therefore less complex than this Rule 23(b)(2) class action seeking injunctive relief to reform the provision of certain mental health services for children across New York State. *See, e.g.*, *Moreno*, 2025 WL 2555609, at *1 (litigation involving one individual plaintiff); *Asseng*, 2024 WL 669871, at *1; *Feltzin v. Ciampa Whitepoint LLC,* No. 15-cv-2279, 2017 WL 570761, at *1 (E.D.N.Y. Feb. 13, 2017) (same); *Rouse v. Broadway & Cooper LLC*, No. 23-cv-07849, 2025 WL 1249605, at *1 (E.D.N.Y. Apr. 30, 2025) (same). Several cases involve representation by a solo practitioner, rather than attorneys with expertise litigating class actions for injunctive relief involving systemic reform issues. *See, e.g.*, *Lilly*, 934 F.3d 222; *Hashimi v. Conandy Realty LLC*, No. 23-cv-2300, 2025 WL 914697 (E.D.N.Y. Mar. 26, 2025). Moreover, a number

of cases considering hourly rates in the Medicaid Act, ADA, Section 504, and civil rights contexts rely on precedent that is now a decade old, and market rates have shifted meaningfully since then, as noted above. *See Feltzin,* 2017 WL 570761, at *2 (citing cases from 2015 and 2016).

Class Counsel submitted a 2024 report by Wolters Kluwer, which demonstrates that the 2024 mean market rates for New York City litigation partners was $906, with rates ranging from $452 at the bottom of the second quartile to $1,250 at the top of the third quartile. (*See* ECF No. 83-7 at 8.) The 2024 mean market rate for New York City litigation associates was $646, with rates ranging from $380 at the bottom of the second quartile to $874 at the top of the third quartile, respectively. (*Id.*) Another exhibit, the Brightflag "Hourly Rates in Am Law 100 Firms" 2025 Report, demonstrates that the 2025 litigation partner rates at the top 100 largest U.S. law firms range from $960 to $1,594. (*See* ECF No. 83-8 at 9.)

Class Counsel's requested hourly rates, which are $840 to $950 for attorneys with 30 years or more of experience, $550 to $790 for attorneys with more than 10 but less than 30 years of experience, and $400 for attorneys with less than 10 years of experience, fall comfortably around the mean for each category of attorney tracked in the Wolters Kluwer report. In other words, Class Counsel do not seek either the low end or high end of rates prevailing in the New York community. Nor should they. Here, where class claims under the Medicaid Act, ADA, and Section 504 of the Rehabilitation Act are legally and factually complex—requiring expertise in federal class actions, statewide reform of healthcare delivery systems, the rights of children with disabilities relating to mental health issues, and the Medicaid Act—the bottom quartile of rates does not apply to attorneys of comparable skill, experience, and reputation. Similarly, the top

59

quartile of rates is not applicable either because this case does not concern complex commercial litigation, where attorneys bill at much higher rates.

## 2. *The Forum Rule is Rebutted Here*

In further support for their requested rates, Class Counsel asks the Court to consider the hourly rates awarded in a recent, similarly complex Rule 23(b)(2) class action involving Medicaid Act, ADA Title II, and Section 504 claims brought on behalf of certain children and young adults in the Central District of California: *Katie A, et al. v. Diana Bonta, et al.*, No. 2:02-cv-05662, Dkt. No. 1115 at 17 (C.D. Cal Nov. 29, 2023). In order to consider the hourly rates supporting a fee award in this out-of-district case, this Court must first determine, based on "experience-based, objective factors," whether Named Plaintiffs have "persuasively establish[ed] that a reasonable client would have selected out-of-district counsel because doing so would likely (not just possibly) produce a substantially better net result." *Simmons*, 575 F.3d at 175.

Class Counsel have made such a showing here. Class Counsel hail from legal organizations and law firms located within this District as well as the Southern District of New York and the Central District of California.[7] The progress and outcomes of this litigation certainly would have suffered had Class Counsel not included attorneys from across the state and, indeed, the United States, with deep subject-matter expertise because this Rule 23(b)(2) class action seeking systemic reform in the provision of mental health services to children across New York is precisely the type of case that is "of such nature as to benefit from special expertise." *Simmons*, 575 F.3d at 176. Children's Rights and Disability Rights New York

---

[7] Children's Rights is based in the Southern District of New York. Disability Rights New York is located within this District. Proskauer Rose LLP is a national law firm with offices in the Southern District of New York and Central District of California, among other places. The National Health Law Program is based in the Central District of California, among other places.

conducted the investigation necessary to file this litigation and brought critical expertise in each of their respective areas, which include deep experience representing classes of children in systemic reform litigation and experience in investigating and litigating ADA claims concerning mental health issues in New York. *See* Discussion Section I.A.ii *supra* (discussing Class Counsel's expertise). The National Health Law Program, which is located in the Central District of California, and Proskauer Rose LLP, a national law firm that practices in both the Eastern District of New York and the Central District of California, both joined in filing the litigation, bringing critically important expertise in their respective areas: Medicaid law and complex class action litigation. *Id*. Reliance on solely in-District counsel would not only have "produce[d] a substantially inferior result" for the Classes, the record shows that this litigation could not have been pursued at all without the deep expertise that all Class Counsel, including out-of-District counsel, brought to bear. *See Simmons*, 575 F.3d at 176 (experience-based, objective factors rebutting the forum rule may include "counsel's special expertise in litigating the particular type of case"). Accordingly, it is appropriate to consider the hourly rates awarded in Katie A.

The hourly rates approved in *Katie A.* are particularly instructive because that action represents the closest comparable case to this action and has resulted in a recent decision on the issue of attorneys' fees. Similar to this action, the plaintiffs in *Katie A.* brought claims on behalf of children concerning the provision of mental health services as required by federal law. *Id*. at 1. Moreover, *Katie A* resulted in a series of settlement agreements, of which one principal objective was to:

> (a) increase the number of Class members who receive [Intensive Care Coordination ("ICC")] and [Intensive Home Based Services ("IHBS")], when medically necessary, in a timely manner and in appropriate amount and duration, (b) prevent the unnecessary psychiatric hospitalization, placement in [a] [Short Term Residential Therapeutic Program ("STRTP")] or group home and multiple placements of Class members, (c)

> provide [Therapeutic Foster Care ("TFC")] to Class members for whom this mental health service is medically necessary . . . .

Although *Katie A.* focused on the delivery of mental health services across a large county—Los Angeles County—rather than an entire state, the complexity of the case is comparable to this action. *See Lilly*, 934 F.3d at 231–32 (2d Cir. 2019) (permitting courts to "consider the complexity of a matter" in determining whether rates for class counsel are fair, reasonable, and commensurate with the action). Moreover, certain class counsel in *Katie A.* hailed from similar or the same organizations as Class Counsel before this Court—the National Health Law Program and Disability Rights California.

In *Katie A.*, the district court found the following hourly rates to be reasonable: (1) $885 to $950 per hour for attorneys with more than 30 years of experience, (2) $690 per hour for attorneys with more than 15 years of experience, and (3) $550 per hour for attorneys with fewer than 10 years of experience. *Katie A*, No. 2:02-cv-05662, Dkt. No. 1115 at 18–20. The rates closely resemble those proposed by Class Counsel. Accordingly, although *Katie A.* is an out-of-district case, it is properly considered in evaluating the reasonableness of Class Counsel's proposed hourly rates.

For all of these reasons, the Court finds that a lodestar calculation relying on higher hourly rates than those approved in the 2019 *Willowbrook* decision and non-representative actions in this District involving ADA, Medicaid, Rehabilitation Act, or other civil rights claims, is appropriate. The complex nature of this action—a Rule 23(b)(2) class action seeking injunctive relief in the form of systemic reform on behalf of statewide classes of children—renders it an action that would benefit from special expertise. Out-of-District counsel were necessary for the significant, meaningful outcome that Class Counsel achieved for the Classes

through the Settlement Agreement. Accordingly, Class Counsel's proposed hourly rates are fair and reasonable.

### B. Class Counsel's Requested Award

The lodestar calculation of $8.7 million is reasonable because, for the reasons explained above, it is premised on Class Counsel's reasonable estimate of the hours expended on this litigation and hourly rates that are fair and reasonable. Moreover, because the Parties have stipulated to $5.3 million in fees to be paid to Class Counsel, the lodestar calculation fully supports the Court's determination that the far lesser amount of $5.3 million is reasonable under Rule 23(h).

First, as noted, the lodestar amount itself already reflects considerable reductions in the form of "significant discretionary write-offs and billing judgment to arrive at the requested number of billable hours." (*See* Second Gerard Decl. ¶¶ 13–17.) Specifically, Class Counsel wrote off "over 2,400 hours of time," or approximately 18% of the total hours, "as well as additional costs, that could reasonably have been sought in a contested application for fees." (*Id.* ¶ 13.) Class Counsel excluded all of the following time: (1) all time billed after September 30, 2025 through the present; (2) all time billed prior to April 1, 2021, even though Disability Rights New York and Children's Rights had investigated the legal and factual basis for this action between October 2020 and April 1, 2022; (3) all travel time; (4) any time "that might be deemed vague, unclear, or potentially unnecessary"; and (5) all time "spent on administrative tasks." *Id*. Class Counsel also did not bill for all attorneys and paralegals present where there were more than two team members in attendance. *Id*.

Second, the actual amount of fees stipulated for Class Counsel—$5.3 million—reflects an *additional* 39% reduction of Class Counsel's lodestar, and is therefore significantly lower

than what Class Counsel would have sought in a contested fee application. When considering the hours for which the Parties seek to compensate Class Counsel, the 39% reduction translates to hourly rates far lower than those proposed by Class Counsel: $512 to $580 for attorneys with 30 years or more of experience, $335 to $482 for attorneys with more than 10 but less than 30 years of experience, $244 for attorneys with less than 10 years of experience, and $92 to $122 for legal support staff.

Third, the requested $5.3 million payment is intended to cover not just attorneys' fees, but also all costs and expenses incurred by Class Counsel. (*See* Joint Fee Stipulation ¶ 6; Second Gerard Decl. ¶ 4.) Although Class Counsel necessarily incurred costs and expenses in litigating this action, including the expense of procuring five expert reports by national leaders in their fields, neither Class Counsel's $8.7 million lodestar nor the Parties' stipulation to $5.3 million for Class Counsel seeks to reimburse Class Counsel for any payments to experts or any other costs. (*See* ECF Nos. 52–55; Second Gerard Decl. ¶ 9.)

Finally, the stipulated amount is the result of arm's-length negotiations conducted largely after the Parties reached an agreement to a settlement in principle. The Parties engaged in "numerous rounds of fee offers and counteroffers, which occurred over many months," before arriving at the agreed upon stipulation. (Second Gerard Decl. ¶ 22.) As part of negotiations, Class Counsel shared with Defendants on numerous occasions a comprehensive accounting of their work. (*Id.* ¶ 12.) These materials totaled more than 1,000 pages, contained individual timeslips for each firm and each individual biller, and accounted for costs incurred by each firm. (*Id.*)

In light of the complexity of the legal and factual issues in this case, the skill and experience required of Class Counsel, the efforts of Class Counsel to reduce duplication, and the

billing judgment exercised by Class Counsel, the Court finds that the requested fee award of $5.3 million satisfies the requirements of Rule 23(h).

### C. <u>Future Attorneys' Fees and Expenses</u>

Under the terms of the Joint Fee Stipulation, Defendants also agree to pay for future legal fees and expenses incurred in connection with Class Counsel's role in monitoring and validating Defendants' compliance with the Settlement Agreement, subject to a cap of $200,000 per year. (Joint Fee Stipulation ¶ 7.) Any compensation for Class Counsel is dependent on the careful expenditure of resources and proper documentation. Class Counsel "agree to submit invoices to Defendants' counsel twice yearly for any such attorneys' fees, costs, and disbursements." (*Id.*) Moreover, Defendants "reserve the right to object to any invoices submitted by Plaintiffs and to withhold payment for any fees that Defendants in good faith designate as excessive, duplicative, or inappropriate." (*Id.*) Any fees and expenses incurred by Class Counsel in relation to contested motion practice to enforce the terms of the Settlement Agreement are excluded from the annual $200,000 cap. (*Id.* ¶ 8.) To secure fees and expenses for contested motion practice, Named Plaintiffs must demonstrate that the work was necessary to enforce the Settlement Agreement, and that the Court ruled in Named Plaintiffs' favor on the motion. (*Id.*) Moreover, Defendants may oppose any motion to recover such fees and expenses, and the Court would resolve such disputes. (*Id.*)

The Parties' stipulation concerning the award of attorneys' fees and costs to Class Counsel for ongoing monitoring and validation of the Settlement Agreement, not including any contested motion practice, also satisfies Rule 23(h). The Settlement Agreement must be in force for a number of years to permit the development and rollout of the Implementation Plan. Ensuring that the Implementation Plan is developed and carried out on a timeframe that complies

with the Settlement Agreement will require Class Counsel to engage in substantial work with Defendants. As explained in Discussion Section I.C.iii *supra*, Class Counsel are taking on significant responsibilities in enforcing the Settlement Agreement, including the development of an Implementation Plan, a Quality Improvement Plan, a publicly available data dashboard, and clear exit criteria for determining whether Defendants have achieved substantial compliance. Class Counsel will also shoulder responsibility for engaging in mediation over any disputes arising out of or in connection with the Settlement Agreement and Implementation Plan. In light of the complexity of the issues, the skill required of Class Counsel, and the volume of work anticipated each year under the timeline set forth in the Settlement Agreement, a maximum of $200,000 per year, excluding any work related to contested motion practice, is a reasonable amount to compensate Class Counsel for reasonable attorneys' fees and costs incurred in monitoring and validating Defendants' compliance with the Settlement Agreement.

## CONCLUSION

For the reasons set forth above, the Court grants the Parties' Joint Motion for Final Approval of Class Action Settlement Agreement and for Further Relief (ECF No. 83) in its entirety. Accordingly, it is hereby ORDERED AND ADJUDGED as follows:

1. The Settlement Agreement (ECF No. 77-2) is fair, reasonable, and adequate to the Classes pursuant to Fed. R. Civ. P. 23(e), and is therefore FINALLY APPROVED, SO ORDERED, and incorporated by reference, in its entirety, in this Opinion and Order.

2. The Court finds that the Settlement Agreement resulted from extensive arm's-length, good-faith negotiations between the Parties and through experienced counsel.

3. The Court finds that by agreeing to settle this action, Defendants do not admit, and specifically deny, any and all liability in the action.

4. The Parties' Joint Fee Stipulation (ECF No. 82) is fair and reasonable under the facts of this case, Fed. R. Civ. P. 23(h), and the relevant law for the reasons set forth above, and is therefore FINALLY APPROVED, SO ORDERED, and incorporated by reference, in its entirety, in this Opinion and Order.

5. The stipulated attorneys' fees for Class Counsel as set forth in the Joint Fee Stipulation are therefore GRANTED final approval.

6. This action is DISMISSED with prejudice; however, the Court RETAINS JURISDICTION over this action to monitor the Parties' compliance with the terms of the Settlement Agreement and Joint Fee Stipulation and to ensure such compliance by enforcing the terms of the Settlement Agreement and Joint Fee Stipulation.

7. Named Plaintiffs shall not be obligated to file an additional or separate action to enforce any part of the Settlement Agreement or Joint Fee Stipulation in this or any other court.

Dated: Central Islip, New York
January 15, 2026

_/s/ Nusrat J. Choudhury_
NUSRAT J. CHOUDHURY
United States District Judge